IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **KEVIN D. ASH, as MANAGER of ELLISDALE CONSTRUCTION, LLC, MANAGER of A&W COURTHOUSE COMMONS, LLC, and MANAGER of A&W LANSDOWNE, LLC,** <br><br> Plaintiff, <br><br> v. <br><br> **RICHARD E. WARD, II,** <br><br> Defendant. | Civil Action No. 1:20-mc-0039 |

## EXHIBIT 3

**Amended and Restated Operating Agreement of A&W Lansdowne, LLC**

# AMENDED AND RESTATED
# OPERATING AGREEMENT
# OF
# A&W LANSDOWNE, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of A&W Lansdowne, LLC, is made effective as of the 27th day of August, 2015, by and among the undersigned parties (collectively, the "Members").

## EXPLANATORY STATEMENT

A. A&W Lansdowne, LLC (the "Company") was formed pursuant to the provisions of the Virginia Limited Liability Company Act (the "Act"), Code of Virginia 1950, §13.1-1000 et seq., by the filing of the Articles of Organization (the "Articles") with the Virginia State Corporation Commission ("SCC") on or about February 25, 2015.

B. Kevin Ash ("Ash"), Richard E. Ward, II ("Ward") and Ward Bell ("Bell") (Ash, Ward and Bell being collectively referred to herein as the "Original Members") entered into that certain Operating Agreement dated May 1, 2015 (the "Original Operating Agreement") to regulate the affairs of the Company, the conduct of its business and the relations of its Members.

C. The Original Members desire to admit Andrew Schwartzberg ("Schwartzberg") as a Member of the Company in consideration of Schwartzberg contributing capital to the Company and providing a guaranty on a loan the Company is obtaining from MVB Bank, Inc.

D. The Original Members and Schwartzberg each desire to amend and restate the Original Operating Agreement in its entirety in accordance with the terms and conditions of this Agreement.

E. The Members have agreed that this Agreement shall serve as an "operating agreement" within the meaning of §13.1-1023 of the Code of Virginia.

NOW, THEREFORE, in consideration of the mutual promises of the parties, and of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed by and between the parties as follows:

1. Formation.

    The Members hereby ratify the formation of the Company under the provisions of the Act and the filing by Michael D. Ravitch as organizer of the Articles with the SCC and confirm their admission to the Company as the Members.

2. Name.

    The name of the Company is "A&W Lansdowne, LLC".

3. <u>Business</u>.

The purposes for which the Company is formed are as follows: (1) to engage in any lawful business, purpose or activity for which a limited liability company may be formed under the Virginia Limited Liability Company Act; (2) to have and exercise all powers now or hereafter conferred by the laws of the Commonwealth of Virginia on limited liability companies formed pursuant to the Act; and (3) to do any and all things necessary, convenient or incidental to the achievement of the foregoing. Notwithstanding the foregoing, the Members hereby agree that the Company's primary purpose shall be to own, develop, construct, lease, rent and sell that certain real property owned by the Company and described as Parcels E2 and E3 in Lansdowne Town Center, Landsdowne, Virginia (the "Property") and to do any and all things related in any manner thereto.

4. <u>Principal Office, Registered Office and Registered Agent</u>.

The location of the principal office of the Company shall be 116 Edwards Ferry Road, Unit E, Leesburg, VA 20176. The records required to be maintained by Section 13.1-1028 of the Code of Virginia are kept at the foregoing principal office. The initial registered office of the Company in the Commonwealth of Virginia shall be at The Law Offices of Howard B. Silberberg, 1489 Chain Bridge Road, Suite 202, McLean, VA 22101. The resident agent of the Company is Howard B. Silberberg, Esq., who is a resident of the Commonwealth of Virginia, and whose business address is the same as the registered office.

5. <u>Duration</u>.

The term of the Company commenced on the date that the Articles of Organization were filed and received for recordation by the SCC and shall continue in full force and effect in perpetuity, unless earlier terminated in accordance with the provisions of this Agreement.

6. <u>Members and Membership Interests</u>.

