**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**KEVIN D. ASH, as MANAGER
of ELLISDALE CONSTRUCTION, LLC,
MANAGER of A&W COURTHOUSE
COMMONS, LLC, and MANAGER of
A&W LANSDOWNE, LLC,**

      **Plaintiff,**

**v.**

                                 Civil Action No. _1:20-mc-0039_

**RICHARD E. WARD, II,**

      **Defendant.**

**EXHIBIT 5**

**Declaration of Derek H. Swanson**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **KEVIN D. ASH, as MANAGER of ELLISDALE CONSTRUCTION, LLC, MANAGER of A&W COURTHOUSE COMMONS, LLC, and MANAGER of A&W LANSDOWNE, LLC,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. <u>1:20-mc-0039</u> |
| **RICHARD E. WARD, II,** | |
| **Defendant.** | |

## DECLARATION OF DEREK H. SWANSON

I, Derek H. Swanson, hereby state the following under the penalty of perjury under the laws of the United States, and laws of the Commonwealth of Virginia:

1.  I am over 18 years of age, and I am not under any mental or physical disability, which could impair my ability to truthfully attest to the matters stated herein.

2.  I am counsel in above-captioned matter and represent Plaintiff Kevin D. Ash in his capacity as Manager of Ellisdale Construction, LLC ("Ellisdale"), Manager of A&W Courthouse Commons, LLC ("Courthouse"), and Manager of A&W Lansdowne, LLC's ("Lansdowne") (collectively the "Companies").

3.  I am an attorney licensed to practice in the Commonwealth of Virginia and am in good standing in this jurisdiction.

4.  On December 21, 2020, I sent a letter to two executives of MVB Bank, Inc. ("MVB"), requesting that funds held by MVB in accounts owned by the Companies be permanently frozen and that certain transfers initiated by Defendant Richard E. Ward, II

("Defendant") be reversed.  A true and correct copy of this letter, with its enclosures, is attached hereto as "Exhibit A."

     5.     In response, MVB representatives communicated to Plaintiff Kevin D. Ash that MVB cannot permanently freeze and/or reverse Defendant's transfers, and will soon release the funds to Defendant.

     6.     On December 22, 2020, I requested that outside counsel for the Companies provide Defendant with my contact information so that Defendant's counsel could contact me and work towards a resolution of this matter without this Court's intervention.  However, to date, I have received no contact by Defendant's Counsel.

FURTHER THE DECLARANT SAYETH NOT.

Executed this the 23rd day of December, 2020 in Richmond, Virginia.


                             */s/ Derek H. Swanson*
                             Derek H. Swanson

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**KEVIN D. ASH, as MANAGER
of ELLISDALE CONSTRUCTION, LLC,
MANAGER of A&W COURTHOUSE
COMMONS, LLC, and MANAGER of
A&W LANSDOWNE, LLC,**

      **Plaintiff,**

**v.**

                        Civil Action No. _____

**RICHARD E. WARD, II,**

      **Defendant.**

**EXHIBIT A to the Declaration of Derek H. Swanson**

**December 21, 2020 Correspondence to MVB Bank, Inc.**



8003 Franklin Farms Dr., Suite 220
Richmond, VA 23229
Phone: (804) 385-0620
Fax: (804) 977-2680
dswanson@dbllawyers.com

December 21, 2020

Jamie Nalls
Regional President, NOVA
MVB Bank, Inc.
106 Harrison Street SE
Suite 100
Leesburg, VA 20175
*jnalls@mvbbanking.com*

Michael Rodgers
Senior Vice President
MVB Bank, Inc.
106 Harrison Street SE
Suite 100
Leesburg, VA 20175
*mrodgers@mvbbanking.com*

*VIA ELECTRONIC MAIL*

Messrs. Nalls and Rodgers:

I am counsel for Kevin Ash, both individually and as a "Manager" and President/CEO of the following entities: (1) Ellisdale Construction, LLC ("Ellisdale"); (2) A&W Lansdowne, LLC ("Lansdowne"); and (3) A&W Courthouse Commons, LLC ("Courthouse").

To the extent that you do not already have them in your possession, I attach to this letter the current operating agreements for Ellisdale (*see* "Exhibit A"), Lansdowne (*see* "Exhibit B"), and Courthouse (*see* "Exhibit C"), which I ask you to treat as confidential.

It has recently come to my knowledge that Richard E. Ward, II has purported to initiate transfers in the following sums from the following accounts:

| Company | Account Number | Amount |
|---|---|---|
| Ellisdale | MVB 131415 | $800,000 |
| Ellisdale | MVB 78042 | $1,400,000 |
| Lansdowne | MVB 75162 | $50,000 |
| Courthouse | MVB 78050 | $250,000 |

This letter is to advise you that, while a signatory on these accounts, Mr. Ward lacks the legal authority to initiate these transfers under the express and explicit terms of the attached operating agreements.

Ellisdale

Mr. Ward is a Manager of Ellisdale.  Pursuant to Section 6.01 of the Ellisdale operating agreement, Mr. Ward is required to discharge his duties as a Manager as a fiduciary of the company.  This is also an express requirement of Article VII.  In addition, pursuant to Sections 6.09(f) and 8.04(c), Mr. Ward is prohibited from transferring all or substantially all of the company's assets other than in the ordinary course of business without the written consent of the Members holding at least 75% of the outstanding percentage interest in the company.  To be clear, Mr. Ward does not have this written consent.  Furthermore, by attempting to transfer substantially all of the company's liquid assets to himself, which will severely and permanently damage the company's business operations, credit, and goodwill, Mr. Ward is breaching his fiduciary duties to the company.  Therefore, you are instructed to return the $800,000 back to MVB 131415 and the $1,400,000 back to MVB 78042 without delay.

Lansdowne

Mr. Ward is a Manager of Lansdowne.  Pursuant to Section 7(A) of the Lansdowne operating agreement, Mr. Ward is authorized to perform activities that are "customary or incident to the management" of the company's business.  However, Section 7(B) clearly provides: "All decisions require the unanimous consent of the Managers."  To be clear, Mr. Ward does not have the unanimous consent of the Managers to transfer substantially all of the company's liquid assets to himself.  Allowing this transfer to occur would cause irreparable damage to the company's business operations, credit, and goodwill.  Therefore, you are instructed to return the $50,000 back to MVB 75162 without delay.

Courthouse

Mr. Ward is a Manager of Courthouse.  Pursuant to Section 7(A) of the Courthouse operating agreement, Mr. Ward is authorized to perform activities that are "customary or incident to the management" of the company's business.  However, Section 7(B) clearly provides: "All decisions require the unanimous consent of both Managers."  To be clear, Mr. Ward does not have the unanimous consent of both Managers to transfer substantially all of the company's liquid assets to himself.  Allowing this transfer to occur would cause irreparable damage to the company's business operations, credit, and goodwill.  Therefore, you are instructed to return the $250,000 back to MVB 78050 without delay.

In sum, for the reasons discussed above, you are requested to return the monies discussed above back into their rightful accounts while Ellisdale, Lansdowne, and Courthouse obtain an appropriate court order.  Your failure to do so would potentially violate your and your bank's fiduciary duties to Ellisdale, Lansdowne, and Courthouse, and would potentially make you and your bank complicit in Mr. Ward's apparent and obvious tortious and illegal conduct.  We compliment, and are appreciative of your diligence in recognizing the potentially fraudulent nature of Mr. Ward's

attempted transfers, and we look to your continued good faith to prevent Mr. Ward from accomplishing his self-dealing fraud.

Thank you very much for your consideration in this matter.

Sincerely,

Derek H. Swanson

Encl.

Cc:    Kevin Ash (via electronic mail – *kash@ellisdaleconstruction.com*)
      Thomas Dunlap, Esq. (via electronic mail – *tdunlap@dbllawyers.com*)
      Ellis L. Bennett, Esq. (via electronic mail – *ebennett@dbllawyers.com*)
      Michael W. Lehr, Esq. (via electronic mail – *mlehr@dbllawyers.com*)

# EXHIBIT A

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**ELLISDALE CONSTRUCTION, LLC**

# TABLE OF CONTENTS
## AMENDED AND RESTRICTED OPERATING AGREEMENT
## OF
## ELLISDALE CONSTRUCTION, LLC

ARTICLE I  FORMATION AND TERM...........................................................................................1
  1.01   Formation and Background. ................................................................................................1
  1.02   Term. ...................................................................................................................................1

ARTICLE II  NAME, OFFICE OF THE COMPANY AND REGISTERED AGENT........................1
  2.01   Name....................................................................................................................................1
  2.02   Offices of the Company......................................................................................................2
  2.03   Registered Agent. ...............................................................................................................2

ARTICLE III  BUSINESS OF THE COMPANY ...............................................................................2

ARTICLE IV  MEMBERS, INTERESTS AND CAPITAL .................................................................2
  4.01   Members, Admission and Percentage Interests. .................................................................2
  4.02   Initial Capital Contributions...............................................................................................2
  4.03   No Additional Capital Contributions. .................................................................................2
  4.04   Guaranty of Company Indebtedness. ..................................................................................3
  4.05   No Third Party Beneficiaries..............................................................................................4
  4.06   Additional Provisions on Capital and Contributions. .........................................................4

ARTICLE V  DISTRIBUTIONS AND ALLOCATIONS....................................................................5
  5.01   Distributable Cash...............................................................................................................5
  5.02   Net Income, Net Loss and Tax Credits. .............................................................................5
  5.03   Tax Withholding..................................................................................................................5

ARTICLE VI  BOARD OF MANAGERS ...........................................................................................5
  6.01   Power and Authority of the Board of Managers. ................................................................5
  6.02   The Board of Managers.......................................................................................................5
  6.03   Removal of Managers and Vacancies. ................................................................................6
  6.04   Meetings of Managers; Votes..............................................................................................6
  6.05   Presumption of Assent. .......................................................................................................6
  6.06   Duties of Managers and Members.......................................................................................6
  6.07   Third Party Reliance............................................................................................................6
  6.08   Transactions with Manager and Affiliates..........................................................................7
  6.09   Limitations on Authority .....................................................................................................7
  6.10   Officers and Agents.............................................................................................................7
  6.11   Life Insurance. ....................................................................................................................8

ARTICLE VII  INDEMNIFICATION ................................................................................................8

ARTICLE VIII  ACTION BY THE MEMBERS ................................................................................9
  8.01   No Participation in Management. ........................................................................................9
  8.02   Member Meetings................................................................................................................9
  8.03   Member Voting and Consents.............................................................................................9
  8.04   Extraordinary Matters. ......................................................................................................10

**ARTICLE IX  SUBCHAPTER S ELECTION** .................................................................................. **10**
  9.01   **Subchapter S Election**. ..................................................................................... 10
  9.02   **Invalid Transfer**. ............................................................................................... 10
  9.03   **S Election Corrections**. .................................................................................... 10
  9.04   **Section 338(h)(10) Elections**. ......................................................................... 11
  9.05   **Pro rata Distributions and Allocations**. ........................................................ 11

**ARTICLE X  REPRESENTATIONS OF MEMBERS** ...................................................................... **11**

**ARTICLE XI TRANSFER OF OWNERSHIP INTERESTS** ............................................................ **12**
  11.01  **Limitations**. ....................................................................................................... 12
  11.02  **Right of First Opportunity**. ............................................................................. 14
  11.03  **Substituted Members**. ...................................................................................... 14
  11.04  **Reasons for Restrictions**. ................................................................................ 15

**ARTICLE XII  ADMISSION AND WITHDRAWAL OF MEMBERS** ............................................ **16**
  12.01  **Admission**. ......................................................................................................... 16
  12.02  **No Right to Withdraw**. ..................................................................................... 16
  12.03  **Withdrawal Event and Withdrawing Member**. ............................................. 16

**ARTICLE XIII DISSOLUTION AND TERMINATION** ................................................................. **17**
  13.01  **Dissolution**. ....................................................................................................... 17
  13.02  **Winding Up Company Affairs; Final Distributions**. .................................... 17

**ARTICLE XIV  ACCOUNTS, BOOKS, RECORDS, ACCOUNTING, REPORTS, AND TAX MATTERS** .. **18**
  14.01  **Bank Accounts**. ................................................................................................ 18
  14.02  **Books and Records**. ......................................................................................... 18
  14.03  **Tax Information**. ............................................................................................... 19
  14.04  **Tax Matters Partner**. ....................................................................................... 19

**ARTICLE XV  APPOINTMENT OF MANAGERS AS ATTORNEYS-IN-FACT** ........................... **19**
  15.01  **Appointment of Attorney-In-Fact**. .................................................................. 19
  15.02  **Duration**. ........................................................................................................... 19

**ARTICLE XVI  AMENDMENTS** ...................................................................................................... **20**

**ARTICLE XVII  MISCELLANEOUS PROVISIONS** ....................................................................... **20**
  17.01  **Governing Law**. ............................................................................................... 20
  17.02  **Captions**. ........................................................................................................... 20
  17.03  **Construction**. .................................................................................................... 20
  17.04  **Survival of Representations and Warranties**. ................................................ 20
  17.05  **Severability**. ...................................................................................................... 20
  17.06  **Nonwaiver**. ........................................................................................................ 20
  17.07  **Confidentiality**. ................................................................................................ 20
  17.08  **Waiver of Partition**. ........................................................................................ 21
  17.09  **Interests as Personal Property**. ...................................................................... 21
  17.10  **Title to Company Property**. ............................................................................. 21
  17.11  **Execution and Counterparts**. ......................................................................... 21
  17.12  **Entire Agreement**. ........................................................................................... 21
  17.13  **Attorneys' Fees**. ............................................................................................... 21
  17.14  **Addresses**. ......................................................................................................... 21

17.15    Notices. ...............................................................................................................................21
17.16    Additional Documents and Acts. ....................................................................................22
17.17    Reliance on Authority of Person Signing Agreement ....................................................22
17.18    Independent Counsel. .......................................................................................................22
17.19    Waiver of Jury Trial. .......................................................................................................22
17.20    Burdens and Benefits. ......................................................................................................22

EXHIBIT A ........................................................................................................................................1

EXHIBIT B ........................................................................................................................................1

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## ELLISDALE CONSTRUCTION, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (together with all Exhibits, the "Agreement") of EllisDale Construction, LLC, a Maryland limited liability company (the "Company"), is made effective as of January 1, 2010, by and between its Members, whose names are set forth on Exhibit A attached to this Agreement, in order to set forth the terms and conditions on which the Company's management, business and financial affairs will be conducted.

NOW, THEREFORE, in consideration of the above premises and of the benefits to be obtained by the observance of the mutual covenants contained in this Agreement, and for other good, valuable and legal consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, agree as follows:

## ARTICLE I
## FORMATION AND TERM

1.01    **Formation and Background**.  The Company was formed as "Ellis Denning Construction LLC" pursuant to Articles of Organization filed with the Maryland State Department of Assessments and Taxation ("SDAT") effective as October 8, 2004.  The Company's initial operating agreement was an agreement dated January 1, 2005 as amended, whereby the Company began its existence as a limited liability company taxed as a partnership.  Effective January 1, 2007, the Company elected to be treated as a corporation that elected Subchapter S tax status.  Since the effective date of the Company's S election, the Company has operated consistently with the Subchapter S tax rules, and now wishes to memorialize their practice and Subchapter S structure in this Amended and Restated Operating Agreement.  Further, the Members hereby expressly approve and authorize the filing with SDAT of LLC Amended and Restated Articles of Organization updating the name of the LLC and confirming that it is a manager-managed limited liability company.  The Members wish to update the Company's operating agreement as a result of these events, such that this Agreement supersedes all prior operating agreements with respect to the Company and its Affiliates.  The Members' rights and liabilities will be as provided in the Act, except as otherwise provided by this Agreement.

1.02    **Term**.  The Company commenced as of its effective date of organization and will continue perpetually, unless sooner terminated in accordance with this Agreement.

## ARTICLE II
## NAME, OFFICE OF THE COMPANY AND REGISTERED AGENT

2.01    **Name**.  The Company's name is EllisDale Construction, LLC.  The Board of Managers, in its reasonable discretion and upon prior notice to all Members, may change the Company's name at any time.  The Company's business may be conducted under such trade or fictitious names as the Board of Managers may determine.

2.02   **Offices of the Company**.   The Company's principal place of business and the specified office of the Company at which will be kept the records required to be maintained by the Company under the Act will be 1300 Piccard Drive, Suite 106, Rockville, Maryland 20850 or such other place or places as the Board of Managers will deem advisable.   The Company may have additional offices as the Board of Managers from time to time will deem advisable.