A. <u>Members</u>. The Members of the Company and their percentage Class A membership interests and Class B membership interests (the "Membership Interests" or "Interests") are listed on Exhibit "A" and Exhibit "A-1", respectively, attached hereto. A Member's Interest is its percentage share of the Company's business, property, assets, capital, profits and losses, subject to all of the provisions of this Agreement and the Act.

B. <u>Two Classes of Members</u>. There shall be two (2) classes of Members, Class A Members and Class B Members. The Class A Members are listed on Exhibit "A" and the Class B Members are listed on Exhibit "A-1".

C. <u>Additional Members</u>. Additional members may be admitted into the Company on such terms and conditions as may be agreed upon by the Managers. Unless named in this Agreement, or unless admitted to the Company as a substituted or new member as provided herein, no person shall be considered a Member, and the Company need deal only with

the Members so named and so admitted. The Company shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death or bankruptcy of a Member, except as otherwise provided in this Agreement.

      7.      <u>Management</u>.

          A.      <u>Managers</u>. The Managers shall have full and complete authority, power and discretion to manage and control the business and affairs of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business. The Members hereby agree that the initial Managers shall be Ash, Ward and Schwartzberg. In the event of the death, bankruptcy resignation or inability to act of Ash, Ward or Schwartzberg, the survivor(s) shall serve as the sole Managers.

          B.      <u>Decision Making Authority of the Managers</u>. The business, operations and affairs of the Company shall be managed by its Managers, who shall have the powers, duties and authority described in this Section 7 and under the Act. The Managers shall have the power on behalf of the Company to enter into contracts; to acquire property and to lease all or any portion thereof; to sell, assign, or transfer for value all or any portion of the property of the Company; to borrow money and, as security therefor, to assign, mortgage, encumber, hypothecate or pledge all or any part of the property of the Company; to obtain replacements for any such mortgage or mortgages; to prepay, in whole or in part, refinance, recast, increase, modify or extend any mortgages; to lend money; to enter into contracts to provide construction, renovation, repair, organization, managerial or other services; to exercise and fulfill the rights, powers and duties of the Company; to employ from time to time persons, firms or corporations in the operation of the Company business, including without limitation accountants and attorneys, on such terms and for such reasonable compensation as the Managers shall determine; and to execute, acknowledge and deliver any and all instruments to effectuate the foregoing. By way of extension of the foregoing and not in limitation thereof, the Managers shall, except as otherwise provided in this Agreement, have all the rights and powers granted to managers by the Act. No assignee or transferee for value of all or any portion of the property of the Company shall be required to investigate the Managers' authority to sell, assign, transfer for value or otherwise liquidate all or any portion of any interest in such property. Any such sale, assignment or transfer for value, if executed by the Managers, shall bind the Company. All decisions shall require the unanimous consent of the Managers.

          C.      <u>Delegation of Authority by the Managers</u>. The Managers shall have the power to delegate the authority of the Managers to qualified persons, and the delegation of any such managerial authority shall be evidenced by a Certificate of Incumbency or Resolutions naming the individual or individuals so authorized and specifying the extent and limitations of the authority so delegated. Any such delegation of authority may be rescinded at any time by the Managers.

          D.      <u>Indemnification of Managers.</u> The Managers shall be indemnified and held harmless by the Company from and against any and all claims, demands, liabilities, costs, damages and causes of action, of any nature whatsoever, arising out of or incidental to the

Managers' involvement in the management of the Company affairs, except where the claim at issue is based upon (i) the fraud, gross negligence or willful misconduct of the Manager; or (ii) the material and adverse breach of the Managers of any material provision of this Agreement. The indemnification authorized by this Section 7.D shall include, but not be limited to, payment of (i) reasonable attorneys' fees or other expenses incurred in connection with settlement or in any finally-adjudicated legal proceeding; and (ii) the removal of any liens affecting any property of the indemnity. The indemnification rights contained in this Section 7.D shall be cumulative of, and in addition to, any and all rights, remedies and recourse to which the Managers shall be entitled, whether pursuant to the provisions of this Agreement, at law or in equity.