2.03   **Registered Agent**.   The Board of Managers will designate, where required, a registered agent and office in each state in which the Company transacts business.   The Company's agent for service of process in the State of Maryland will be as indicated in the Company's Articles of Organization, or such other qualified Person as the Board of Managers may designate.

<div align="center">

**ARTICLE III**
**BUSINESS OF THE COMPANY**

</div>

The purposes for which the Company is formed are as follows:   (1) to engage in and carry on the business of constructing and erecting or contracting for the construction and erection of buildings and structures in and on such lands for any uses or purposes, constructing improvements upon dwellings and any other buildings and improvements on real estate, and providing construction management services; (2) to have and exercise all powers now or hereafter conferred by the laws of the State of Maryland on limited liability companies formed pursuant to the Act; and (3) to do any and all things necessary, convenient or incidental to the achievement of the foregoing.

<div align="center">

**ARTICLE IV**
**MEMBERS, INTERESTS AND CAPITAL**

</div>

4.01   **Members, Admission and Percentage Interests**.   Each of the Persons listed on the Ownership Schedule, attached as Exhibit A, is a current Member of the Company, and has as of the date of this Agreement the Percentage Interests listed on such Ownership Schedule.

4.02   **Initial Capital Contributions**.   The Members have contributed, assigned and transferred to the Company in exchange for the Company issuing to them their Membership Interests, the amount of cash or item(s) of Property or services, as the case may be, as set forth on the Company's books and records.   Whenever a Member contributes property to the Company, he or she will provide to the Company the property's tax basis, and the current fair market value will be agreed upon by the Company and such Member.   Upon the execution of this Agreement by the Members, the Board of Managers will prepare an Ownership Schedule, which will be maintained with the Company's books and records, be updated by the Board of Managers without the necessity of amending this Agreement when there is a change in any information set forth on such Ownership Schedule, and be available to all Members upon request.

4.03   **No Additional Capital Contributions**.

(a)   The Board of Managers will endeavor to obtain a loan or loans for the Company, from time to time, for necessary capital on reasonable terms, in order to finance the ownership, improvement, management and operation of the Business, the rental and/or purchase and

improvement of any Property to be used in connection with the Business, or to otherwise refinance outstanding Company indebtedness.

(b)     No Member will be required to contribute any additional Capital Contributions to the Company.

4.04     **Guaranty of Company Indebtedness**.

(a)     A Member will not be obligated to guarantee Company indebtedness or other contractual obligations unless he or she agrees to do so. If, however, with the consent of the Board of Managers, a Member guarantees any debt or other contractual obligations of the Company ("Guaranteed Debt") and is subsequently called upon by the creditor holding such Guaranteed Debt to pay on his or her guarantee (which Member will be referred to below as a "Paying Member"), in whole or in part, the Paying Member (whether or not such Paying Member remains a Member) will be entitled to indemnification and a right of contribution from all the other Members for the amount by which the portion of the Guaranteed Debt the Paying Member actually pays exceeds his or her share of the Guaranteed Debt. A Person's share of the Guaranteed Debt will be determined by multiplying (i) the Percentage Interests then held by such Person (or if less than all Members contribute to the payment, then the Paying Member's Percentage Interest as compared to the aggregate Percentage Interests so contributing) by (ii) the amount of Guaranteed Debt then being paid out of the personal funds of all Members.

(b)     Any and all non-Paying Members ("Indemnifying Members") will, within 30 days of the Paying Member's demand therefor, indemnify and reimburse any Paying Member who has paid more than his or her respective share of Guaranteed Debt, such amount(s) as will cause each of the Paying Members and the Indemnifying Members to bear his or her respective share of the Guaranteed Debt. If any Indemnifying Member will default in his or her obligation to indemnify the Paying Member, then the Paying Member will be entitled to additional indemnification from the nondefaulting Indemnifying Members, within 15 days of the Paying Member's demand therefor, such that the Paying Member and the nondefaulting Indemnifying Members will share the burden of paying the Guaranteed Debt in amounts proportionate to their respective Percentage Interests (whereupon the still nondefaulting Indemnifying Members will also be considered Paying Members entitled to indemnification hereunder).

(c)     The Paying Member(s), *pari passu*, will have a continuing lien and security interest against the Membership Interest(s) of the defaulting Indemnifying Member(s) to secure the payment of the indemnification provided hereunder. The defaulting Indemnifying Member(s) will execute and deliver to the Paying Member(s) such instruments, including security agreements and financing statements, as any Paying Member deems necessary or appropriate to create and perfect such lien and security interest, and the defaulting Indemnifying Member(s) will pay all reasonable attorneys' fees in connection with preparation and filing of such instruments. Each Member irrevocably appoints the Paying Member(s), any one or more of whom may act, as his or her attorney-in-fact to execute, deliver and file any instruments, including security agreements and financing statements, as may be necessary or appropriate, in their discretion, to create and perfect the lien and security interest intended to be created subject to the provisions of this Section 4.04. This

power of attorney will be deemed coupled with an interest and will not terminate upon the death, dissolution, Bankruptcy, or disability of the defaulting Indemnifying Member.

(d)     If any defaulting Indemnifying Member does not cure his or her default under this Section 4.04 immediately upon demand by the Paying Member(s), the Paying Member(s) will be entitled to exercise all the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in the Commonwealth of Virginia and otherwise treat the defaulting Indemnifying Member as a Defaulting Member. Interest will accrue on the amount in default at the rate of 4% plus the Prime Rate in effect from time to time (but not higher than the maximum rate legally permitted). All distributions otherwise payable to defaulting Indemnifying Members while any indemnification owed to a Paying Member remains unpaid will be distributed to each Paying Member in the proportion that the unpaid amount of indemnification owed to such Paying Member bears to the total unpaid amount of indemnification owed to all Paying Members, and will be applied first to the payment of interest and then to the payment of principal. Except to the extent otherwise provided by law, for so long as he or she is a defaulting Indemnifying Member, (1) a defaulting Indemnifying Member will not be entitled to vote any of his or her Percentage Interests or to exercise any other consent or approval rights reserved to Members under this Agreement, (2) any Company action may be taken without the consent or approval of the defaulting Indemnifying Member, and (3) his or her Percentage Interests will be disregarded in determining whether the requisite consent has been obtained on any Company matters.

4.05   **No Third Party Beneficiaries**.  In accordance with the Maryland Act, the provisions of this Agreement relating to the financial obligations of Members (including but not limited to this Article IV) are not intended to be for the benefit of any creditor or other Person (except for Members) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members; and, except for Members, no creditor or other person will obtain any right under any of such provisions or will by reason of any of such provisions make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any of the Members.

4.06   **Additional Provisions on Capital and Contributions**.

(a)     In accordance with the Act, no Member or Assignee will be paid interest on his or her Capital Contributions.

(b)     In accordance with the Act, no Member or Assignee will have the right to demand and receive property other than cash in return of his or her Capital Contributions.

(c)     In accordance with the Act, except as otherwise provided in this Agreement, no Member or Assignee will have the right to demand or receive cash or other property of the Company in return of his or her Capital Contributions until the proper termination and a complete winding up of the Company as described in Section 13.02 of this Agreement.

(d)     In accordance with the Act, the liability of any Member or Assignee for the losses, debts, liabilities and obligations of the Company will be limited to paying his or her Capital Contributions and/or indemnification when due under this Agreement, his or her share of any

- 4 -

undistributed assets of the Company, and (only to the extent required by the Act) any amounts previously distributed to him or her from the Company.

## ARTICLE V
## DISTRIBUTIONS AND ALLOCATIONS

5.01  **Distributable Cash.**  At any time during which the Company has only one Member, Distributable Cash will be distributed to such Member and any Assignee.  When there is more than one Member of the Company, then Distributable Cash will be distributed at least annually, among the Members and any Assignees pro rata in accordance with their respective residual Percentage Interests.  The Members intend that all Members and any Assignees share the economic benefits of the Company on that pro rate basis (regardless of voting rights).

5.02  **Net Income, Net Loss and Tax Credits**.  All Net Income and Net Loss will be allocated among the Members and any Assignees on a pro rata basis in proportion to their respective Percentage Interests.

5.03  **Tax Withholding**.  Each Member and Assignee authorizes the Company to withhold and pay over any withholding or other taxes (federal, state and local) payable by the Company as a result of such Person's status as a Member or Assignee.  To the extent the activities of the Company may subject it and/or its Members to state and local taxation, the Board of Managers are authorized (but not required) to file, deposit and pay taxes attributable to the Company's activities in a state or other jurisdiction on behalf of the Members and Assignees, and withhold that amount from other distributions to such Members and Assignees.  To the extent such taxes are paid by the Company, but are not withheld from a distribution made to a Member or Assignee, then such Member or Assignee will be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or taxes are paid by the Company, which payment will be considered a loan from the Company to that Member or Assignee.  Such loan will bear interest at the Prime Rate and will be repayable on demand, or at the election of the Company discharged out of other distributions to which the Member or Assignee otherwise would be entitled.  The provisions of this Section will survive the dissolution, winding up and termination of the Company.

## ARTICLE VI
## BOARD OF MANAGERS

6.01  **Power and Authority of the Board of Managers**.  Except as otherwise expressly limited in this Agreement, the Board of Managers will (i) exercise complete and exclusive control of the management of the Company's Business and affairs and (ii) have the exclusive right, power and authority on behalf of the Company, and in its name, to exercise all of the rights, powers and authorities of the Company under the Act.  Each Manager will discharge his or her duties as a manager in accordance with the standards of conduct set forth in the Act and be a fiduciary with respect to the Company.

6.02  **The Board of Managers**.  The Board of Managers will be composed of Managers, the current Managers being Kevin D. Ash and Richard E. Ward, II (in such capacity, the "managers"

pursuant to the Act). A Manager may, but will not be required to, be a Member. The term of any Manager will begin at his or her election, and will continue until removed pursuant to Section 6.03.

6.03    **Removal of Managers and Vacancies**. A Manager may be removed by or as a result of (i) operation of law, (ii) an order or decree of any court of competent jurisdiction, (iii) voluntary resignation, (iv) the death, dissolution, or Bankruptcy of the Manager, (v) in the case of a Manager who is also a Member, a Withdrawal Event with respect to such Manager, or (vi) by vote or written consent of Members holding at least 66⅔% of the outstanding Percentage Interests entitled to vote. A successor or additional Manager may be elected by the Members holding at least a Majority in Interest of Members.

6.04    **Meetings of Managers; Votes**. The Board of Managers will endeavor to meet at least quarterly. On each matter coming before the Board of Managers, each Manager will have one vote for each percent of Membership Interest that he or she (or his or her trust) may own in the Company, and if he or she (or his or her trust) does not own any Membership Interests then such Manager will have only one vote; such that those Managers who own more Membership Interests of the Company will have a greater weighted vote than Managers who own fewer or no Membership Interests of the Company. Any Manager not present at a meeting may vote on any matter by general or specific proxy and/or by power of attorney directed to a Manager present, or by specific instructions in writing. Except as otherwise provided in this Agreement, any action of the Board of Managers will be by majority vote of the Managers. Managers may have Board of Managers meetings from time to time upon such reasonable notice as mutually agreed upon by the Managers, and/or the Board of Managers may act informally without meetings upon the consent of a majority vote of Managers (except as otherwise provided in this Agreement).

6.05    **Presumption of Assent**. A Manager who is present at a meeting of the Board of Managers or a Committee of the Board of Managers when Company action is taken is deemed to have assented to the action taken unless (a) he or she objects at the beginning of the meeting, or promptly upon his or her arrival, to holding it or transacting specified business at the meeting; or (b) he or she votes against, or abstains from, the action taken. The Secretary or any other officer performing the Secretary's duties will maintain accurate records of all votes of the Board of Managers.

6.06    **Duties of Managers and Members.** The Managers will devote such time, effort and skill in the management of the Company's business affairs as each deems necessary and proper for the Company's welfare and success. The Members expressly recognize that the Managers and Members may have substantial other business activities and agree that the Managers will not be bound to devote all of their business time to the Company's affairs, and that the Managers, Members or their Affiliates may engage for their own account and for the account of others in other businesses or activities. Provided, however, it is expected that Kevin D. Ash is expected to devote substantially all of his full time attention to the business of the Company.

6.07    **Third Party Reliance**. Third parties dealing with the Company will be entitled to rely conclusively upon the power and authority of the Managers as set forth in this Agreement, subject only to the express limitations set forth in this Agreement or by law. The Managers may

from time to time execute certificates of authority attesting to this Agreement's full force and effect, the Manager's powers hereunder, and the incumbency of the Managers.

6.08 **Transactions with Manager and Affiliates**. Subject to obtaining any consent expressly required under the terms of this Agreement, the Managers may appoint, employ, contract, or otherwise deal with any Person, including a Manager and Affiliates of a Manager, individuals with whom a Manager is related, and with Persons that have a financial interest in a Manager or in which a Manager has a financial interest, for transacting the Company's business; provided, however, these or other payments under the terms of contracts with such related parties will not be in excess of prevailing competitive rates for such transactions.

6.09 **Limitations on Authority** Notwithstanding anything else in this Agreement to the contrary, without the express written determination by all Managers, an individual Member or Manager does not have any authority to:

(a) purchase, sell, exchange or otherwise dispose of any real or personal property by the Company having a value (including a value on the books of the Company) in excess of $50,000;

(b) obtain a loan on behalf of the Company in excess of $50,000 or refinance a loan on behalf of the Company in excess of its then balance plus the cost to refinance;

(c) admit any Person as a Member;

(d) dissolve or otherwise terminate the Company;

(e) merge with one or more entities;

(f) sell or transfer all or substantially all of the Company's assets other than in the ordinary course of business; or

(g) issue any new Membership Interests under this Agreement.

6.10 **Officers and Agents**.

(a) The Board of Managers may from time to time appoint officers and other agents of the Company with such authority and duties as may be prescribed from time to time by the Board of Managers. Any two or more offices may be held by the same person, and such officers and agents will serve at the pleasure of the Board of Managers. Kevin D. Ash ("Ash) is hereby appointed as the President/CEO of the Company with overall day-to-day authority to execute documents on behalf of the Company and to take such further action as may be determined from time to time by the Board of Managers. Subject to Section 6.09, the President will have authority to (i) enter into contracts with customers, subcontractors or suppliers; (ii) hire employees and agents of the Company for such reasonable compensation as he will determine; (iii) terminate employees and agents of the Company; and (iv) execute, acknowledge and deliver any and all instruments to effectuate the foregoing.

(b) Ash will be employed on a full time basis by the Company and be reasonably compensated for his efforts on behalf of the Company. His existing Employment Agreement and Employee Confidentiality, Assignment of Inventions and Non-Competition Agreement are terminated in their entirety and superseded by this Agreement. So long as the Company is taxed as an S Corporation, the Company will deduct applicable income and payroll taxes in accordance with

law. Ash will be entitled to participate in any retirement, 401(k), group medical, disability and other benefit plans, leave programs and other fringe benefits now existing or hereafter established from time to time by the Company.

      6.11   **Life Insurance**. The Company is authorized and directed to purchase, own and maintain life insurance policy(s) on the life of Ash. Currently the Company owns, maintains and is the beneficiary of a term life insurance policy in the face amount of $1,000,000. That life insurance policy is deemed to be key person insurance that may be used by the Company for its working capital and other business needs. Any balance of such key person life insurance proceeds will be added to the Company's remaining net assets for distribution to Members and Assignees in dissolution and winding up of the Company pursuant to Section 13.02. The Company will also maintain (and/or alternatively pay the premiums for) a whole life insurance policy on Ash's life in the face amount of $1,000,000 and Ash's family, estate or designee will be the beneficiary of that policy. The Company and the Members agree to maintain all such insurance in full force and effect. The parties agree that the Company and its other Members have the right to take out insurance on Ash's life for purposes of this Agreement. The Company will cause to be paid all premiums on life insurance policies purchased pursuant to this Agreement as they become due and give proof of payment to Ash within 20 days after each premium's due date. If any premium on any policy is not paid by the Company or the other Members within 20 days after its due date, then Ash may pay the premium and be entitled to reimbursement from the Company and the other Members. Upon Ash's death, the Company and the surviving Member must promptly proceed to collect any net proceeds of such insurance on Ash's life that has been purchased or held pursuant to this Agreement. If Ash is no longer a Member of the Company during his life, he is entitled to cause the ownership and beneficiaries of these life insurance policies to be transferred to him or an Affiliate. The Company and the other Members agree to cooperate and execute all such instruments as may be necessary or appropriate to cause such a transfer. This Section 6.11 will also constitute written notice to Ash that the Company may insure his life and may insure it up to a maximum face amount of $2,000,000; and that the Company and the other Members will be the indirect beneficiary of Ash's death benefits under all such policies due into this Agreement. Ash's signature to this Agreement will constitute a written consent to being insured on such terms.