    E. <u>Construction</u>.  The Members hereby acknowledge and agree that EllisDale Construction, LLC ("EllisDale"), shall serve as the general contractor for the construction of a mixed-use three (3) building condominium project on the Property pursuant to an AIA Document A-105 dated April 5, 2015 (the "Construction Contract") by and between the Company and EllisDale.  There shall be no changes to the Construction Contract, scope of work or approval of change orders related thereto without the prior written consent (which may be in the form of an e-mail) of each of the Managers.  EllisDale is entitled to receive a general contractor's fee of Four Hundred Fifty Thousand Dollars ($450,000.00) (the "GC Fee") under the terms of the Construction Contract and has agreed to defer payment of the GC Fee by the Company until such time that the Members have received back from the Company all of their Capital Contributions and Schwartzberg has received the sum he is entitled to under Section 10.2.A.(ii) below.

  8. <u>Separate Capital Accounts</u>.

The Company shall maintain a separate Capital Account for each Member in accordance with the regulations promulgated under Section 704(b) of the Internal Revenue Code of 1986 as amended (the "Code"), and the Treasury Regulations thereunder.

  9. <u>Members Not Liable for Company Losses</u>.

Except as expressly provided under the Act, the Members shall have no personal liability for the losses, debts, claims, expenses or encumbrances of or against the Company or its property.

  10. <u>Profits, Losses and Distributions</u>.

  10.1 <u>Defined Terms</u>.  For purposes of this Agreement, the following terms shall have the meaning specified below unless the context otherwise requires:

    A. <u>Adjusted Capital Contributions</u>.  "Adjusted Capital Contributions" means, for each Member, such Member's Capital Contributions to the Company, reduced (but not below zero) by the amount of cash and the fair market value of any other asset distributed to such Member pursuant to Section 10.2.A.

4

B. <u>Available Cash</u>. "Available Cash" means, with respect to any taxable year of the Company, at the time of determination, the total cash receipts of the Company (such as, but not limited to, gross operating receipts, gross sales proceeds, loan or refinancing proceeds and the Capital Contributions of the Members), plus any other funds (including amounts previously set aside as reserves by the Manager, where and to the extent the Managers no longer regards such reserves as reasonably necessary in the efficient conduct of the Company business) deemed available for distribution and designated as Available Cash by the Managers, less the total cash disbursements of the Company (such as, but not limited to, operating expenses of the Company and repayments of any loans made to the Company by any person or entity whatsoever (including Members)), and less such reserves or other uses of cash as the Managers shall reasonably deem to be necessary for the efficient conduct of the Company business.

C. <u>Capital Account</u>. "Capital Account" means, as to any Member, the Capital Contribution actually made by that Member, plus all Profit allocated to that Member, and minus the sum of (i) all Loss allocated to that Member, (ii) the amount of cash and the fair market value of any other assets distributed to that Member (net of liabilities, assumed or taken subject to by such Member), and (iii) such Member's distributive share of all other expenditures of the Company not deductible in computing its taxable income and not properly chargeable as additions to the basis of Company property. Each Member's Capital Account shall be determined and maintained in accordance with the Treasury Regulations adopted under Section 704(b) of the Code. Any questions concerning a Member's Capital Account shall be resolved by applying principles consistent with this Agreement and the Treasury Regulations adopted under Section 704 of the Code in order to ensure that all allocations to the Members will have substantial economic effect or will otherwise be respected for federal income tax purposes.

D. <u>Capital Contribution</u>. "Capital Contribution" means the total amount of cash and the fair market value (net of liabilities assumed or taken subject to by the Company) of any other assets contributed (or deemed contributed under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member.

E. <u>Code</u>. "Code" means the Internal Revenue Code of 1986, as amended or any corresponding Section of any succeeding law.

F. <u>Minimum Gain</u>. "Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(d). Minimum Gain shall be computed separately for each Member, applying principles consistent with both the foregoing definition and the Treasury Regulations promulgated under Section 704 of the Code.