### ARTICLE VII
### INDEMNIFICATION

      The Managers are agents of the Company in accordance with law, and owe fiduciary duties to the Company. The Company has the power in accordance with law to indemnify, defend and hold harmless any Person who was or is a party to any proceeding, including a proceeding brought by a Member in the right of the Company or brought by or on behalf of the Members of the Company, by reason of the fact that such Person is or was a Manager of the Company, or is or was serving at the request of the Company as a manager, director, trustee, partner or officer of another limited liability company, corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against any liability, judgment, fine, settlement payment, and reasonable expenses (including reasonable attorneys' fees) incurred by such Person in connection with such proceeding.

## ARTICLE VIII
## ACTION BY THE MEMBERS

8.01    **No Participation in Management**.  Except as may be specifically provided in this Agreement, Members may not and will not participate in the management or control of the Company's affairs in any manner whatsoever, may not and will not have any right to obligate the Company in any way, and may not and will not have a right to receive Company assets other than allocations of income, gain and loss as required by tax law, and distributions in cash or property as provided herein; and the Members may not and will not have any other rights to vote, propose, or approve Company actions or otherwise except as expressly provided otherwise in this Agreement. Instead, this Agreement contemplates a representational form of governance, whereby Members elect Managers from time to time to manage the Company.

8.02    **Member Meetings**.  Meetings of the Members will be held on the call of the Board of Managers or any Members holding not less than 10% of the outstanding Percentage Interests entitled to vote.  These meetings may be to review the activities of the Company and obtain information regarding the Company from the Board of Managers.  The meetings may also be called to elect and remove Managers and approve other matters regarding the Company which may require Membership approval.  In accordance with the Maryland Act, there is no requirement for annual member meetings – rather, meetings may be called by the Members or the Board of Managers as appropriate in furtherance of Company Business.  Written notice stating the place, day and time of every meeting of Members will be given personally, by mail or electronically not less than 5 nor more than 60 days before the date of the meeting to each Member entitled to vote at such meetings, at his or her address which appears on the records of the Company.  Oral notice of a meeting is also effective when communicated, if communicated in a comprehensible manner.  Further, meetings may be held at any time without notice if all of the Members are present, or those not present waive notice of the meeting.

8.03    **Member Voting and Consents**.  Elsewhere in this Agreement, certain actions or activities require the express consent of a certain percentage of Membership Interests.  Each Member will have 1 vote for each Percentage Interest (a fractional Percentage Interest will have a corresponding fractional vote) then held by him or her.  In accordance with the Maryland Act, a Withdrawing Member and any Assignee do not have any voting rights until fully admitted to membership pursuant to Articles XI or XII of this Agreement.  Such Member voting and consent may be taken at a meeting of Members (a meeting will include the use of communication by which all Members participating may simultaneously hear each other during the meeting).  Alternatively, Member votes and consents may be taken without a meeting if the action is taken by a Majority in Interest of Members (or such higher vote as may be provided elsewhere in this Agreement in order for Members to take action).  Such action without a meeting will be evidenced by one or more written consents to be filed with the Company's records.  The action taken pursuant to a written consent is effective when the last consenting Member needed for an approval, signs the consent unless such consent specifies a different effective date, in which event the action taken is effective as of the date specified therein provided the consent states the date of execution for each consenting Member.  A Member's consent to an action by electronic transmission is deemed a written and signed consent.  In the event that any Member fails to respond within 30 days to a written notice

- 9 -

from the Board of Managers requesting a consent, such Member will conclusively be deemed to have consented to the proposed action.

8.04 **Extraordinary Matters**. Despite any provision to the contrary in this Agreement, the affirmative vote or written consent of Members holding at least 75% of the outstanding Percentage Interests entitled to vote will be necessary (and sufficient) for the Company to (a) be dissolved or terminated under the provisions of the Act; (b) merge with one or more domestic or foreign limited liability companies, limited partnerships or corporations under the applicable provisions of the Act; or (c) sell or transfer all or substantially all of the Company assets other than in the ordinary course of business.

## ARTICLE IX
## SUBCHAPTER S ELECTION

9.01 **Subchapter S Election**. The Company has "checked-the-box" to be treated as a corporation for tax purposes and has specifically filed an S election under the Code and applicable sate tax laws to be treated as an S corporation for tax purposes. The Company and the Members agree that, unless and until mutually agreed otherwise in a written instrument executed by the Company and Members holding at least 75% of the outstanding Percentage Interests entitled to vote, (a) the Company will continue to elect to be treated as an S corporation under the Code; and (b) the Members (for themselves and their heirs, beneficiaries and personal representatives) will not take any action or make any transfer or other Disposition of any Membership Interests that would directly or indirectly cause a termination of any Company S election. The Company and the Members agree to take all actions necessary, including but not limited to completion and execution of all required consents and filings, to establish and preserve the Company's status as an S corporation. Notwithstanding anything in this Agreement to the contrary, a Member may <u>not</u> transfer, and no person may acquire, the beneficial ownership of any Membership Interest if such transfer or acquisition would cause the termination of the Company's status as an S corporation.

9.02 **Invalid Transfer**. Any transfer or acquisition of Membership Interests in violation of this Article IX will be null and void and of no effect. Each Member agrees that any such attempt at transfer or acquisition may be enjoined. Any purported transfer in violation of this Agreement will not be recorded on the books and records of the Company and will not affect the beneficial ownership of the Membership Interests. Thus, a Member making the purported transfer will retain the right to receive distributions and liquidation proceeds despite any purported transfer in violation of this Agreement. Additionally, the Member making the purported transfer will continue to report the share of Net Income or Net Loss of the Company allocated to such Membership Interests on his federal and state income tax returns in accordance with the Code.

9.03 **S Election Corrections**. If the Company's S election is terminated because of any such Member's act or failure to act, then such Member will be liable to and hereby indemnifies, defends and holds harmless the Company and the other Members and the Assignees of Company for any damages, liabilities and costs resulting directly or indirectly therefrom, including without limitation any additional federal and state income tax liability which would not have been incurred had the S election continued in effect. All Members agree to fully cooperate with the Company in

seeking to correct a terminated S election. A Member's obligations under this Article IX will continue after such Member has ceased to own any Membership Interests of the Company.

9.04    **Section 338(h)(10) Elections**. If Members holding at least 75% of the outstanding Percentage Interests entitled to vote agree to make a Code Section 338(h)(10) election with respect to a sale of the Company's Membership Interests, then each Member agrees to execute such documents and take such steps to effectuate such an election.

9.05    **Pro rata Distributions and Allocations**. Any and all distributions to Members and Assignees in their capacity as owners (i.e. not including compensation) will be pro rata among all Members and Assignees in their ratio of overall Percentage Interests in the Company. To the extent any distributions are not pro rata, the recipients will promptly repay such non-pro rata amounts upon request by the Company.

<div align="center">

**ARTICLE X**
**REPRESENTATIONS OF MEMBERS**

</div>

Each of the Members, in becoming admitted as a Member hereunder, hereby represents and warrants to the Managers and each other and to the Company that:

(a)    Such Member's acquisition of a Membership Interest in the Company is made as a principal for his or her sole account only and not with a view toward the distribution of all or any portion thereof and that under no circumstances will such Member sell, transfer or assign all or any portion of his or her Membership Interest except in compliance with the provisions of this Agreement;

(b)    Such Member is relying on his or her own business and financial knowledge and experience, or that of his or her duly qualified investment advisor, in making a decision to enter into and execute this Agreement; he or she, either alone or together with such investment advisor, has such knowledge and experience in business and financial matters as will enable him or her to evaluate the merits and risks of this venture, and to make an informed decision, and is able to bear the economic risk of his or her participation in the Company; and that such Member is not relying on the Company's advice or any affiliates in becoming a Member hereunder;

(c)    Such Member is aware of the restrictions on transfer of his or her Membership Interest hereunder, and that the same will at no time be freely transferable or be assignable otherwise than to a person accepting similar restrictions on transferability, and that no trading market for Membership Interests in the Company will exist at any time;

(d)    Such Member has adequate means of providing for current needs and possible personal contingencies, no need for liquidity of his or her Membership Interest, and no reason to anticipate any change in personal circumstances, financial or otherwise, which should cause him or her to sell or distribute, or necessitate or require any sale or distribution, of such Membership Interest;

(e)     Such Member is familiar with the nature of and risks attendant to investments in business, real estate and/or in securities, and has relied on no representations or warranties of the Company or its Managers or Members (or any of their affiliates) other than those set forth in this Agreement or otherwise delivered by the Company or its Managers in writing;

(f)     Such Member is fully aware of the restrictions on resale of his or her Membership Interest under this Agreement and under federal and state law (including any applicable securities law); in particular, he or she is aware that the Membership Interest will not at any time be freely saleable and that any sale thereof may have significant adverse tax consequences;

(g)     Such Member will not, in any event, sell or distribute his or her Membership Interest or any portion thereof unless, in the opinion of counsel, which opinion will be satisfactory to counsel for the Company, such Membership Interest may be legally sold or distributed;

(h)     Such Member is fully aware that the Membership Interests are being issued by the Company in reliance upon the exemption provided by Section 4(2) and/or 4(6) of the Securities Act of 1933 and/or Regulation D thereunder and applicable state laws on the grounds that no public offering is involved, and upon the representations, warranties and agreements set forth in this Article X;

(i)     Such Member has full power and complete authority to enter into this Agreement, form the Company and perform his or her obligations hereunder, without the need of any consent of others; and

(j)     Such Member will not, directly or indirectly, take any action or fail to take any action, which would terminate this limited liability company and/or cause the Company to not be taxed as a partnership.

## ARTICLE XI
## TRANSFER OF OWNERSHIP INTERESTS

### 11.01   **Limitations**.

(a)     In accordance with law, the ownership and transferability of interests in the Company are substantially restricted. No Member or Assignee may make or permit a Disposition of all or any part of his or her Membership Interests except as specifically set forth in this Agreement. Without limiting the foregoing, a Member may not pledge, grant a security interest in or otherwise encumber all or any part of his or her Membership Interests except as otherwise approved in writing by the Board of Managers. Any attempted Disposition not specifically authorized herein will be invalid, null and void *ab initio*.

(b)     A Person who has made a Disposition of all or any portion of his or her Membership Interests in accordance with the provisions of this Article XI will cease to have any right or entitlement to (i) share in the distributions of the Company in respect of such transferred Membership Interests, (ii) share in the tax allocations in respect of such transferred Membership Interests, or (iii) vote any purportedly transferred Membership Interests. In accordance with the Maryland Act, no Disposition will relieve or exculpate the transferring Member from any liabilities

or obligations under this Agreement until his or her Assignee is admitted as a substitute Member in accordance with Section 11.03. Further in accordance with the Maryland Act, unless and until an Assignee is admitted as a substitute Member in accordance with Section 11.03, the Assignee will not have any of the rights to participate in the management or affairs of the Company or exercise any rights of a full Member under the Act, and will only have the rights of an assignee under Section 4A-603 of the Act to share in the tax allocations and distributions to which the transferor Member would be entitled in respect of the transferred Membership Interests.

(c)     Unless otherwise permitted by a written authorization by the Board of Managers, no Person may make or permit a Disposition of all or any portion of his or her Membership Interests (or make or permit any filing, election or other action which could result in a deemed Disposition) in the following circumstances:

(i)     in the absence of an opinion of counsel, satisfactory to the Board of Managers, that the registration of the Membership Interests, or the Disposition thereof, is not required under the Securities Act of 1933, as amended, or any applicable state securities laws,

(ii)     unless his or her Assignee will agree in a writing acceptable to the Board of Managers to be bound by, and to take such transferred Membership Interests subject to, the obligations, conditions and restrictions hereunder as same applies to Members or their Membership Interests, or

(iii)     if there is a deed of trust, security agreement or other material contract to which the Company is a party or by which the Company or any of the Property is bound or subject, and pursuant thereto such Disposition entitles the holder of the indebtedness secured thereby or other contractual party to accelerate the indebtedness or terminate or otherwise materially alter the terms of the contract.
If there is a doubt as to ownership of a Membership Interest or who is entitled to Distributable Cash or liquidating proceeds or other Property, the Board of Managers may accumulate Distributable Cash or liquidation proceeds or other Property until the issue is resolved to the satisfaction of the Board of Managers.

(d)     In accordance with the Maryland Act, no Disposition of Membership Interests by an Assignee will entitle the transferee(s) to become a Member or to otherwise acquire membership rights unless such transferee(s) is/are admitted as a substituted Member under the provisions of Section 11.03.

(e)     Despite the foregoing provisions of this Section 11.01, upon the occurrence of a Withdrawal Event with respect to a Member, his or her Membership Interests will be held by his or her Assignee, as determined under applicable law, but subject to the terms, conditions and restrictions of this Agreement. Without limitation of the preceding sentence, the restrictions of Sections 11.01 – 11.05 and Section 12.04 will apply to any Assignee pursuant to a Disposition by reason of a Withdrawal Event to the same extent that, under the circumstances, such restrictions would have applied to the Withdrawing Member.

- 13 -

(f)     Notwithstanding anything in this Agreement to the contrary, any acquisitions of Membership Interests pursuant to the Purchase Agreements will be automatically substituted as a Member with respect to such assigned Membership Interests.

11.02   **Right of First Opportunity**.

(a)     (i)     If a Member wishes to sell or transfer all or any portion of his or her Membership Interests, he or she will, before making any such Disposition, first give the other Members (if any) a Selling Notice, specifying in writing the price, conditions and terms upon which he or she is willing to sell such Membership Interests.  The other Members will have the option to purchase in the aggregate all (but not less than all) of the offered Membership Interests at the price and upon the conditions and terms set forth in the Selling Notice in the manner described in Sections 11.02(a)(ii) and (iii).

(ii)    The other Members will have 45 days from the date of the Selling Notice within which to elect to purchase all of the offered Membership Interests.

(iii)   The option may be exercised by giving notice to the offering Member within the specified period.  If more than one Member among those eligible to elect desires to purchase, they may purchase the offered Membership Interests in proportion to their respective Membership Interests, unless they otherwise agree.  The closing of the purchase will be not more than 90 days from the date of the Selling Notice.  To the extent any Member purchases any of the offered Membership Interests, the purchasing Member(s) will likewise succeed to that same pro rata portion of the seller's Membership Interests.

(iv)    If the other Members fail to elect to purchase all of the offered Membership Interests, then the offering Member may, subject to the restrictions set forth in Section 11.01, sell the Membership Interests attributable to all such offered Membership Interests at a price not below nor upon terms more advantageous to the purchaser than those contained in the Selling Notice.  If the sale is not made and consummated within 120 days after the date of the Selling Notice, the offering Member may not thereafter sell or otherwise dispose of any of his or her Membership Interests without again complying with this Section 11.02.

(b)     Despite any provision herein to the contrary, a Member who suffers or otherwise experiences a Withdrawal Event will have no right to sell any of his or her Membership Interests under this Section 11.02.

11.03   **Substituted Members**.

(a)     Unless named in Exhibit A to this Agreement or admitted as provided in this Section 11.03 or Section 12.01, no Person will be considered a Member nor have any rights of Members.  Except as otherwise provided herein, the Company, each Member, and any other Person having business with the Company need deal only with Members so named or so admitted, and will not be required to deal with any other Person (including but not limited to any Assignee) by reason of any Disposition by a Member or by reason of a Withdrawal Event with respect to a Member.  Except as otherwise provided herein, in the absence of the admission of an Assignee as a substituted

Member in full or partial substitution for a Member who makes any Disposition of all or any portion of his or her Membership Interests, any payment to a Member or to his or her estate or personal representative in respect of Membership Interests transferred by him or her will acquit the Company of all liability to any other Person (including but not limited to any Assignee) who may be interested in such payment by reason of a Disposition by, or a Withdrawal Event of, such Member.