G. <u>Negative Capital Account</u>. "Negative Capital Account" means a Capital Account with a balance less than zero.

H. <u>Positive Capital Account</u>. "Positive Capital Account" means a Capital Account with a balance greater than zero.

I. <u>Profit and Loss</u>. "Profit and Loss" means for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period,

5

determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss).

   J. <u>Restoration Amount</u>.  "Restoration Amount" means with respect to each Member (a) the Member's share of Minimum Gain, and (b) any amount that the Member is unconditionally required under this Agreement or by law to contribute to the Company to restore the Member's Negative Capital Account balance under Section 10.4 hereof.

   K. <u>Unreturned Capital</u>.  "Unreturned Capital" shall mean, as of any date, the aggregate Capital Contributions of a Member less the aggregate distributions of Available Cash to such Member, if any, pursuant to Section 10.2 (A)(i).

  10.2 <u>Allocation of Profit or Loss from Operations and Distributions of Available Cash</u>.

   A. <u>Available Cash</u>.  For any taxable year of the Company, Available Cash shall be distributed to the Members in the following order of priority:

    (i) First, to the Class A Members and the Class B Members <u>pro rata</u> in the proportion that each Member's Unreturned Capital bears to the aggregate Unreturned Capital of all Class A Members and Class B Members until each Member has received an amount equal to his Unreturned Capital;

    (ii) Second, to the Class B Members until the Class B Members have received an aggregate amount under this Section 10.2.A.(ii) equal to the sum of Two Million Dollars ($2,000,000.00);

    (iii) Third, the GC Fee in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00) shall be paid to EllisDale;

    (iv) Fourth, the sum of Five Hundred Fifty Thousand Dollars ($550,000.00) to the Class A Members, <u>pro rata</u> in accordance with their respective Membership Interests as shown on Exhibit "A" attached hereto; and

    (v) Fifth, the balance, if any, shall be split on a 50/50 basis between (i) the Class A Members <u>pro rata</u> in accordance with their respective Membership Interests as shown on Exhibit "A" attached hereto and (ii) the Class B Members <u>pro rata</u> in accordance with their respective Membership Interests as shown on Exhibit "A-1" attached hereto.

   B. <u>Taxable Income or Taxable Loss</u>.  For any taxable year of the Company, Profit or Loss shall be allocated to the Members as follows:

    1. Except as otherwise provided in Section 10.2.C below, first to the Members in proportion to and to the extent of the amount of Available Cash distributed to

each Member in such taxable year under Section 10.2.A hereof; provided, however, that in the event that no Available Cash is distributed in any fiscal year, Profit shall be allocated to the Members pro rata in accordance with their respective Membership Interests as set forth on Exhibit "A" and Exhibit "A-1" attached hereto; and

2. Thereafter, to the Members pro rata in accordance with their respective Membership Interests as set forth on Exhibit "A" attached hereto.

C. Special Allocations. Notwithstanding any other provision to the contrary in this Agreement, the following provisions shall apply:

1. Qualified Income Offset. No Member shall be allocated Losses or deductions if such allocation causes a Member's Negative Capital Account to increase in excess of the Member's Restoration Amount. If a Member receives (1) an allocation of loss or deduction (or item thereof) or (2) any Company distribution, which causes such member to have a Negative Capital Account in excess of its Restoration Amount or increase a Member's Negative Capital Account at the end of any Company taxable year in excess of its Restoration Amount, then all items of income and gain of Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for such taxable year shall be allocated to such Member, before any other allocation is made of Company items for such taxable year, in the amount and in proportions required to eliminate such excess as quickly as possible. This Section 10.2.C(1) is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

2. Minimum Gain Chargeback. If there is a net decrease in the Minimum Gain during any taxable year and if any Member has a Negative Capital Account as of the last day of such taxable year which exceeds the Member's Restoration Amount as of such last day, then all items of gross income and gain of the Company for such taxable year (and, if necessary, for subsequent taxable years) shall be allocated to such Member in the amount and in the proportions required to eliminate such excess as quickly as possible. This Section 10.2.C(2) is intended to comply with, and shall be interpreted consistently with, the "minimum gain chargeback" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

10.3 Liquidation or Dissolution.

A. In the event the Company is liquidated or dissolved, the assets of the Company shall be distributed, after taking into account the allocations of Profit or Loss pursuant to Section 10.2, if any, to the Members in accordance with the priorities set forth in Section 10.2.A.