(b)     After a Disposition to an Assignee of all or any portion of a Member's Membership Interests (whether by reason of a Withdrawal Event or any other Disposition) at any time when there exists at least one other Member of the Company, then the Assignee may become a substituted Member in full or partial substitution for the transferor Member to the extent of the transferred Membership Interests, but in any case only if all of the following conditions are satisfied:

(i)     The requirements of Sections 11.01 and 11.02 will have been satisfied to the extent applicable under the circumstances;

(ii)     The transferor Member and Assignee will execute and deliver such other instruments as the Company may require, including written acceptance by the Assignee of the terms and conditions of this Agreement and to assume liability for all obligations of the transferor Member to the Company (including but not limited to loans resulting from distributions in excess of the transferor's Capital Account);

(iii)     Pursuant to the Maryland Act except as otherwise expressly provided herein, the affirmative unanimous vote or unanimous written consent to the full or partial substitution will have been obtained from the Board of Managers, which consent may be granted or withheld in the absolute discretion of each Manager; and

(iv)     The Assignee will have paid all reasonable fees and costs incurred by the Company in connection with his or her substitution as a Member, as determined by the Board of Managers.

11.04   **Reasons for Restrictions**. This Company is formed by those who know and trust one another, who will have surrendered certain management rights (in exchange for limited liability in the case of a non-Manager Member), or who will have assumed management responsibility and risk (in the case of a Manager Member) based upon their relationship and trust. Capital is material to the business and investment objectives of the Company and its federal tax status. An unauthorized Disposition of a Person's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure. These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue. Except as provided in this Agreement, neither record title nor beneficial ownership of any Membership Interest may be transferred without the unanimous written consent of all Members.

## ARTICLE XII
## ADMISSION AND WITHDRAWAL OF MEMBERS

12.01 **Admission.**

(a)     The Company may issue new Membership Interests directly to a new or existing Member upon the approval of the Board of Managers in accordance with Section 6.09. The issuance of new Membership Interests will be authorized based on the good faith determination that the consideration to be received therefor is adequate. Membership Interests may be issued in return for the contribution of cash, property, services rendered or a promissory note or other binding obligations to constitute cash or property or to perform services. If the cash or property is not received, the services are not performed, the benefits are not received, or the note is not paid, the Membership Interests may be canceled in whole or in part. Without limitation of the foregoing, the Company may grant to Persons options, warrants, and other rights to acquire a Membership Interest (and to become a Member upon the exercise thereof) on such terms and conditions as approved by the Board of Managers in accordance with Section 6.09. In addition, any issuance or award of Membership Interests may be subject to forfeiture, in whole or in part, upon the failure of any of the conditions or requirements that are stipulated in connection with the issuance or award of such Membership Interests.

(b)     The admission of a Member to the Company will be evidenced by a writing signed by an officer authorized by Board of Managers and the Member, and such writing will set forth (i) the Membership Interests to be acquired by such Member; (ii) the Capital Contribution to be furnished by the Member, and (iii) the Member's agreement to be bound by, and to take his or her Membership Interests subject to, the terms and conditions of this Agreement. Any such writing will be deemed to amend, and will be incorporated into, this Agreement.

12.02 **No Right to Withdraw**. In accordance with the Maryland Act, no Member will have any right to voluntarily resign or otherwise withdraw or resign from the Company without a vote or the written consent of Members holding at least 75% of the outstanding Percentage Interests entitled to vote.

12.03 **Withdrawal Event and Withdrawing Member**. A Withdrawing Member will cease to be a Member as of the effective date of the applicable Withdrawal Event and will thereafter be treated as an Assignee with respect to the Membership Interests then held by such Withdrawing Member. Such Withdrawing Member will not be released or discharged from any of the obligations of a Member under the provisions of this Agreement, unless provided otherwise in the written consent of Members holding at least 75% of the outstanding Percentage Interests entitled to vote. In accordance with the Maryland Act, such Withdrawing Member will have no entitlement to "put" his or her Membership Interests to the Company or to the other Members or otherwise to receive any payments or distributions in respect of his or her Membership Interests except as expressly provided in this Agreement. Such Withdrawing Member may be re-admitted to membership in the Company only upon satisfaction of the requirements set forth in Section 12.01. Despite anything in this Agreement to the contrary, upon a Withdrawal Event occurring to the last remaining Member of the Company, his or her Assignee is hereby automatically continued as a full Member without any further act or deed thereby succeeding to a full Membership Interest in the Company effective as of

- 16 -

the date of the Withdrawal Event and the Company's existence continued uninterrupted by operation of law.

12.04  **Dissolution on Withdrawal Event**.  Upon a Member's death or other Withdrawal Event, then the Company will dissolve and wind up its projects and affairs and close down, distributing any net assets in accordance with Section 13.02.  In such a case, the Company will wind up all projects that are under contract with the Company.  If a project is merely a prospect or in the discussion phase, pursuant to a letter or intent or otherwise not a binding contract, it will not be part of the winding up activities of the Company.  Each Member is thereupon free to start up a new company separately or with others.  No Member is subject to a non-compete or a non-solicit agreement with respect to the Company's activities.  If the Withdrawal Event is due to the death or disability of a Member, the surviving or remaining Member has the right to continue to use the name of the Company in use at the time of that Withdrawal Event.  The Members may also agree to let the remaining Members continue to use this Company (as long as all the existing projects are wound up and any net proceeds thereof are distributed in accordance with this Section 12.04).

## ARTICLE XIII
## DISSOLUTION AND TERMINATION

13.01  **Dissolution**.

(a)  The Company will be dissolved and its affairs wound up only upon the earlier of (i) the affirmative vote (or written consent) of the Members adopting such dissolution and winding up in accordance with Section 8.04; or (ii) the sale or other disposition of all or substantially all of the assets of the Company, but if in connection with such disposition, the Company receives a promissory note(s), the Company will continue until such promissory note(s) is satisfied, sold or otherwise disposed of; (iii) the entry of a decree of judicial dissolution under the Act, or (iv) a Withdrawal Event of a Member (as more particularly described in Section 12.04).

(b)  A Withdrawal Event with respect to any Member will not cause a dissolution or winding up of the Company except as otherwise authorized pursuant to Section 13.01(a).

13.02  **Winding Up Company Affairs; Final Distributions**.

(a)  Upon any dissolution of the Company, the Board of Managers will wind up the affairs of the Company.  A reasonable time as determined by the Board of Managers not to exceed 18 months will be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to the creditors so as to minimize any losses attendant upon dissolution.  The Board of Managers may sell or otherwise liquidate the Company's assets in *bona fide* sales on such prices and terms as it may determine, or it may distribute assets in kind.  After any dissolution and winding up of the Company, and the payment of, or the making of due provisions for, all debts and liabilities of the Company, then the Company's remaining assets (or the net proceeds of the sale thereof) will be distributed as follows:

(i)     If the Company had only one Member just before the dissolution of the Company, then all such net assets and proceeds will be distributed to such Member or his or her Assignee; or

(ii)     If the Company had more than one Member just before the dissolution of the Company, then all such net assets and proceeds will be distributed to the Members and Assignees in the order provided in Section 5.01.

If any assets are distributed in kind, they will be distributed on the basis of the fair market value thereof as determined in the same manner described in Section 12.04 and will be deemed to have been sold at fair market value for purposes of the allocations under Article V prior to making such distributions.

(b)     When all assets of the Company have been sold and/or distributed and all affairs of the Company have been wound up, the Managers will execute and file Articles of Cancellation with the SDAT (and any certificate or other document which may be appropriate to indicate it has wound up). Upon the issuance by the SDAT of a Certificate of Cancellation, the Company's existence will thereupon cease.

### ARTICLE XIV
### ACCOUNTS, BOOKS, RECORDS, ACCOUNTING, REPORTS, AND TAX MATTERS

14.01   **Bank Accounts**. The Company's funds will be deposited in the Company's name in such bank or financial accounts as may be designated by the Board of Managers, and the Board of Managers will arrange for the appropriate conduct of such accounts, including the signatures to be required.

14.02   **Books and Records**.

(a)     The Managers and officers will keep or cause to be kept (i) complete and accurate books of account in accordance with normally accepted tax accounting principles and methods consistently applied, in which will be entered fully and accurately each and every transaction of the Company, and (ii) the records required to be maintained by the Company pursuant to the Act. The Company's books and records will be maintained at the Company's principal office or at such other place as the Company may from time to time designate.

(b)     Each Member, after giving reasonable notice of his or her request in writing, has the right of access to and/or the right to inspect at the Company's principal office, at such reasonable times as the Managers may determine, the following records required to be maintained by the Company pursuant to the Act: (i) a current list of the full name and last known business address of each Member in alphabetical order; (ii) a copy of the Company's Articles of Organization and any amendments thereto; (iii) copies of the Company's federal, state and local income tax returns for the 3 most recent years; (iv) copies of this Agreement and any amendments thereto; and (v) of any financial statements of the Company for the 3 most recent years. Within a reasonable time after giving written notice of his or her request to the Company, the requesting Member will have the right, after making prepayment to the Company of the Company's reasonable expenses incurred or to

be incurred in responding to the Member's request, to obtain copies of any records described in this Section 14.02(b) that such Member has the right to inspect.

14.03   **Tax Information**.  The Company will deliver to each Member as soon as practicable after the end of each taxable year the information relating to the Company necessary for the preparation of the Members' federal income tax returns.

14.04   **Tax Matters Partner**.  When there is more than one Member of the Company, the Board of Managers may designate from time to time the "tax matters partner" for purposes of the Code.  The Company may name a substitute or successor at any time.  All decisions with respect to tax matters affecting the Company will require the concurrence of the Board of Managers.

## ARTICLE XV
## APPOINTMENT OF MANAGERS AS ATTORNEYS-IN-FACT

15.01   **Appointment of Attorney-In-Fact**.  The Members irrevocably constitute and appoint, with full power of substitution, the Managers of the Company (including but not necessarily limited to the General Manager and/or President), any of whom may act, to be the Company's true and lawful attorneys-in-fact with full power and authority in their or its name, place and stead to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement or the business or affairs of the Company, including but not limited to:

(a)     All instruments, certificates or documents, and any amendments thereto, which may be required to be filed by the Company under the laws of any state or which the Board of Managers deems advisable to file pursuant to the terms of this Agreement;

(b)     Any instrument or document which may be required to effect the continuation of the Company, the admission of a substituted or an additional Member, or the dissolution and termination of the Company, provided that the continuation, admission or dissolution and termination has been approved by the Board of Managers and/or Members, as the case may be, in accordance with the provisions and requirements of this Agreement; and

(c)     Any agreement, instrument, lease, deed, deed of trust, promissory note, certificate or other document in the name or behalf of the Company which is necessary or appropriate to implement, effectuate or otherwise carry out any transaction to which the Company is a party or to which the Company or any of its assets or businesses is or may be subject, provided such transaction has been approved by the Board of Managers or the Members, as the case may be, in accordance with the provisions and requirements of this Agreement.

15.02   **Duration**.  The appointment by each Member of the Managers of the Company as his or her attorneys-in-fact is irrevocable and will be deemed to be a power coupled with an interest and will survive the death, disability, incompetence, Bankruptcy or dissolution of any person giving such power, except, that in the event of a Disposition by a Member of all or any part of his or her Membership Interests, this power of attorney will survive such Disposition only until such time, if any, as the Assignee will have been admitted to the Company as a substituted Member and all

- 19 -

required documents and instruments will have been duly executed, filed and recorded to effect such substitution.

## ARTICLE XVI
## AMENDMENTS

Except as otherwise specifically required by any other provision of this Agreement, this Agreement may be amended or modified only by the vote or the written consent of Members holding at least 85% of the outstanding Percentage Interests entitled to vote; provided, however that no amendment may change a Member's economic rights under this Agreement without that Member's written consent.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

17.01 **Governing Law**. This Agreement and its interpretation, and the rights and liabilities of the parties, including all matters arising out of or relating to this Agreement, whether in tort or in contract, will be governed exclusively by the local, internal law of the State of Maryland.

17.02 **Captions**. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

17.03 **Construction**. Whenever the context may require, any pronouns used herein will include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns will include the plural and *vice versa*. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person.

17.04 **Survival of Representations and Warranties**. All representations and warranties herein will survive until the termination of the Company, except to the extent that a representation or warranty expressly provides otherwise.

17.05 **Severability**. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity will not affect the validity of the remainder of the terms or provisions within this Agreement.

17.06 **Nonwaiver**. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

17.07 **Confidentiality**. No party will, without the express written consent of the Company, either during or after the termination of his or her Membership Interests in the Company, divulge to others any information not already known to the public pertinent to the operations of the Company.

17.08 **Waiver of Partition**. Each of the parties hereto irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the Company's property or assets.

17.09 **Interests as Personal Property**. The interests of the Members in all property of the Company will be deemed to be personal property and will pass and may be assigned or otherwise transferred only as such, in accordance with the provisions of this Agreement; provided, however, that in accordance with law, Members may not have their Membership Interests subject to UCC security interests without the express written consent of the Board of Managers or otherwise complying with this Agreement or the Act.

17.10 **Title to Company Property**. The property of the Company may be held in the Company's name, in the name of the Managers or one or more Managers on behalf of the Company, as the Board of Managers will determine.

17.11 **Execution and Counterparts**. This Agreement and any amendments may be executed in multiple counterparts, each of which will be deemed an original and all of which together will constitute one agreement. In addition, this Agreement and any amendments may be executed through the use of counterpart signature pages. The signature of any party on any counterpart agreement or counterpart signature page will be deemed to be a signature to, and may be appended to, one document.

17.12 **Entire Agreement**. This Agreement embodies the entire agreement and understanding between the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings between such parties relating to the subject matter hereof. The parties are not relying on any inducements not otherwise recited herein. No amendment, modification, termination or waiver of any provision of this Agreement will be effected unless the same is set forth in a writing signed by Members holding the required number of Percentage Interests pursuant to Article XVI.

17.13 **Attorneys' Fees**. Any party seeking to enforce his or her or its rights hereunder will be entitled, if substantially successful, to recover reasonable attorney's fees and expenses incurred in such enforcement against any party or parties who will have necessitated such enforcement because (a) such party or parties have breached, or attempted to breach, any obligations owing to the enforcing party under the provisions of this Agreement or (b) such party or parties have initiated or joined any claim, demand, arbitration or action against the enforcing party in contravention of, or inconsistent with, the provisions of this Agreement.

17.14 **Addresses**. Each party will keep the Company informed of his or her or its current address. The Members will have the addresses furnished by the Members on file at the Company office.

17.15 **Notices**. Except as otherwise expressly provided in this Agreement, any notice permitted or required hereunder will be in writing and will be deemed given when hand delivered or sent by registered or certified mail to the intended recipient at his or her last known address. Notice

- 21 -

sent to a Member's address as maintained in the Company's records will be effective with respect to such Member and/or any Assignee of such Member.

17.16   **Additional Documents and Acts**.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

17.17   **Reliance on Authority of Person Signing Agreement**.  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Member or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be required to see to the application or distribution proceeds paid or credited to individuals signing this Agreement on behalf of such Member.

17.18   **Independent Counsel**.  Each Member warrants and represents that such Member has been advised that such Member should obtain the advice of counsel of such Member's own choosing in the analysis of this Agreement; that such Member has been represented by independent counsel or has had the opportunity to be represented by independent counsel; and that such Member has read this Agreement with care and believes that such Member is fully aware of and understands the contents hereof and their legal effect.

17.19   **Waiver of Jury Trial**.  **EACH MEMBER AND THE COMPANY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, FRAUD OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND/OR THE RELATIONSHIP AMONG THEM.**

17.20   **Burdens and Benefits**.  Subject to the limits on transferability contained herein, each and all of the covenants, terms, provisions and agreements herein contained will be binding upon and inure to the benefit of the successors, heirs, and assigns of the respective parties, including but not limited to all Assignees of Members.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE.]

IN WITNESS WHEREOF, the undersigned Members have signed and sealed this Agreement as of the day and year first above written.

_____ (SEAL)
KEVIN D. ASH

_____ (SEAL)
RICHARD E. WARD, II

**MANAGERS AGREED:**

_____ (SEAL)
Kevin D. Ash

_____ (SEAL)
Richard E. Ward, II

#1176578v1  Amended & Restated Operating Agmt EllisDale Construction LLC  51940/00001

## EXHIBIT A

## OWNERSHIP SCHEDULE

| MEMBER | PERCENTAGE INTEREST |
|---|---|
| Kevin D. Ash | 50% |
| Richard E. Ward, II | 50% |
| **TOTAL** | **100%** |

## EXHIBIT B

## DEFINITIONS

The following terms used in the Agreement will (unless otherwise expressly provided in the Agreement or unless the context otherwise requires) have the following respective meanings (and are hereby incorporated by reference into the Agreement):

**Act**. The Maryland Limited Liability Company Act, as amended or superseded from time to time (also sometimes referred to as the Maryland Act).