B. No Member shall be obligated to restore a Negative Capital Account at any time.

10.4 <u>General</u>.

A. The timing and amount of all distributions shall be as determined by the Managers.

B. If any assets of the Company are distributed to the Members in kind, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Members so entitled. The fair market value of the assets distributed in kind shall be determined by an independent appraiser selected by the Managers. Based upon the fair market value, the Profit or Loss for each unsold asset shall be determined as if that asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 10.3 and shall be properly credited or charged to the Capital Accounts of the Members prior to the dissolution of the assets in liquidation pursuant to Section 10.3.

C. For each taxable year, all Profit and Loss of the Company shall be allocated at and as of the end of that taxable year.

D. Except as otherwise provided in this Section 10.4.D, all Profit and Loss shall be allocated, and all distributions of cash shall be distributed, as the case may be, to the persons shown on the records of the Company to have been Members as of the last day of the taxable year for which that allocation or distribution is to be made. Unless the Members agree to separate the Company's fiscal year into segments, if the Company admits a new member to the Company or if a member sells, exchanges or otherwise disposes of all or any portion of the Member's Interest to any person who, during that taxable year is admitted as an additional or substitute member, the Profit and Loss shall be allocated between the transferor and the transferee on the basis of the number of days of the taxable year in which each was a member; provided, however, that in the event of a Capital Transaction or any other extraordinary non-recurring items of the Company, Profit, Loss and distributions shall be allocated to the Members shown on the records of the Company as of the date of such event.

E. The methods set forth above by which Profit, Loss and distributions are allocated, apportioned, and paid are hereby expressly consented to by each Member as an express condition to becoming a Member. Upon the advice of the outside accountants or of legal counsel to the Company, this Section 10 may be amended to comply with the Code and the regulations promulgated under Section 704 of the Code; provided, however, that no such amendment shall become effective without the consent of those Members who would be materially or adversely affected thereby.

11. <u>Company Property</u>.

The Company's property shall consist of all the assets and all Company funds. Title to the property and assets of the Company may be taken and held only in the name of the Company or in such other name or names as shall be determined by the Managers.

12. <u>Capital Contributions</u>.

A. Each Member shall contribute to the capital of the Company, the amount in cash set beside its name on Exhibit "A" and shall receive a credit to his capital account in the amount of such investment, when made. No Member shall be required to contribute any additional amount to the capital of the Company beyond the sum required pursuant to this Section 12.A.

B. In the event that at any time (or from time to time) additional funds in excess of (i) the aforesaid capital contributions of the Members, (ii) the proceeds from any loan financing, (iii) gross rental receipts, and (iv) any other income of the Company are required by the Company for or in respect of its business or any of its obligations, expenses, costs, liabilities or expenditures (including, without limitation of the generality of the foregoing, any operating deficits), then the Manager, acting for and on behalf of, and in the name of the Company, may cause the Company to borrow such required additional funds, with interest payable at then-prevailing rates, from commercial banks, savings and loan associations and/or other lending institutions or persons (including Members or their affiliates). In the event that the Managers are unable or unwilling to cause the Company to borrow said required additional funds, any Member or other person or entity may, but shall not be required to, lend such funds to the Company. Any loan to the Company from any Member shall bear interest at such rate as the Managers and such lending Member may determine, and shall be repaid, in accordance with the provisions of Section 10 hereof, to the lending Member on the terms upon which such loans are made.

C. The provisions of this Section 12 are not for the benefit of any creditor or other person other than a Member to whom any debts, liabilities, or obligations are owed by, or who otherwise has any claim against, the Company or any Member, and no creditor or other person shall obtain any rights under this section or by reason of this section, or shall be able to make any claim in respect of any debts, liabilities, or obligations against the Company or any Member.