**Affiliate**. Any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or under common control with, the Person specified. The term "control" (including the terms "controlling," "controlled by," and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or the policies of a Person, whether through the ownership of greater than 50% of the voting securities, by contract or otherwise.

**Agreement**. The Operating Agreement including all Exhibits, as originally executed and as amended from time to time, as the context requires.

**Assignee**. A Person other than a Member who, in accordance with the Maryland Act, succeeds to an ownership interest in all or any portion of a Member's Membership Interests in the Company upon the death, Bankruptcy, dissolution, or other Withdrawal Event with respect to such Member (including the debtor in possession where applicable) or upon another Disposition of such Membership Interests to such Person. The Membership Interest obtained by an Assignee will be no more favorable to the Assignee than the Membership Interest owned by his predecessor, and such Membership Interest will not be relieved of any of its obligations under this Agreement. Therefore, an Assignee will be bound by, and take such Membership Interests subject to, all of the terms and conditions of the Agreement as same applies to Members, but, in accordance with the Maryland Act, an Assignee will not have any votes, consents, inspection rights or any other rights or privileges of a Member (other than those mere assignee rights under Section 4A-603 of the Act described in Section 11.01(b) of the Agreement) unless and until such Assignee is admitted as a substituted Member in accordance with the provisions of Section 11.03 hereof. For example, an Assignee will take Membership Interests subject to any obligations under this Agreement for additional Capital Contributions, cross-indemnification, rights of contribution, transfer restrictions and buy-sell provisions.

**Bankruptcy**. Bankruptcy will mean any of the following:

(a)     The filing of an application by a Person for, or a Person's consent to, the appointment of a trustee, receiver, or custodian of a Person's assets;

(b)     The entry of an order for relief with respect to a Person in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time;

(c)     The making by a Person of a general assignment for the benefit of creditors;

(d)     The entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Person unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within 90 days;

(e)     The failure by a Person generally to pay his or her debts as they become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, or the admission in writing of the inability to pay his or her debts as they become due; or

(f)     A Person suffering or permitting any of his or her Membership Interests to become subject to the enforcement of any rights of a creditor, whether arising out of an attempt to charge upon that Person's Membership Interests by judicial process or otherwise, if such Person fails to effectuate the release of those enforcement rights, whether by legal process, bonding or otherwise, within 90 days after the actual notice of such creditor's action.

**Business**.  Business will mean the purpose for which the Company is formed as more particularly described in Article III.

**Capital Contribution**.  The total amount of money and/or the agreed upon net fair market value of property or services contributed to the Company by a Member or his or her predecessor in interest on the date of contribution.

**Code**.  The 1986 Internal Revenue Code, as amended from time to time.

**Defaulting Member**.  A Person who fails to pay any amount he or she is required to pay to a Paying Member as indemnification by the due date thereof under Section 4.04 of the Agreement.

**Disability**.  A Member who is employed by the Company is under a Disability if that Member: (1) is under a legal decree of incompetency (the date of such decree being deemed to be the date on which such disability occurred); (2) submits any claim, accepted by the insurance carrier, for disability insurance benefits or for early distribution of any amounts from a qualified pension or profit-sharing plan maintained by the Company; or (3) because of a disease, injury, or other mental or physical impairment that substantially limits a major life activity, is unable to perform the essential functions of his or her position, with or without a reasonable accommodation for at least (or reasonably expected to last at least) 12 months, based on then-available medical information.  The date of any written medical determination that is conclusive as to such disability is the date on which such disability will be deemed to have occurred.  A medical determination of disability will exist upon the receipt by the Company of the written opinion of a physician who has examined the Member whose disability is in question.  If the Company disagrees with the opinion of such physician, it may engage at its own expense another physician to examine the Member.  If the physicians do not agree, they will choose a third consulting physician (board-certified in the specialty most closely related to the nature of the disability alleged to exist and the expense of which will be borne by the Company), and the written opinion of a majority of these three (3) physicians will be

conclusive as to such disability. In signing this Agreement, each Member consents to such examination, to furnish any medical information requested by any examining physician, and to waive any applicable physician-patient privilege and HIPAA privacy rights that may arise because of such examination.

**Disposition or Dispose**. The sale, assignment, transfer, exchange, bequest, gift, pledge, encumbrance or other disposition of any Membership Interest(s) in any manner, whether voluntary or involuntary, outright or in trust, or by operation of law (such as upon death, adjudicated incapacity, dissolution, Bankruptcy, Withdrawal Event or in connection with a decree of divorce) or otherwise.

**Distributable Cash**. All cash and funds received from the operation of the Company's Business, other than (1) Capital Contributions, with any interest earned thereon pending its utilization, (2) financing proceeds used in the Company's Business, (3) reserves for working capital, liabilities, and other contingencies, (4) other amounts used to pay or establish reserves for all Company expenses, debt and loan payments, capital improvements, replacements, acquisitions and contingencies, and (5) amounts distributable in, or in anticipation of, liquidation of the Company, all as reasonably determined by the Board of Managers in the efficient conduct of the Company's Business.

**Guaranteed Debt**. This will have the meaning given to such term in Section 4.04.

**Majority in Interest**. In respect of all Members or any specified subgroup thereof, a majority of the Percentage Interests entitled to vote then held by all the Members or the specified subgroup thereof (as in the case of consent of another Member's actions), as the case may be.

**Manager(s)**. The Managers, as a group, will constitute a Board of Managers. Manager(s) means the Person(s) appointed and serving from time to time as a Manager of the Company pursuant to Article VI.

**Members**. The Person(s) whose names are set forth on the Ownership Schedule (a sample is attached as Exhibit A) in each such Person's capacity as a Member of the Company, and any Person admitted as a new Member or a substituted Member under the Agreement.

**Membership Interest**. A Member's entire interest as a Member of the Company, comprised of such Member's economic and financial rights, governance rights and status as a Member of the Company under the Agreement and the Act, together with the obligations of such Member to comply with all of the provisions and requirements of the Agreement and the Act.

**Net Income or Net Loss**. The income or loss, as the case may be, of the Company for a period as determined in accordance with the Code, including each item of income, gain, loss or deduction required to be separately stated.

**Ownership Schedule**. The list of Members and Assignees and their interests as described in Article IV, the initial Ownership Schedule being attached as Exhibit A.

**Paying Member**. A Member who pays Guaranteed Debt of the Company out of personal funds in the manner and under the circumstances provided in Section 4.04.

**Percentage Interest**. With respect to any Member or Assignee, the percentage set forth opposite such person's name on the Ownership Schedule, as those percentages may be adjusted from time to time due to transfer of Membership Interests or the admission of additional Members in accordance with the Agreement.

**Person**. An individual, proprietorship, trust, estate, personal representative, partnership, joint venture, association, company, corporation, or other entity.

**Prime Rate**. The prime rate (or base rate) reported in the "Money Rates" column or section of *The Wall Street Journal* as being the base rate on corporate loans at larger U.S. Money Center banks on the first date on which *The Wall Street Journal* is published in each month. In the event *The Wall Street Journal* ceases publication of the Prime Rate, then the "Prime Rate" will mean the "prime rate" or "base rate" announced by the bank with which the Company has its principal banking relationship (whether or not such rate has actually been charged by that bank). In the event that bank discontinues the practice of announcing that rate, Prime Rate will mean the highest rate charged by that bank on short term, unsecured loans to its most credit worthy large corporate borrowers.

**Property**. The assets, including all personal and real property, owned by the Company for use in the Business.

**Selling Notice**. The Notice described in Section 11.02 relating to the Disposition of Membership Interests.

**Withdrawal Event**. The death, adjudicated incapacity, dissolution, or Bankruptcy of a Member (or Assignee), or Disability of a Member who is employed by the Company that continues for 12 months, or the cessation of employment of a Member who is employed by the Company for any reason or no reason, or any other event of dissociation with respect to a Member (or Assignee) as described in the Act.

**Withdrawing Member**. A Member (or Assignee) to whom a Withdrawal Event relates.

# EXHIBIT B

## AMENDED AND RESTATED
## OPERATING AGREEMENT
## OF
## A&W LANSDOWNE, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of A&W Lansdowne, LLC, is made effective as of the 27ᵗʰ day of August, 2015, by and among the undersigned parties (collectively, the "Members").

### EXPLANATORY STATEMENT

A.  A&W Lansdowne, LLC (the "Company") was formed pursuant to the provisions of the Virginia Limited Liability Company Act (the "Act"), Code of Virginia 1950, §13.1-1000 et seq., by the filing of the Articles of Organization (the "Articles") with the Virginia State Corporation Commission ("SCC") on or about February 25, 2015.

B.  Kevin Ash ("Ash"), Richard E. Ward, II ("Ward") and Ward Bell ("Bell") (Ash, Ward and Bell being collectively referred to herein as the "Original Members") entered into that certain Operating Agreement dated May 1, 2015 (the "Original Operating Agreement") to regulate the affairs of the Company, the conduct of its business and the relations of its Members.

C.  The Original Members desire to admit Andrew Schwartzberg ("Schwartzberg") as a Member of the Company in consideration of Schwartzberg contributing capital to the Company and providing a guaranty on a loan the Company is obtaining from MVB Bank, Inc.

D.  The Original Members and Schwartzberg each desire to amend and restate the Original Operating Agreement in its entirety in accordance with the terms and conditions of this Agreement.

E.  The Members have agreed that this Agreement shall serve as an "operating agreement" within the meaning of §13.1-1023 of the Code of Virginia.

NOW, THEREFORE, in consideration of the mutual promises of the parties, and of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed by and between the parties as follows:

1.  Formation.

The Members hereby ratify the formation of the Company under the provisions of the Act and the filing by Michael D. Ravitch as organizer of the Articles with the SCC and confirm their admission to the Company as the Members.

2.  Name.

The name of the Company is "A&W Lansdowne, LLC".

3.      Business.

The purposes for which the Company is formed are as follows: (1) to engage in any lawful business, purpose or activity for which a limited liability company may be formed under the Virginia Limited Liability Company Act; (2) to have and exercise all powers now or hereafter conferred by the laws of the Commonwealth of Virginia on limited liability companies formed pursuant to the Act; and (3) to do any and all things necessary, convenient or incidental to the achievement of the foregoing. Notwithstanding the foregoing, the Members hereby agree that the Company's primary purpose shall be to own, develop, construct, lease, rent and sell that certain real property owned by the Company and described as Parcels E2 and E3 in Lansdowne Town Center, Landsdowne, Virginia (the "Property") and to do any and all things related in any manner thereto.

4.      Principal Office, Registered Office and Registered Agent.

The location of the principal office of the Company shall be 116 Edwards Ferry Road, Unit E, Leesburg, VA 20176. The records required to be maintained by Section 13.1-1028 of the Code of Virginia are kept at the foregoing principal office. The initial registered office of the Company in the Commonwealth of Virginia shall be at The Law Offices of Howard B. Silberberg, 1489 Chain Bridge Road, Suite 202, McLean, VA 22101. The resident agent of the Company is Howard B. Silberberg, Esq., who is a resident of the Commonwealth of Virginia, and whose business address is the same as the registered office.

5.      Duration.

The term of the Company commenced on the date that the Articles of Organization were filed and received for recordation by the SCC and shall continue in full force and effect in perpetuity, unless earlier terminated in accordance with the provisions of this Agreement.

6.      Members and Membership Interests.

A.      Members. The Members of the Company and their percentage Class A membership interests and Class B membership interests (the "Membership Interests" or "Interests") are listed on Exhibit "A" and Exhibit "A-1", respectively, attached hereto. A Member's Interest is its percentage share of the Company's business, property, assets, capital, profits and losses, subject to all of the provisions of this Agreement and the Act.

B.      Two Classes of Members. There shall be two (2) classes of Members, Class A Members and Class B Members. The Class A Members are listed on Exhibit "A" and the Class B Members are listed on Exhibit "A-1".

C.      Additional Members. Additional members may be admitted into the Company on such terms and conditions as may be agreed upon by the Managers. Unless named in this Agreement, or unless admitted to the Company as a substituted or new member as provided herein, no person shall be considered a Member, and the Company need deal only with

2

the Members so named and so admitted.   The Company shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death or bankruptcy of a Member, except as otherwise provided in this Agreement.

      7.   <u>Management</u>.

      A.   <u>Managers</u>.   The Managers shall have full and complete authority, power and discretion to manage and control the business and affairs of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.   The Members hereby agree that the initial Managers shall be Ash, Ward and Schwartzberg.   In the event of the death, bankruptcy resignation or inability to act of Ash, Ward or Schwartzberg, the survivor(s) shall serve as the sole Managers.

      B.   <u>Decision Making Authority of the Managers</u>.   The business, operations and affairs of the Company shall be managed by its Managers, who shall have the powers, duties and authority described in this Section 7 and under the Act.   The Managers shall have the power on behalf of the Company to enter into contracts; to acquire property and to lease all or any portion thereof; to sell, assign, or transfer for value all or any portion of the property of the Company; to borrow money and, as security therefor, to assign, mortgage, encumber, hypothecate or pledge all or any part of the property of the Company; to obtain replacements for any such mortgage or mortgages; to prepay, in whole or in part, refinance, recast, increase, modify or extend any mortgages; to lend money; to enter into contracts to provide construction, renovation, repair, organization, managerial or other services; to exercise and fulfill the rights, powers and duties of the Company; to employ from time to time persons, firms or corporations in the operation of the Company business, including without limitation accountants and attorneys, on such terms and for such reasonable compensation as the Managers shall determine; and to execute, acknowledge and deliver any and all instruments to effectuate the foregoing.   By way of extension of the foregoing and not in limitation thereof, the Managers shall, except as otherwise provided in this Agreement, have all the rights and powers granted to managers by the Act.   No assignee or transferee for value of all or any portion of the property of the Company shall be required to investigate the Managers' authority to sell, assign, transfer for value or otherwise liquidate all or any portion of any interest in such property.   Any such sale, assignment or transfer for value, if executed by the Managers, shall bind the Company.   All decisions shall require the unanimous consent of the Managers.

      C.   <u>Delegation of Authority by the Managers</u>.   The Managers shall have the power to delegate the authority of the Managers to qualified persons, and the delegation of any such managerial authority shall be evidenced by a Certificate of Incumbency or Resolutions naming the individual or individuals so authorized and specifying the extent and limitations of the authority so delegated.   Any such delegation of authority may be rescinded at any time by the Managers.

      D.   <u>Indemnification of Managers</u>.   The Managers shall be indemnified and held harmless by the Company from and against any and all claims, demands, liabilities, costs, damages and causes of action, of any nature whatsoever, arising out of or incidental to the

Managers' involvement in the management of the Company affairs, except where the claim at issue is based upon (i) the fraud, gross negligence or willful misconduct of the Manager; or (ii) the material and adverse breach of the Managers of any material provision of this Agreement. The indemnification authorized by this Section 7.D shall include, but not be limited to, payment of (i) reasonable attorneys' fees or other expenses incurred in connection with settlement or in any finally-adjudicated legal proceeding; and (ii) the removal of any liens affecting any property of the indemnity.   The indemnification rights contained in this Section 7.D shall be cumulative of, and in addition to, any and all rights, remedies and recourse to which the Managers shall be entitled, whether pursuant to the provisions of this Agreement, at law or in equity.

        E.    <u>Construction</u>.   The Members hereby acknowledge and agree that EllisDale Construction, LLC ("EllisDale"), shall serve as the general contractor for the construction of a mixed-use three (3) building condominium project on the Property pursuant to an AIA Document A-105 dated April 5, 2015 (the "Construction Contract") by and between the Company and EllisDale.   There shall be no changes to the Construction Contract, scope of work or approval of change orders related thereto without the prior written consent (which may be in the form of an e-mail) of each of the Managers.   EllisDale is entitled to receive a general contractor's fee of Four Hundred Fifty Thousand Dollars ($450,000.00) (the "GC Fee") under the terms of the Construction Contract and has agreed to defer payment of the GC Fee by the Company until such time that the Members have received back from the Company all of their Capital Contributions and Schwartzberg has received the sum he is entitled to under Section 10.2.A.(ii) below.

8.    <u>Separate Capital Accounts</u>.

        The Company shall maintain a separate Capital Account for each Member in accordance with the regulations promulgated under Section 704(b) of the Internal Revenue Code of 1986 as amended (the "Code"), and the Treasury Regulations thereunder.

9.    <u>Members Not Liable for Company Losses</u>.