D. No Member or individual shall execute and become personally liable under any guaranty, indemnity, loan or other instrument for the benefit of the Company (each an "Obligation Agreement"), unless and until (i) such Member or individual, as the case may be, agrees to execute such Obligation Agreement; and (iii) any Obligation Agreement which require the personal liability of any Member ("Member Obligation Liability"), may be co-made or guaranteed jointly and severally by all of the Members. Notwithstanding whether any such Obligation Agreement is co-made or guaranteed jointly and severally by all of the Members, the Members (other than Bell) shall in any event, and hereby do, indemnify the obligated Member(s) from and against any disproportionate Member Obligation Liability with respect such Obligation Agreements. The Members hereby agree that notwithstanding anything to the contrary, Schwartzberg shall only be responsible for fifty percent (50%) of the Member Obligation Liability, Ward shall only be responsible for twenty-five percent (25%) of the Member Obligation Liability and Ash shall only be responsible for twenty-five percent (25%) of the Member Obligation Liability (each, a "Member's Percentage of Obligation Liability"), regardless of whether such Obligation is undertaken solely, or jointly and severally with other Member(s). In furtherance of the foregoing, each of the Members other than Bell (collectively,

9

the "Indemnifying Members") shall indemnify, defend and hold harmless each of the other Members (the "Indemnified Members") from and against that portion of any and all claims, payments, costs, liabilities, losses, damages and expenses (including, but not limited to, court costs and reasonable attorneys' fees) sustained or incurred by any of the Indemnified Members which constitute Member Obligation Liabilities and which are in an amount in excess of such Member's Percentage of Obligation Liability.  For example, if Ash enters into an Obligation Agreement pursuant to this Section 8.04, Ash's liability shall only be 25% of any eventual Member Obligation Liability under such Obligation Agreement, with the other 75% being contributed by Ward and Schwartzberg in proportion to their Member's Percentage of Obligation Liability.  In the event that any Indemnifying Member becomes obligated to make any payment to any Indemnified Member pursuant to this Agreement, such payment shall be made within ten (10) business days following written demand therefor by the Indemnified Member to the Indemnifying Member. In the event of any default by any party in the performance of its obligations under this Section 8.04, the defaulting party shall pay to the non-defaulting party all reasonable attorneys' fees and other costs incurred by the non-defaulting party in connection with such default or the enforcement of the non-defaulting party's rights or remedies arising in connection therewith.

13. Bank Accounts.

All funds of the Company shall be deposited in such bank or savings and loan account or accounts as shall be designated by the Managers.  Withdrawals from any such bank account shall be made upon such signature or signatures as the Managers may designate, and shall be made only for the purposes of the Company.

14. Books and Records.

The Company shall keep true, exact, and complete books of account in which shall be entered fully and accurately each and every transaction of the Company.  The books of account shall be kept on the accrual method of accounting.  The fiscal year and the taxable year of the Company shall be the calendar year.  All books of account shall be kept at the principal office of the Company and all Members shall have the right to inspect and copy such books at all reasonable times.  An accounting shall be made at the end of each calendar year and a copy of the accounting report shall be transmitted to each Member.

15. Disposition of Membership Interests.

Except as otherwise expressly permitted in this Section 15, no Membership Interest of any Member may be sold, exchanged, gifted, pledged, mortgaged, hypothecated or otherwise disposed of without in each instance, the prior written consent of the Manager, which consent may be withheld in the sole and exclusive discretion of the Managers.  The interest of each Member in the Company shall be assignable, upon the prior written approval of the Manager, which approval may be withheld in the sole and exclusive discretion of the Manager, and if such approval is given then such assignment shall be permitted subject to the following terms and conditions:

(i) <u>Right of First Refusal</u>. If a Member (hereinafter sometimes called the "Offeror") shall receive a bona fide written offer, as defined in subdivision (iii) of this Section 15(A), for the purchase of its Membership Interest, which offer it is willing to accept, it shall send written notice to all other Members advising of the receipt of said offer, enclosing a true copy of said offer. For a period of thirty (30) days after the date of delivery of the offer notice to all Members, the remaining Members [pro rata, in proportion to their respective Membership Interests in the event more than one of such remaining Members shall be desirous of purchasing the Offeror's Interest], shall have the exclusive and irrevocable right and option to purchase all (but not less than all) of the Membership Interest offered for sale at a price proportionately equal to, and on the same terms contained in the bona fide written offer; such right to be exercisable by written notice to the Offeror given within the thirty (30) days' period aforesaid. If no Member desires to purchase the Offeror's Membership Interest, then the Offeror shall be at liberty to assign its Membership Interest to the person from whom it received the bona fide acceptable offer, at a price not below nor upon the terms more advantageous to the buyer than the price and terms contained in said bona fide acceptable offer, provided, however, that if such sale is not made and consummated within six (6) months after the date of such bona fide offer, the Offeror may not thereafter dispose of its said Membership Interest without again giving the Members the option to purchase his interest as aforesaid.

(ii) <u>Substitution of Members</u>. If the Managers shall consent thereto, a permitted assignee shall have the right to become a substituted Member upon the payment to the Company of a reasonable fee to cover the costs and expenses of preparation and execution of an amendment to this Agreement. Each of the parties hereto does hereby agree, whenever requested so to do, personally to sign and swear to any such amendment and to execute whatever further instruments may be requisite to effect the substitution of a Member in accordance with the terms hereof. Unless named in this Agreement, or unless admitted to the Company as above provided, no person shall be considered a Member; and the Company, each Member, and any other persons having business with the Company need deal only with Members so named and so admitted. They shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death of a Member, except as otherwise provided in this Agreement. In the absence of substitution of a Member for an assigning or deceased Member, any payment to a Member or to his executors or administrators shall acquit the Company of all liability to any other person who may be interested in such payment by reason of an assignment by the partner or by reason of his death.

(iii) <u>Bona Fide Offer</u>. An offer, in order to be a bona fide offer within the meaning of this Section 15, must be in writing; it must be made by a person, partnership or corporation having sufficient financial ability to consummate the purchase of the Interest so offered to be purchased; said offer must be accompanied by a good faith cash or certified check deposit of at least ten percent (10%) of the amount of the offering price; and the home and business address of the offeror must be shown therein.

(iv) Notwithstanding the other provisions of this Section 15 hereof, and without the necessity of complying with the provisions thereof or obtaining the consent of the Manager, the Membership Interest of any Member or the Membership Interest of any Member of

11

a Member of the Company (in its entirety or any portion thereof) may be transferred or disposed of by inter vivos instrument, by bequest or devise to any of the following namely:

  (a) Another Member, a spouse, parent, parent-in-law, child (natural born or adopted) of such Member, or a custodian for such child under the Uniform Gift to Minors Act, or a spouse of a child, descendant or spouse of a descendant, sister or brother, or spouse of a sister or brother, of such Member; or

  (b) A trust, whether inter vivos or testamentary, of which any person named in Subsection 15(A)(iv)(a) is a primary income beneficiary; or

  (c) The beneficiary of any trust or custodianship described in (a) or (b) above who would under the provisions of such trust or custodianship become entitled to the corpus of the custodianship or the trust on its termination, or to a parent, descendant or spouse of a descendant, sister or brother, spouse of a sister or brother of any beneficiary of any such trust or custodianship; or

  (d) A corporation, foundation, or other organization described in Section 501(c)(3) of the U.S. Internal Revenue Code of 1986 as amended and qualifying for exemption under Section 501(a) of the U.S. Internal Revenue Code of 1986, as amended.

  PROVIDED, HOWEVER, that upon the transfer of any Membership Interest to any person or party described in the foregoing sections of Subsection 15(A)(iv), any subsequent transfer of such interest by such transferee shall be subject to all terms and provisions of this Section 15, as well as any and all other provisions of this Agreement; provided, further, that at or prior to the date of any inter vivos transfer of any Membership Interest as aforesaid, the transferor shall give written notice of such transfer to the Company and to each other Member, setting forth in such notice the name and address of the transferee.