        Except as expressly provided under the Act, the Members shall have no personal liability for the losses, debts, claims, expenses or encumbrances of or against the Company or its property.

10.    <u>Profits, Losses and Distributions</u>.

        10.1    <u>Defined Terms</u>.   For purposes of this Agreement, the following terms shall have the meaning specified below unless the context otherwise requires:

        A.    <u>Adjusted Capital Contributions</u>.   "Adjusted Capital Contributions" means, for each Member, such Member's Capital Contributions to the Company, reduced (but not below zero) by the amount of cash and the fair market value of any other asset distributed to such Member pursuant to Section 10.2.A.

B.     Available Cash.    "Available Cash" means, with respect to any taxable year of the Company, at the time of determination, the total cash receipts of the Company (such as, but not limited to, gross operating receipts, gross sales proceeds, loan or refinancing proceeds and the Capital Contributions of the Members), plus any other funds (including amounts previously set aside as reserves by the Manager, where and to the extent the Managers no longer regards such reserves as reasonably necessary in the efficient conduct of the Company business) deemed available for distribution and designated as Available Cash by the Managers, less the total cash disbursements of the Company (such as, but not limited to, operating expenses of the Company and repayments of any loans made to the Company by any person or entity whatsoever (including Members)), and less such reserves or other uses of cash as the Managers shall reasonably deem to be necessary for the efficient conduct of the Company business.

C.     Capital Account.    "Capital Account" means, as to any Member, the Capital Contribution actually made by that Member, plus all Profit allocated to that Member, and minus the sum of (i) all Loss allocated to that Member, (ii) the amount of cash and the fair market value of any other assets distributed to that Member (net of liabilities, assumed or taken subject to by such Member), and (iii) such Member's distributive share of all other expenditures of the Company not deductible in computing its taxable income and not properly chargeable as additions to the basis of Company property.    Each Member's Capital Account shall be determined and maintained in accordance with the Treasury Regulations adopted under Section 704(b) of the Code.  Any questions concerning a Member's Capital Account shall be resolved by applying principles consistent with this Agreement and the Treasury Regulations adopted under Section 704 of the Code in order to ensure that all allocations to the Members will have substantial economic effect or will otherwise be respected for federal income tax purposes.

D.     Capital Contribution.    "Capital Contribution" means the total amount of cash and the fair market value (net of liabilities assumed or taken subject to by the Company) of any other assets contributed (or deemed contributed under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member.

E.     Code.    "Code" means the Internal Revenue Code of 1986, as amended or any corresponding Section of any succeeding law.

F.     Minimum Gain.    "Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(d).  Minimum Gain shall be computed separately for each Member, applying principles consistent with both the foregoing definition and the Treasury Regulations promulgated under Section 704 of the Code.

G.     Negative Capital Account.    "Negative Capital Account" means a Capital Account with a balance less than zero.

H.     Positive Capital Account.    "Positive Capital Account" means a Capital Account with a balance greater than zero.

I.     Profit and Loss.    "Profit and Loss" means for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period,

5

determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss).

       J.     <u>Restoration Amount</u>.  "Restoration Amount" means with respect to each Member (a) the Member's share of Minimum Gain, and (b) any amount that the Member is unconditionally required under this Agreement or by law to contribute to the Company to restore the Member's Negative Capital Account balance under Section 10.4 hereof.

       K.     <u>Unreturned Capital</u>.  "Unreturned Capital" shall mean, as of any date, the aggregate Capital Contributions of a Member less the aggregate distributions of Available Cash to such Member, if any, pursuant to Section 10.2 (A)(i).

     10.2    <u>Allocation of Profit or Loss from Operations and Distributions of Available Cash</u>.

       A.     <u>Available Cash</u>.  For any taxable year of the Company, Available Cash shall be distributed to the Members in the following order of priority:

       (i)     First, to the Class A Members and the Class B Members <u>pro rata</u> in the proportion that each Member's Unreturned Capital bears to the aggregate Unreturned Capital of all Class A Members and Class B Members until each Member has received an amount equal to his Unreturned Capital;

       (ii)     Second, to the Class B Members until the Class B Members have received an aggregate amount under this Section 10.2.A.(ii) equal to the sum of Two Million Dollars ($2,000,000.00);

       (iii)     Third, the GC Fee in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00) shall be paid to EllisDale;

       (iv)     Fourth, the sum of Five Hundred Fifty Thousand Dollars ($550,000.00) to the Class A Members, <u>pro rata</u> in accordance with their respective Membership Interests as shown on Exhibit "A" attached hereto; and

       (v)     Fifth, the balance, if any, shall be split on a 50/50 basis between (i) the Class A Members <u>pro rata</u> in accordance with their respective Membership Interests as shown on Exhibit "A" attached hereto and (ii) the Class B Members <u>pro rata</u> in accordance with their respective Membership Interests as shown on Exhibit "A-1" attached hereto.

       B.     <u>Taxable Income or Taxable Loss</u>.  For any taxable year of the Company, Profit or Loss shall be allocated to the Members as follows:

       1.     Except as otherwise provided in Section 10.2.C below, first to the Members in proportion to and to the extent of the amount of Available Cash distributed to

each Member in such taxable year under Section 10.2.A hereof; provided, however, that in the event that no Available Cash is distributed in any fiscal year, Profit shall be allocated to the Members pro rata in accordance with their respective Membership Interests as set forth on Exhibit "A" and Exhibit "A-1" attached hereto; and

2.     Thereafter, to the Members pro rata in accordance with their respective Membership Interests as set forth on Exhibit "A" attached hereto.

C.     Special Allocations.     Notwithstanding any other provision to the contrary in this Agreement, the following provisions shall apply:

1.     Qualified Income Offset.     No Member shall be allocated Losses or deductions if such allocation causes a Member's Negative Capital Account to increase in excess of the Member's Restoration Amount.  If a Member receives (1) an allocation of loss or deduction (or item thereof) or (2) any Company distribution, which causes such member to have a Negative Capital Account in excess of its Restoration Amount or increase a Member's Negative Capital Account at the end of any Company taxable year in excess of its Restoration Amount, then all items of income and gain of Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for such taxable year shall be allocated to such Member, before any other allocation is made of Company items for such taxable year, in the amount and in proportions required to eliminate such excess as quickly as possible.  This Section 10.2.C(1) is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

2.     Minimum Gain Chargeback.     If there is a net decrease in the Minimum Gain during any taxable year and if any Member has a Negative Capital Account as of the last day of such taxable year which exceeds the Member's Restoration Amount as of such last day, then all items of gross income and gain of the Company for such taxable year (and, if necessary, for subsequent taxable years) shall be allocated to such Member in the amount and in the proportions required to eliminate such excess as quickly as possible.  This Section 10.2.C(2) is intended to comply with, and shall be interpreted consistently with, the "minimum gain chargeback" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

10.3     Liquidation or Dissolution.

A.     In the event the Company is liquidated or dissolved, the assets of the Company shall be distributed, after taking into account the allocations of Profit or Loss pursuant to Section 10.2, if any, to the Members in accordance with the priorities set forth in Section 10.2.A.

B.     No Member shall be obligated to restore a Negative Capital Account at any time.

7

10.4    General.

A.      The timing and amount of all distributions shall be as determined by the Managers.

B.      If any assets of the Company are distributed to the Members in kind, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Members so entitled.   The fair market value of the assets distributed in kind shall be determined by an independent appraiser selected by the Managers.   Based upon the fair market value, the Profit or Loss for each unsold asset shall be determined as if that asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 10.3 and shall be properly credited or charged to the Capital Accounts of the Members prior to the dissolution of the assets in liquidation  pursuant to Section 10.3.

C.      For each taxable year, all Profit and Loss of the Company shall be allocated  at and as of the end of that taxable year.

D.      Except as otherwise provided in this Section 10.4.D, all Profit and Loss shall be allocated, and all distributions of cash shall be distributed, as the case may be, to the persons shown on the records of the Company to have been Members as of the last day of the taxable year for which that allocation or distribution is to be made.  Unless the Members agree to separate the Company's fiscal year into segments, if the Company admits a new member to the Company or if a member sells, exchanges or otherwise disposes of all or any portion of the Member's Interest to any person who, during that taxable year is admitted as an additional or substitute member, the Profit and Loss shall be allocated between the transferor and the transferee on the basis of the number of days of the taxable year in which each was a member; provided, however, that in the event of a Capital Transaction or any other extraordinary non-recurring items of the Company, Profit, Loss and distributions shall be allocated to the Members shown on the records of the Company as of the date of such event.

E.      The methods set forth above by which Profit, Loss and distributions are allocated, apportioned, and paid are hereby expressly consented to by each Member as an express condition to becoming a Member.   Upon the advice of the outside accountants or of legal counsel to the Company, this Section 10 may be amended to comply with the Code and the regulations promulgated under Section 704 of the Code; provided, however, that no such amendment shall become effective without the consent of those Members who would be materially  or adversely  affected thereby.

11.     Company Property.

The  Company's property shall consist of all the assets and all Company funds. Title to the property and assets of the Company may be taken and held only in the name of the Company or in such other name or names as shall be determined  by the Managers.

12.    Capital Contributions.

A.    Each Member shall contribute to the capital of the Company, the amount in cash set beside its name on Exhibit "A" and shall receive a credit to his capital account in the amount of such investment, when made.  No Member shall be required to contribute any additional amount to the capital of the Company beyond the sum required pursuant to this Section 12.A.

B.    In the event that at any time (or from time to time) additional funds in excess of (i) the aforesaid capital contributions of the Members, (ii) the proceeds from any loan financing, (iii) gross rental receipts, and (iv) any other income of the Company are required by the Company for or in respect of its business or any of its obligations, expenses, costs, liabilities or expenditures (including, without limitation of the generality of the foregoing, any operating deficits), then the Manager, acting for and on behalf of, and in the name of the Company, may cause the Company to borrow such required additional funds, with interest payable at then-prevailing rates, from commercial banks, savings and loan associations and/or other lending institutions or persons (including Members or their affiliates).  In the event that the Managers are unable or unwilling to cause the Company to borrow said required additional funds, any Member or other person or entity may, but shall not be required to, lend such funds to the Company.  Any loan to the Company from any Member shall bear interest at such rate as the Managers and such lending Member may determine, and shall be repaid, in accordance with the provisions of Section 10 hereof, to the lending Member on the terms upon which such loans are made.

C.    The provisions of this Section 12 are not for the benefit of any creditor or other person other than a Member to whom any debts, liabilities, or obligations are owed by, or who otherwise has any claim against, the Company or any Member, and no creditor or other person shall obtain any rights under this section or by reason of this section, or shall be able to make any claim in respect of any debts, liabilities, or obligations against the Company or any Member.

D.    No Member or individual shall execute and become personally liable under any guaranty, indemnity, loan or other instrument for the benefit of the Company (each an "Obligation Agreement"), unless and until (i) such Member or individual, as the case may be, agrees to execute such Obligation Agreement; and (iii) any Obligation Agreement which require the personal liability of any Member ("Member Obligation Liability"), may be co-made or guaranteed jointly and severally by all of the Members.  Notwithstanding whether any such Obligation Agreement is co-made or guaranteed jointly and severally by all of the Members, the Members (other than Bell) shall in any event, and hereby do, indemnify the obligated Member(s) from and against any disproportionate Member Obligation Liability with respect such Obligation Agreements.    The Members hereby agree that notwithstanding anything to the contrary, Schwartzberg shall only be responsible for fifty percent (50%) of the Member Obligation Liability, Ward shall only be responsible for twenty-five percent (25%) of the Member Obligation Liability and Ash shall only be responsible for twenty-five percent (25%) of the Member Obligation Liability (each, a "Member's Percentage of Obligation Liability"), regardless of whether such Obligation is undertaken solely, or jointly and severally with other Member(s).  In furtherance of the foregoing, each of the Members other than Bell (collectively,

9

the "Indemnifying Members") shall indemnify, defend and hold harmless each of the other Members (the "Indemnified Members") from and against that portion of any and all claims, payments, costs, liabilities, losses, damages and expenses (including, but not limited to, court costs and reasonable attorneys' fees) sustained or incurred by any of the Indemnified Members which constitute Member Obligation Liabilities and which are in an amount in excess of such Member's Percentage of Obligation Liability.   For example, if Ash enters into an Obligation Agreement pursuant to this Section 8.04, Ash's liability shall only be 25% of any eventual Member Obligation Liability under such Obligation Agreement, with the other 75% being contributed by Ward and Schwartzberg in proportion to their Member's Percentage of Obligation Liability.   In the event that any Indemnifying Member becomes obligated to make any payment to any Indemnified Member pursuant to this Agreement, such payment shall be made within ten (10) business days following written demand therefor by the Indemnified Member to the Indemnifying Member. In the event of any default by any party in the performance of its obligations under this Section 8.04, the defaulting party shall pay to the non-defaulting party all reasonable attorneys' fees and other costs incurred by the non-defaulting party in connection with such default or the enforcement of the non-defaulting party's rights or remedies arising in connection therewith.

13.   Bank Accounts.

All funds of the Company shall be deposited in such bank or savings and loan account or accounts as shall be designated by the Managers.   Withdrawals from any such bank account shall be made upon such signature or signatures as the Managers may designate, and shall be made only for the purposes of the Company.

14.   Books and Records.

The Company shall keep true, exact, and complete books of account in which shall be entered fully and accurately each and every transaction of the Company.   The books of account shall be kept on the accrual method of accounting.   The fiscal year and the taxable year of the Company shall be the calendar year.   All books of account shall be kept at the principal office of the Company and all Members shall have the right to inspect and copy such books at all reasonable times.   An accounting shall be made at the end of each calendar year and a copy of the accounting report shall be transmitted to each Member.

15.   Disposition of Membership Interests.

Except as otherwise expressly permitted in this Section 15, no Membership Interest of any Member may be sold, exchanged, gifted, pledged, mortgaged, hypothecated or otherwise disposed of without in each instance, the prior written consent of the Manager, which consent may be withheld in the sole and exclusive discretion of the Managers.   The interest of each Member in the Company shall be assignable, upon the prior written approval of the Manager, which approval may be withheld in the sole and exclusive discretion of the Manager, and if such approval is given then such assignment shall be permitted subject to the following terms and conditions:

10

(i)     Right of First Refusal.    If a Member (hereinafter sometimes called the "Offeror") shall receive a bona fide written offer, as defined in subdivision (iii) of this Section 15(A), for the purchase of its Membership Interest, which offer it is willing to accept, it shall send written notice to all other Members advising of the receipt of said offer, enclosing a true copy of said offer.   For a period of thirty (30) days after the date of delivery of the offer notice to all Members, the remaining Members [pro rata, in proportion to their respective Membership Interests in the event more than one of such remaining Members shall be desirous of purchasing the Offeror's Interest], shall have the exclusive and irrevocable right and option to purchase all (but not less than all) of the Membership Interest offered for sale at a price proportionately equal to, and on the same terms contained in the bona fide written offer; such right to be exercisable by written notice to the Offeror given within the thirty (30) days' period aforesaid.   If no Member desires to purchase the Offeror's Membership Interest, then the Offeror shall be at liberty to assign its Membership Interest to the person from whom it received the bona fide acceptable offer, at a price not below nor upon the terms more advantageous to the buyer than the price and terms contained in said bona fide acceptable offer, provided, however, that if such sale is not made and consummated within six (6) months after the date of such bona fide offer, the Offeror may not thereafter dispose of its said Membership Interest without again giving the Members the option to purchase his interest as aforesaid.

(ii)     Substitution of Members.    If the Managers shall consent thereto, a permitted assignee shall have the right to become a substituted Member upon the payment to the Company of a reasonable fee to cover the costs and expenses of preparation and execution of an amendment to this Agreement. Each of the parties hereto does hereby agree, whenever requested so to do, personally to sign and swear to any such amendment and to execute whatever further instruments may be requisite to effect the substitution of a Member in accordance with the terms hereof. Unless named in this Agreement, or unless admitted to the Company as above provided, no person shall be considered a Member; and the Company, each Member, and any other persons having business with the Company need deal only with Members so named and so admitted. They shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death of a Member, except as otherwise provided in this Agreement. In the absence of substitution of a Member for an assigning or deceased Member, any payment to a Member or to his executors or administrators shall acquit the Company of all liability to any other person who may be interested in such payment by reason of an assignment by the partner or by reason of his death.

(iii)     Bona Fide Offer.    An offer, in order to be a bona fide offer within the meaning of this Section 15, must be in writing; it must be made by a person, partnership or corporation having sufficient financial ability to consummate the purchase of the Interest so offered to be purchased; said offer must be accompanied by a good faith cash or certified check deposit of at least ten percent (10%) of the amount of the offering price; and the home and business address of the offeror must be shown therein.