16. <u>Dissolution</u>.

  A. The Company shall dissolve, if such dissolution is unanimously ordered in writing by the Members, as of the end of any calendar year.

  B. Anything contained herein or in the Act to the contrary notwithstanding, the death, resignation, retirement, expulsion, bankruptcy or dissolution of a Member shall not dissolve the Company, unless there are no remaining Members.

17. <u>Winding Up</u>.

  Upon dissolution of the Company, the Company shall liquidate its assets and wind up its affairs in the following manner. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities in order to minimize the normal losses attendant upon such a liquidation. The Managers shall liquidate the Company and shall have the authority, to perform any and all acts and to take any and all actions which may be necessary, appropriate, or incidental thereto. The authority of the Managers shall

continue as long as necessary, and exercise of such authority shall be deemed a proper act in winding up the affairs of the Company. Further, the Managers are authorized to sell the assets of the Company in a bona fide sale or sales to any party or parties (including a Member) at such price or prices and upon such terms as they may deem advisable, having due regard for the interests of all Members. Any such sale or sales shall be deemed a proper act in winding up the affairs of the Company.

18. <u>Notice</u>.

All communications provided for herein shall be made in writing and transmitted by mail, first class postage prepaid, return receipt requested, to the Members at the addresses set forth in Exhibit "A". Any address may be changed by notice given to the Members, as aforesaid, by the party whose address for notice is to be changed. Insofar as practicable, any consent of the Members, required or appropriate under this Agreement, shall be accomplished by written instrument without the necessity of meetings of the Members.

19. <u>Separability</u>.

The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

20. <u>Interpretation</u>.

This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Virginia. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the person or person referred to may require. The captions of sections of this Agreement have been inserted as a matter of convenience only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

21. <u>Entire Agreement</u>.

The parties hereto agree that all understandings and agreements heretofore made between them are merged in this Agreement, which alone fully and completely expresses their agreement with respect to the subject matter hereof. There are no promises, agreements, conditions, understandings, warranties, or representations, oral or written, express or implied, among the parties hereto, other than as set forth in this Agreement, and the Articles. All prior agreements among the parties are superseded by this agreement, which integrates all promises, agreements, conditions, and understandings among the parties with respect to the Company and its property. No termination, revocation, waiver, modification or amendment of this Agreement shall be binding unless agreed to in writing and executed by all the Members.

22. <u>Counterparts; Effective Date</u>.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement. The signatures of any party to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. This Agreement is dated and shall be effective among the parties as of the date first above written.

23. <u>Binding Effect</u>.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, assigns, heirs, executors, administrators, and legal representatives.

**[signatures on next page]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

CLASS A MEMBERS:

_____ [SEAL]
Kevin Ash

_____ [SEAL]
Richard E. Ward, II

Digitally signed by Ward Bell
Date: 2015.08.27 07:10:16 -04'00'
_____ [SEAL]
Ward Bell

CLASS B MEMBERS:

_____ [SEAL]
Andrew Schwartzberg

15

**AMENDED AND RESTATED
OPERATING AGREEMENT
OF
A&W LANSDOWNE, LLC**

**Exhibit "A"**

| Class A Members | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Kevin Ash<br>116 Edwards Ferry Road, Unit E, Leesburg, VA 20176 | $165,000.00 | 37.5% |
| Richard E. Ward, II<br>116 Edwards Ferry Road, Unit E, Leesburg, VA 20176 | $165,000.00 | 37.5% |
| Ward Bell<br>116 Edwards Ferry Road, Unit E, Leesburg, VA 20176 | $100.00 | 25% |
| **TOTAL** | **$330,100.00** | **100%** |

**AMENDED AND RESTATED
OPERATING AGREEMENT
OF
A&W LANSDOWNE, LLC**

**Exhibit "A-1"**

| Class B Members | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Andrew Schwartzberg<br>c/o Preservation Services, LLC<br>11200 Rockville Pike, Suite 225<br>Rockville, Maryland 20852 | $330,000.00 | 100% |