(iv)     Notwithstanding the other provisions of this Section 15 hereof, and without the necessity of complying with the provisions thereof or obtaining the consent of the Manager, the Membership Interest of any Member or the Membership Interest of any Member of

11

a Member of the Company (in its entirety or any portion thereof) may be transferred or disposed of by inter vivos instrument, by bequest or devise to any of the following namely:

       (a)    Another Member, a spouse, parent, parent-in-law, child (natural born or adopted) of such Member, or a custodian for such child under the Uniform Gift to Minors Act, or a spouse of a child, descendant or spouse of a descendant, sister or brother, or spouse of a sister or brother, of such Member; or

       (b)    A trust, whether inter vivos or testamentary, of which any person named in Subsection 15(A)(iv)(a) is a primary income beneficiary; or

       (c)    The beneficiary of any trust or custodianship described in (a) or (b) above who would under the provisions of such trust or custodianship become entitled to the corpus of the custodianship or the trust on its termination, or to a parent, descendant or spouse of a descendant, sister or brother, spouse of a sister or brother of any beneficiary of any such trust or custodianship; or

       (d)    A corporation, foundation, or other organization described in Section 501(c)(3) of the U.S. Internal Revenue Code of 1986 as amended and qualifying for exemption under Section 501(a) of the U.S. Internal Revenue Code of 1986, as amended.

       PROVIDED, HOWEVER, that upon the transfer of any Membership Interest to any person or party described in the foregoing sections of Subsection 15(A)(iv), any subsequent transfer of such interest by such transferee shall be subject to all terms and provisions of this Section 15, as well as any and all other provisions of this Agreement; provided, further, that at or prior to the date of any inter vivos transfer of any Membership Interest as aforesaid, the transferor shall give written notice of such transfer to the Company and to each other Member, setting forth in such notice the name and address of the transferee.

16.    <u>Dissolution</u>.

       A.    The Company shall dissolve, if such dissolution is unanimously ordered in writing by the Members, as of the end of any calendar year.

       B.    Anything contained herein or in the Act to the contrary notwithstanding, the death, resignation, retirement, expulsion, bankruptcy or dissolution of a Member shall not dissolve the Company, unless there are no remaining Members.

17.    <u>Winding Up</u>.

       Upon dissolution of the Company, the Company shall liquidate its assets and wind up its affairs in the following manner. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities in order to minimize the normal losses attendant upon such a liquidation. The Managers shall liquidate the Company and shall have the authority, to perform any and all acts and to take any and all actions which may be necessary, appropriate, or incidental thereto. The authority of the Managers shall

continue as long as necessary, and exercise of such authority shall be deemed a proper act in winding up the affairs of the Company.  Further, the Managers are authorized to sell the assets of the Company in a bona fide sale or sales to any party or parties (including a Member) at such price or prices and upon such terms as they may deem advisable, having due regard for the interests of all Members.  Any such sale or sales shall be deemed a proper act in winding up the affairs of the Company.

18.    Notice.

All communications provided for herein shall be made in writing and transmitted by mail, first class postage prepaid, return receipt requested, to the Members at the addresses set forth in Exhibit "A".  Any address may be changed by notice given to the Members, as aforesaid, by the party whose address for notice is to be changed.  Insofar as practicable, any consent of the Members, required or appropriate under this Agreement, shall be accomplished by written instrument without the necessity of meetings of the Members.

19.    Separability.

The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

20.    Interpretation.

This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Virginia.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the person or person referred to may require.  The captions of sections of this Agreement have been inserted as a matter of convenience only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

21.    Entire Agreement.

The parties hereto agree that all understandings and agreements heretofore made between them are merged in this Agreement, which alone fully and completely expresses their agreement with respect to the subject matter hereof.  There are no promises, agreements, conditions, understandings, warranties, or representations, oral or written, express or implied, among the parties hereto, other than as set forth in this Agreement, and the Articles.  All prior agreements among the parties are superseded by this agreement, which integrates all promises, agreements, conditions, and understandings among the parties with respect to the Company and its property.  No termination, revocation, waiver, modification or amendment of this Agreement shall be binding unless agreed to in writing and executed by all the Members.

22.   <u>Counterparts; Effective Date</u>.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement.  The signatures of any party to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.  This Agreement is dated and shall be effective among the parties as of the date first above written.

23.   <u>Binding Effect</u>.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, assigns, heirs, executors, administrators, and legal representatives.

**[signatures on next page]**

14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

<u>CLASS A MEMBERS</u>:

_____  [SEAL]
Kevin Ash

_____  [SEAL]
Richard E. Ward, II

Digitally signed
by Ward Bell
Date: 2015.08.27
07:10:16-04'00'
_____  [SEAL]
Ward Bell

<u>CLASS B MEMBERS</u>:

_____  [SEAL]
Andrew Schwartzberg

15

**AMENDED AND RESTATED**
**OPERATING  AGREEMENT**
**OF**
**A&W LANSDOWNE, LLC**

**Exhibit  "A"**

| Class A Members | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Kevin Ash 116 Edwards Ferry Road, Unit E, Leesburg,  VA 20176 | $165,000.00 | 37.5% |
| Richard  E. Ward, II 116 Edwards Ferry Road, Unit E, Leesburg,  VA 20176 | $165,000.00 | 37.5% |
| Ward Bell 116 Edwards Ferry Road, Unit E, Leesburg,  VA 20176 | $100.00 | 25% |
| **TOTAL** | **$330,100.00** | **100%** |

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**A&W LANSDOWNE, LLC**

**Exhibit "A-1"**

| Class B Members | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Andrew Schwartzberg c/o Preservation Services, LLC 11200 Rockville Pike, Suite 225 Rockville, Maryland 20852 | $330,000.00 | 100% |

# EXHIBIT C

# A&W COURTHOUSE COMMONS, LLC
# OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the "Agreement") is made effective as of the ___ day of August, 2014, by and among the undersigned parties (collectively, the "Members").

## EXPLANATORY STATEMENT

A.    A&W Courthouse Commons, LLC (the "Company") was formed pursuant to the provisions of the Virginia Limited Liability Company Act (the "Act"), Code of Virginia 1950, §13.1-1000 et seq., by the filing of the Articles of Organization (the "Articles") with the Virginia State Corporation Commission ("SCC") on or about August 13, 2014.

B.    The Members have agreed to enter into this Agreement to regulate the affairs of the Company, the conduct of its business and the relations of its Members.

C.    The Members have agreed that this Agreement shall serve as an "operating agreement" within the meaning of §13.1-1023 of the Code of Virginia.

NOW, THEREFORE, in consideration of the mutual promises of the parties, and of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed by and between the parties as follows:

1.    Formation.

The Members hereby ratify the formation of the Company under the provisions of the Act and the filing by Michael D. Ravitch as organizer of the Articles with the SCC and confirm their admission to the Company as the initial Members.

2.    Name.

The name of the Company is "A&W Courthouse Commons, LLC".

3.    Business.

The purposes for which the Company is formed are as follows: (1) to purchase, own, redevelop, operate, and manage the property located at 109-111 East Market Street Leesburg VA 20176; (2) to have and exercise all powers now or hereafter conferred by the laws of the Commonwealth of Virginia on limited liability companies formed pursuant to the Act; and (3) to do any and all things necessary, convenient or incidental to the achievement of the foregoing.

4.    <u>Principal Office, Registered Office and Registered Agent</u>.

The location of the principal office of the Company shall be 116 Edwards Ferry Road, Unit E, Leesburg, VA 20176. The records required to be maintained by Section 13.1-1028 of the Code of Virginia are kept at the foregoing principal office. The initial registered office of the Company in the Commonwealth of Virginia shall be at The Law Offices of Howard B. Silberberg, 1489 Chain Bridge Road, Suite 202, McLean, VA 22101. The resident agent of the Company is Howard B. Silberberg, Esq., who is a resident of the Commonwealth of Virginia, and whose business address is the same as the registered office.

5.    <u>Duration</u>.

The term of the Company commenced on the date that the Articles of Organization were filed and received for recordation by the SCC and shall continue in full force and effect in perpetuity, unless earlier terminated in accordance with the provisions of this Agreement.

6.    <u>Members and Membership Interests</u>.

A.    <u>Original Members</u>. The original Members of the Company and their percentage membership interests (the "Membership Interests" or "Interests") are listed on Exhibit A attached hereto. A Member's Interest is its percentage share of the Company's business, property, assets, capital, profits and losses, subject to all of the provisions of this Agreement and the Act.

B.    <u>Additional Members</u>. Additional members may be admitted into the Company on such terms and conditions as may be agreed upon by the Managers. Unless named in this Agreement, or unless admitted to the Company as a substituted or new member as provided herein, no person shall be considered a Member, and the Company need deal only with the Members so named and so admitted. The Company shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death or bankruptcy of a Member, except as otherwise provided in this Agreement.

7.    <u>Management</u>.

A.    <u>Managers</u>. The Managers shall have full and complete authority, power and discretion to manage and control the business and affairs of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business. The Members hereby agree that the initial Managers shall be Kevin Ash ("Ash") and Richard E. Ward, II ("Ward"). In the event of the death, bankruptcy resignation or inability to act of either Ash or Ward, the survivor shall serve as the sole Manager. In the event of the death, bankruptcy, resignation or inability to act of both Ash and Ward, such vacancy shall be filled by an affirmative vote of a majority in interest (i.e., not less than 51%) of the Members.

B.     Decision Making Authority of the Managers.   The business, operations and affairs of the Company shall be managed by its Managers, who shall have the powers, duties and authority described in this Section 7 and under the Act.   The Managers shall have the power on behalf of the Company to enter into contracts; to acquire property and to lease all or any portion thereof; to sell, assign, or transfer for value all or any portion of the property of the Company; to borrow money and, as security therefor, to assign, mortgage, encumber, hypothecate or pledge all or any part of the property of the Company; to obtain replacements for any such mortgage or mortgages; to prepay, in whole or in part, refinance, recast, increase, modify or extend any mortgages; to lend money; to enter into contracts to provide construction, renovation, repair, organization, managerial or other services; to exercise and fulfill the rights, powers and duties of the Company; to employ from time to time persons, firms or corporations in the operation of the Company business, including without limitation accountants and attorneys, on such terms and for such reasonable compensation as the Managers shall determine; and to execute, acknowledge and deliver any and all instruments to effectuate the foregoing. By way of extension of the foregoing and not in limitation thereof, the Managers shall, except as otherwise provided in this Agreement, have all the rights and powers granted to managers by the Act.   No assignee or transferee for value of all or any portion of the property of the Company shall be required to investigate the Managers' authority to sell, assign, transfer for value or otherwise liquidate all or any portion of any interest in such property.   Any such sale, assignment or transfer for value, if executed by the Managers, shall bind the Company.   All decisions shall require the unanimous consent of both Managers.

C.     Delegation of Authority by the Managers.   The Managers shall have the power to delegate the authority of the Managers to qualified persons, and the delegation of any such managerial authority shall be evidenced by a Certificate of Incumbency naming the individual or individuals so authorized and specifying the extent and limitations of the authority so delegated.   Any such delegation of authority may be rescinded at any time by the Managers.

D.     Indemnification of Managers.   The Managers shall be indemnified and held harmless by the Company from and against any and all claims, demands, liabilities, costs, damages and causes of action, of any nature whatsoever, arising out of or incidental to the Managers' involvement in the management of the Company affairs, except where the claim at issue is based upon (i) the fraud, gross negligence or willful misconduct of the Manager; or (ii) the material and adverse breach of the Managers of any material provision of this Agreement. The indemnification authorized by this Section 7.D shall include, but not be limited to, payment of (i) reasonable attorneys' fees or other expenses incurred in connection with settlement or in any finally-adjudicated legal proceeding; and (ii) the removal of any liens affecting any property of the indemnity.   The indemnification rights contained in this Section 7.D shall be cumulative of, and in addition to, any and all rights, remedies and recourse to which the Managers shall be entitled, whether pursuant to the provisions of this Agreement, at law or in equity.

3

8.      Separate Capital Accounts.

The Company shall maintain a separate Capital Account for each Member in accordance with the regulations promulgated under Section 704(b) of the Internal Revenue Code of 1986 as amended (the "Code"), and the Treasury Regulations thereunder.

9.      Members Not Liable for Company Losses.

Except as expressly provided under the Act, the Members shall have no personal liability for the losses, debts, claims, expenses or encumbrances of or against the Company or its property.

10.     Profits, Losses and Distributions.

10.1    Defined Terms. For purposes of this Agreement, the following terms shall have the meaning specified below unless the context otherwise requires:

A.      Adjusted Capital Contributions. "Adjusted Capital Contributions" means, for each Member, such Member's Capital Contributions to the Company, reduced (but not below zero) by the amount of cash and the fair market value of any other asset distributed to such Member pursuant to Section 10.2.A.

B.      Available Cash. "Available Cash" means, with respect to any taxable year of the Company, at the time of determination, the total cash receipts of the Company (such as, but not limited to, gross operating receipts, gross sales proceeds, loan or refinancing proceeds and the Capital Contributions of the Members), plus any other funds (including amounts previously set aside as reserves by the Manager, where and to the extent the Managers no longer regards such reserves as reasonably necessary in the efficient conduct of the Company business) deemed available for distribution and designated as Available Cash by the Managers, less the total cash disbursements of the Company (such as, but not limited to, operating expenses of the Company and repayments of any loans made to the Company by any person or entity whatsoever (including Members)), and less such reserves or other uses of cash as the Managers shall reasonably deem to be necessary for the efficient conduct of the Company business.

C.      Capital Account. "Capital Account" means, as to any Member, the Capital Contribution actually made by that Member, plus all Profit allocated to that Member, and minus the sum of (i) all Loss allocated to that Member, (ii) the amount of cash and the fair market value of any other assets distributed to that Member (net of liabilities, assumed or taken subject to by such Member), and (iii) such Member's distributive share of all other expenditures of the Company not deductible in computing its taxable income and not properly chargeable as additions to the basis of Company property. Each Member's Capital Account shall be determined and maintained in accordance with the Treasury Regulations adopted under Section 704(b) of the Code. Any questions concerning a Member's Capital Account shall be resolved by applying principles consistent with this Agreement and the Treasury Regulations adopted under Section 704 of the Code in order to ensure that all allocations to the Members will have substantial economic effect or will otherwise be respected for federal income tax purposes.

4

        D.     Capital Contribution.  "Capital Contribution" means the total amount of cash and the fair market value (net of liabilities assumed or taken subject to by the Company) of any other assets contributed (or deemed contributed under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member.

        E.     Capital Proceeds.  "Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

        F.     Capital Transaction.  "Capital Transaction" means the sale, exchange, financing, refinancing, condemnation, casualty or other disposition of all, or substantially all of the assets of the Company.

        G.     Code.  "Code" means the Internal Revenue Code of 1986, as amended or any corresponding Section of any succeeding law.

        H.     Minimum Gain.  "Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(d).  Minimum Gain shall be computed separately for each Member, applying principles consistent with both the foregoing definition and the Treasury Regulations promulgated under Section 704 of the Code.

        I.     Negative Capital Account.  "Negative Capital Account" means a Capital Account with a balance less than zero.

        J.     Positive Capital Account.  "Positive Capital Account" means a Capital Account with a balance greater than zero.

        K.     Priority Return.  "Priority Return" shall mean, as to each Member and for each fiscal year of the Company, an amount equal to twelve percent (12%) of such Member's Unreturned Capital for such year, which Priority Return shall be computed daily and shall be cumulative but non-compounding.

        L.     Profit and Loss.  "Profit and Loss" means for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss).

        M.     Restoration Amount.  "Restoration Amount" means with respect to each Member (a) the Member's share of Minimum Gain, and (b) any amount that the Member is unconditionally required under this Agreement or by law to contribute to the Company to restore the Member's Negative Capital Account balance under Section 10.4 hereof.

        N.     Unreturned Capital.  "Unreturned Capital" shall mean, as of any date, the aggregate Capital Contributions of a Member less the aggregate distributions of Available Cash to such Member, if any, pursuant to Section 10.2 (A)(ii).

10.2    Allocation of Profit or Loss from Operations and Distributions of Available Cash.

A.    Available Cash.  For any taxable year of the Company, Available Cash shall be distributed to the Members in the following order of priority:

(i)    First, to the Members pro rata in the proportion that each Member's unpaid Priority Return bears to the aggregate unpaid Priority Returns of all Members until the Priority Return of all Members has been paid in full; and

(ii)    Second, to the Members pro rata in the proportion that each Member's Unreturned Capital bears to the aggregate Unreturned Capital of all Members until each Member has received an amount equal to his Unreturned Capital;

(v)    Third, the balance, if any, to the Members pro rata in accordance with their respective Membership Interests as shown on Exhibit "A" attached hereto.

B.    Taxable Income or Taxable Loss.  For any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 10.3A and 10.3.B) shall be allocated to the Members as follows:

1.    Except as otherwise provided in Section 10.2.C below, first to the Members in proportion to and to the extent of the amount of Available Cash distributed to each Member in such taxable year under Section 10.2.A hereof, excluding, however, the amount of Available Cash, if any, distributed to the Members pursuant Sections 10.2.A (iv) which represents a return of such Members Unreturned Capital; provided, however, that in the event that no Available Cash is distributed in any fiscal year, Profit shall be allocated to the Members pro rata in accordance with their respective Membership Interest as set forth on Exhibit "A" attached hereto; and

2.    Thereafter, to the Members pro rata in accordance with their respective Membership Interests as set forth on Exhibit "A" attached hereto.

C.    Special Allocations.  Notwithstanding any other provision to the contrary in this Agreement, the following provisions shall apply:

1.    Qualified Income Offset.  No Member shall be allocated Losses or deductions if such allocation causes a Member's Negative Capital Account to increase in excess of the Member's Restoration Amount.  If a Member receives (1) an allocation of loss or deduction (or item thereof) or (2) any Company distribution, which causes such member to have a Negative Capital Account in excess of its Restoration Amount or increase a Member's Negative Capital Account at the end of any Company taxable year in excess of its Restoration Amount, then all items of income and gain of Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for such taxable year shall be

6

allocated to such Member, before any other allocation is made of Company items for such taxable year, in the amount and in proportions required to eliminate such excess as quickly as possible. This Section 10.2.C(1) is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

        2.    <u>Minimum Gain Chargeback</u>.  If there is a net decrease in the Minimum Gain during any taxable year and if any Member has a Negative Capital Account as of the last day of such taxable year which exceeds the Member's Restoration Amount as of such last day, then all items of gross income and gain of the Company for such taxable year (and, if necessary, for subsequent taxable years) shall be allocated to such Member in the amount and in the proportions required to eliminate such excess as quickly as possible.  This Section 10.2.C(2) is intended to comply with, and shall be interpreted consistently with, the "minimum gain chargeback" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code.

      10.3    <u>Allocation of Profit or Loss from a Capital Transaction</u>.

        A.    <u>Taxable Income</u>.    Profit from a Capital Transaction shall be allocated as follows:

        1.    Except as otherwise provided in Section 10.2.C above, first, to the Members in proportion to and to the extent of the amount of Available Cash distributed to each Member under Section 10.2 A hereof as a result of such Capital Transaction, excluding, however, the amount of Available Cash, if any, distributed to the Members pursuant Sections 10.2.A (iv) which represents a return of such Members Unreturned Capital; provided, however, that in the event that no Available Cash is distributed in any fiscal year, Profit from a Capital Transaction shall be allocated to the Members <u>pro</u> <u>rata</u> in accordance with their respective Membership Interest as set forth on Exhibit "A" attached hereto; and

        2.    Thereafter, any remaining Profit not allocated pursuant to Section 10.3.A (1) above shall be allocated to the Members <u>pro</u> <u>rata</u> in accordance with their respective Membership Interests as set forth on Exhibit "A" attached hereto.

        B.    <u>Taxable Loss</u>.  Loss from a Capital Transaction shall be allocated as follows:

        1.    If one or more Members has a Positive Capital Account, Loss from a Capital Transaction shall be allocated first to those Members, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero; then

        2.    Any remaining Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 10.3.B(1) shall be allocated to the Members in proportion to their respective Membership Interest.

10.4.   Liquidation or Dissolution.

A.      In the event the Company is liquidated or dissolved, the assets of the Company shall be distributed, after taking into account the allocations of Profit or Loss pursuant to Section 10.2, if any, to the Members in accordance with the priorities set forth in Section 10.2.A.

B.      No Member shall be obligated to restore a Negative Capital Account at any time.

10.5   General.

A.      The timing and amount of all distributions shall be as determined by the Managers.

B.      If any assets of the Company are distributed to the Members in kind, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Members so entitled.  The fair market value of the assets distributed in kind shall be determined by an independent appraiser selected by the Managers.  Based upon the fair market value, the Profit or Loss for each unsold asset shall be determined as if that asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 10.3 and shall be properly credited or charged to the Capital Accounts of the Members prior to the dissolution of the assets in liquidation pursuant to Section 10.4.

C.      For each taxable year, all Profit and Loss of the Company shall be allocated at and as of the end of that taxable year.

D.      Except as otherwise provided in this Section 10.5.D, all Profit and Loss shall be allocated, and all distributions of cash shall be distributed, as the case may be, to the persons shown on the records of the Company to have been Members as of the last day of the taxable year for which that allocation or distribution is to be made. Unless the Members agree to separate the Company's fiscal year into segments, if the Company admits a new member to the Company or if a member sells, exchanges or otherwise disposes of all or any portion of the Member's Interest to any person who, during that taxable year is admitted as an additional or substitute member, the Profit and Loss shall be allocated between the transferor and the transferee on the basis of the number of days of the taxable year in which each was a member; provided, however, that in the event of a Capital Transaction or any other extraordinary non-recurring items of the Company, Profit, Loss and distributions shall be allocated to the Members shown on the records of the Company as of the date of such event.

E.      The methods set forth above by which Profit, Loss and distributions are allocated, apportioned, and paid are hereby expressly consented to by each Member as an express condition to becoming a Member.  Upon the advice of the outside accountants or of legal counsel to the Company, this Section 10 may be amended to comply with the Code and the regulations promulgated under Section 704 of the Code; provided, however,

8

that no such amendment shall become effective without the consent of those Members who would be materially or adversely affected thereby.

11.     Company Property.

The Company's property shall consist of all the assets and all Company funds. Title to the property and assets of the Company may be taken and held only in the name of the Company or in such other name or names as shall be determined by the Managers.

12.     Capital Contributions.

A.      Each Member shall contribute to the capital of the Company, the amount in cash set beside its name on Exhibit "A" and shall receive a credit to his capital account in the amount of such investment, when made.   No Member shall be required to contribute any additional amount to the capital of the Company beyond the sum required pursuant to this Section 12.A.

B.      In the event that at any time (or from time to time) additional funds in excess of (i) the aforesaid capital contributions of the Members, (ii) the proceeds from any loan financing, (iii) gross rental receipts, and (iv) any other income of the Company are required by the Company for or in respect of its business or any of its obligations, expenses, costs, liabilities or expenditures (including, without limitation of the generality of the foregoing, any operating deficits), then the Manager, acting for and on behalf of, and in the name of the Company, may cause the Company to borrow such required additional funds, with interest payable at then-prevailing rates, from commercial banks, savings and loan associations and/or other lending institutions or persons (including Members or their affiliates).  In the event that the Managers are unable or unwilling to cause the Company to borrow said required additional funds, any Member or other person or entity may, but shall not be required to, lend such funds to the Company.  Any loan to the Company from any Member shall bear interest at such rate as the Managers and such lending Member may determine, and shall be repaid, in accordance with the provisions of Section 10 hereof, to the lending Member on the terms upon which such loans are made.

C.      The provisions of this Section 12 are not for the benefit of any creditor or other person other than a Member to whom any debts, liabilities, or obligations are owed by, or who otherwise has any claim against, the Company or any Member, and no creditor or other person shall obtain any rights under this section or by reason of this section, or shall be able to make any claim in respect of any debts, liabilities, or obligations against the Company or any Member.

13.     Bank Accounts.

All funds of the Company shall be deposited in such bank or savings and loan account or accounts as shall be designated by the Managers.  Withdrawals from any such bank account shall be made upon such signature or signatures as the Managers may designate, and shall be made only for the purposes of the Company.

14.    <u>Books and Records</u>.

   The Company shall keep true, exact, and complete books of account in which shall be entered fully and accurately each and every transaction of the Company. The books of account shall be kept on the accrual method of accounting. The fiscal year and the taxable year of the Company shall be the calendar year. All books of account shall be kept at the principal office of the Company and all Members shall have the right to inspect and copy such books at all reasonable times. An accounting shall be made at the end of each calendar year and a copy of the accounting report shall be transmitted to each Member.

15.    <u>Disposition of Membership Interests</u>.

   Except as otherwise expressly permitted in this Section 15, no Membership Interest of any Member may be sold, exchanged, gifted, pledged, mortgaged, hypothecated or otherwise disposed of without in each instance, the prior written consent of the Manager, which consent may be withheld in the sole and exclusive discretion of the Managers. The interest of each Member in the Company shall be assignable, upon the prior written approval of the Manager, which approval may be withheld in the sole and exclusive discretion of the Manager, and if such approval is given then such assignment shall be permitted subject to the following terms and conditions:

   (i)    <u>Right of First Refusal</u>.  If a Member (hereinafter sometimes called the "Offeror") shall receive a bona fide written offer, as defined in subdivision (iii) of this Section 15(A), for the purchase of its Membership Interest, which offer it is willing to accept, it shall send written notice to all other Members advising of the receipt of said offer, enclosing a true copy of said offer. For a period of thirty (30) days after the date of delivery of the offer notice to all Members, the remaining Members [pro rata, in proportion to their respective Membership Interests in the event more than one of such remaining Members shall be desirous of purchasing the Offeror's Interest], shall have the exclusive and irrevocable right and option to purchase all (but not less than all) of the Membership Interest offered for sale at a price proportionately equal to, and on the same terms contained in the bona fide written offer; such right to be exercisable by written notice to the Offeror given within the thirty (30) days' period aforesaid. If no Member desires to purchase the Offeror's Membership Interest, then the Offeror shall be at liberty to assign its Membership Interest to the person from whom it received the bona fide acceptable offer, at a price not below nor upon the terms more advantageous to the buyer than the price and terms contained in said bona fide acceptable offer, provided, however, that if such sale is not made and consummated within six (6) months after the date of such bona fide offer, the Offeror may not thereafter dispose of its said Membership Interest without again giving the Members the option to purchase his interest as aforesaid.

   (ii)    <u>Substitution of Members</u>.  If the Managers shall consent thereto, a permitted assignee shall have the right to become a substituted Member upon the payment to the Company of a reasonable fee to cover the costs and expenses of preparation and execution of an amendment to this Agreement. Each of the parties hereto does hereby agree, whenever requested so to do, personally to sign and swear to any such amendment and to execute whatever further instruments may be requisite to effect the substitution of a Member in accordance with the terms

10

hereof. Unless named in this Agreement, or unless admitted to the Company as above provided, no person shall be considered a Member; and the Company, each Member, and any other persons having business with the Company need deal only with Members so named and so admitted. They shall not be required to deal with any other person by reason of an assignment by a Member or by reason of the death of a Member, except as otherwise provided in this Agreement. In the absence of substitution of a Member for an assigning or deceased Member, any payment to a Member or to his executors or administrators shall acquit the Company of all liability to any other person who may be interested in such payment by reason of an assignment by the partner or by reason of his death.

(iii)  Bona Fide Offer.  An offer, in order to be a bona fide offer within the meaning of this Section 15, must be in writing; it must be made by a person, partnership or corporation having sufficient financial ability to consummate the purchase of the Interest so offered to be purchased; said offer must be accompanied by a good faith cash or certified check deposit of at least ten percent (10%) of the amount of the offering price; and the home and business address of the offeror must be shown therein.

(iv)  Notwithstanding the other provisions of this Section 15 hereof, and without the necessity of complying with the provisions thereof or obtaining the consent of the Manager, the Membership Interest of any Member or the Membership Interest of any Member of a Member of the Company (in its entirety or any portion thereof) may be transferred or disposed of by inter vivos instrument, by bequest or devise to any of the following namely:

(a)  Another Member, a spouse, parent, parent-in-law, child (natural born or adopted) of such Member, or a custodian for such child under the Uniform Gift to Minors Act, or a spouse of a child, descendant or spouse of a descendant, sister or brother, or spouse of a sister or brother, of such Member; or

(b)  A trust, whether inter vivos or testamentary, of which any person named in Subsection 15(A)(iv)(a) is a primary income beneficiary; or

(c)  The beneficiary of any trust or custodianship described in (a) or (b) above who would under the provisions of such trust or custodianship become entitled to the corpus of the custodianship or the trust on its termination, or to a parent, descendant or spouse of a descendant, sister or brother, spouse of a sister or brother of any beneficiary of any such trust or custodianship; or

(d)  A corporation, foundation, or other organization described in Section 501(c)(3) of the U.S. Internal Revenue Code of 1986 as amended and qualifying for exemption under Section 501(a) of the U.S. Internal Revenue Code of 1986, as amended.

PROVIDED, HOWEVER, that upon the transfer of any Membership Interest to any person or party described in the foregoing sections of Subsection 15(A)(iv), any subsequent transfer of such interest by such transferee shall be subject to all terms and provisions of this Section 15, as well as any and all other provisions of this Agreement; provided, further, that at or prior to the date of any inter vivos transfer of any Membership Interest as aforesaid, the

transferor shall give written notice of such transfer to the Company and to each other Member, setting forth in such notice the name and address of the transferee.

16.   Dissolution.

A.   The Company shall dissolve, if such dissolution is unanimously ordered in writing by the Members, as of the end of any calendar year.

B.   Anything contained herein or in the Act to the contrary notwithstanding, the death, resignation, retirement, expulsion, bankruptcy or dissolution of a Member shall not dissolve the Company, unless there are no remaining Members.

17.   Winding Up.

Upon dissolution of the Company, the Company shall liquidate its assets and wind up its affairs in the following manner. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities in order to minimize the normal losses attendant upon such a liquidation. The Managers shall liquidate the Company and shall have the authority, to perform any and all acts and to take any and all actions which may be necessary, appropriate, or incidental thereto.  The authority of the Managers shall continue as long as necessary, and exercise of such authority shall be deemed a proper act in winding up the affairs of the Company. Further, the Managers are authorized to sell the assets of the Company in a bona fide sale or sales to any party or parties (including a Member) at such price or prices and upon such terms as they may deem advisable, having due regard for the interests of all Members. Any such sale or sales shall be deemed a proper act in winding up the affairs of the Company.

18.   Notice.

All communications provided for herein shall be made in writing and transmitted by mail, first class postage prepaid, return receipt requested, to the Members at the addresses set forth in Exhibit A.  Any address may be changed by notice given to the Members, as aforesaid, by the party whose address for notice is to be changed. Insofar as practicable, any consent of the Members, required or appropriate under this Agreement, shall be accomplished by written instrument without the necessity of meetings of the Members.

19.   Separability.

The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

20.   Interpretation.

This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Virginia.  All pronouns and any variations thereof shall be deemed to

refer to the masculine, feminine, neuter, singular, or plural as the identity of the person or person referred to may require. The captions of sections of this Agreement have been inserted as a matter of convenience only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

21.    Entire Agreement.

The parties hereto agree that all understandings and agreements heretofore made between them are merged in this Agreement, which alone fully and completely expresses their agreement with respect to the subject matter hereof. There are no promises, agreements, conditions, understandings, warranties, or representations, oral or written, express or implied, among the parties hereto, other than as set forth in this Agreement, and the Articles. All prior agreements among the parties are superseded by this agreement, which integrates all promises, agreements, conditions, and understandings among the parties with respect to the Company and its property. No termination, revocation, waiver, modification or amendment of this Agreement shall be binding unless agreed to in writing and executed by all the Members.

22.    Counterparts; Effective Date.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement. The signatures of any party to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. This Agreement is dated and shall be effective among the parties as of the date first above written.

23.    Binding Effect.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, assigns, heirs, executors, administrators, and legal representatives.

**[signatures on next page]**

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

MEMBERS:

_____ [SEAL]
Kevin Ash

_____ [SEAL]
Richard E. Ward, II

14

**A&W COURTHOUSE COMMONS, LLC**
**OPERATING AGREEMENT**

**Exhibit "A"**

| Members | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Kevin Ash<br>116 Edwards Ferry Road, Unit E,<br>Leesburg, VA 20176 | $500.00 | 50% |
| Richard E. Ward, II<br>116 Edwards Ferry Road, Unit E,<br>Leesburg, VA 20176 | $500.00 | 50% |
| **TOTAL** | **$1,000.00** | **100%** |