1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
KEVIN D. ASH, as MANAGER of    .    Civil Action No. 1:20mc39
ELLISDALE CONSTRUCTION, LLC,   .
MANAGER of A&W COURTHOUSE       .
COMMONS, LLC, and MANAGER of    .
A&W LANSDOWNE, LLC,             .
                               .
              Plaintiff,        .
                               .
     vs.                        .    Alexandria, Virginia
                               .    December 23, 2020
RICHARD E. WARD, II,            .    2:56 p.m.
                               .
              Defendant.        .
                               .
. . . . . . . . . . .
```

TRANSCRIPT OF TRO HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE
(Via Teleconference)

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:            DEREK H. SWANSON, ESQ.
                             Dunlap Bennett & Ludwig PLLC
                             8003 Franklin Farms Drive
                             Suite 220
                             Richmond, VA 23229
                               and
                             THOMAS M. DUNLAP, ESQ.
                             Dunlap Bennett & Ludwig PLLC
                             8300 Boone Boulevard, Suite 550
                             Vienna, VA 22182

FOR THE DEFENDANT:           JASON E. HICKMAN, ESQ.
                             Compton & Duling
                             12701 Marblestone Drive
                             Suite 350
                             Woodbridge, VA 22192

ALSO PRESENT:                JANE IMPERATORE, ESQ.

(Pages 1 - 40)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Third Floor
2                                    401 Courthouse Square
                                     Alexandria, VA 22314
3                                    (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        P R O C E E D I N G S

2              THE COURT:  All right, counsel, are you there for the

3    matter of Kevin D. Ash, as Manager of Ellisdale Construction,

4    LLC; Manager of A&W Courthouse Commons, LLC; and Manager of A&W

5    Lansdowne, LLC, versus Edward (sic) E. Ward, II?

6              Mr. Swanson, are you there?

7                             (No response.)

8              THE COURT:  How about Mr. Dunlap?

9                             (No response.)

10             Ms. Imperatore, are you there?

11                            (No response.)

12             THE COURT:  Hello, is anybody there?

13             THE COURT REPORTER:  Your Honor, this is the court

14   reporter.  I'm here.

15             THE CLERK:  I'm here as well, Judge.

16             MR. SWANSON:  Your Honor, this is Derek Swanson for

17   the plaintiff.

18             THE COURT:  All right, Mr. Swanson.

19             Do we have Ms. Imperatore?

20                            (No response.)

21             MR. SWANSON:  We're a few minutes early, Your Honor.

22   She, she is planning to join.  Also, my partner, Tom Dunlap,

23   will be joining on behalf of the plaintiff.

24             THE COURT:  All right.  Well, we'll just wait another

25   minute.

4

1          All right, is that Ms. Imperatore?

2          MR. DUNLAP:  No, Your Honor.  This is Tom Dunlap.

3          THE COURT:  All right.  So this is Civil Action 20 --

4    why is this filed as an MC?  Have you not filed a complaint in

5    this case?  Mr. Swanson, have you filed a complaint?

6          MR. SWANSON:  No, Your Honor.  I conferred with the

7    clerk about that.  There's -- under Rule 65, a TRO can be

8    brought either under a -- through a motion with an affidavit or

9    by a verified complaint, and we elected to file as a motion

10   with affidavit, and the clerk instructed for it to be docketed

11   as a miscellaneous case.

12         THE COURT:  All right.  That's not normally -- I

13   mean, I guess the rule permits it, but that's not normally how

14   it's done, and so that needs to be cleaned up quickly.

15         Ms. Imperatore, are you there yet?

16         MS. IMPERATORE:  Good afternoon.  I am.  Hello, this

17   is Jane Imperatore.

18         THE COURT:  All right, Ms. Imperatore.

19         Now, we're on the record, just again for the record,

20   this is 1:20mc39, a civil miscellaneous matter at this point.

21   I've had a chance very briefly to read, I've read the motion,

22   I've read the affidavits, and I've looked briefly at these

23   agreements, business agreements.  Obviously, this came on

24   really, what, a half an hour ago, so it's not digested, and I'm

25   not a big fan of TROs pushed up against the holiday weekend

5

1    when the other side has not had a chance to respond.

2         And I understand, ma'am, that you're not representing

3    Mr. Ward, but there has to be some kind of a history here.

4    This thing doesn't just pop out of nowhere, and I don't have

5    any idea what the other side of this situation is.  So as

6    representative of the LLCs, can you at least tell me what your

7    understanding is of the dispute?

8         MS. IMPERATORE:  Yes.  So I have represented this

9    LLC, Ellisdale, for more than ten years, probably close to 13

10   or 14 years, and know both the principals very well.  I

11   understand there was a business -- there's a business dispute

12   between them that has most recently culminated in the

13   withdrawal of funds that are identified in this TRO pleading.

14        Kevin Ash, who is represented, obviously, by the

15   Dunlap firm here, contacted me when he found out that happened.

16   Rich Ward contacted me, and I said to both of them, "I can't

17   get in the middle of a dispute between you guys.  I represent

18   the company.  You both need separate counsel."

19        So what I understand is that there is sort of an

20   ongoing business dispute between them, and this action was

21   taken by Rich in that context, Rich Ward.

22        THE COURT:  But you represent the company.  As I

23   understand, the only damage or the only entity that suffered

24   potential injury are these companies, who according to this

25   motion will be unable to make payroll and other obligations and

1    thereby suffer a loss of reputation in the community, have

2    financial problems, etc.

3            So it strikes me as though the party most of interest

4    actually would be the entities whom you represent.

5            MS. IMPERATORE:  I don't disagree with that, Your

6    Honor.  As I understand, there's -- there are other funds at

7    issue that were in a separate account that were a predecessor

8    sort of concern here, and that is -- that's part of what's,

9    what's at issue between the parties.

10            I don't disagree with anything that you've just said,

11   and I understand that these funds are in part to pay bills that

12   are, you know -- excuse me, checks that have already been cut,

13   and that's going to be a big problem with the company.  So I

14   don't, I don't disagree with any of that.

15            THE COURT:  But yet your companies are not business

16   partners at this point as a litigant.  It seems to me, I mean,

17   if the companies' assets are being depleted to the extent that

18   you will not be -- that the checks written by Ellisdale, for

19   example, will bounce because there are not sufficient funds to

20   cover them, that's a problem for those entities, and yet the

21   entities themselves are not bringing suit against Mr. Ward.  So

22   I don't quite understand the, the lineup of the parties here.

23            MR. SWANSON:  Your Honor --

24            MS. IMPERATORE:  Just to be clear -- I'm sorry, go

25   ahead, please.

7

1          MR. SWANSON:  No, no, go ahead, Jane.  Sorry.

2          MS. IMPERATORE:  And I -- my, my issue was one of my

3     personal ethical obligation, understanding that there is a

4     conflict between the two managers of the company, and they're

5     both, you know, 50 percent owners each, that I had to step out

6     and recommend that they both get separate counsel to address

7     that.  So that was, that was my -- what I said to both of them.

8          THE COURT:  But -- I don't, I don't disagree with you

9     about the ethics here, but there are -- and I know the nature

10    of an LLC is a strange beast.  Nevertheless, they are still an

11    entity in this case.

12         MS. IMPERATORE:  Right.

13         THE COURT:  And furthermore, in terms of the other

14    two entities that are mentioned here, Courthouse Commons and

15    Lansdowne, there are other people involved in some of those, a

16    fellow named Schwartzberg who appears to have invested as much

17    money as Mr. Ash and Mr. Ward in, I think it's Lansdowne,

18    correct?  So, I mean, there's a slightly different structure to

19    those entities.

20         But the bottom line is and the thing I was most

21    interested in finding out is in terms of the amounts of money

22    that are alleged to have been taken by Mr. Ward, does that

23    reduce those corporate accounts to zero or just diminish them

24    but not totally wipe them out?  Do you know that, ma'am?

25         MS. IMPERATORE:  I don't know that.  It is my

8

1    understanding there are other accounts, but I don't have any

2    optics into what, you know, what those other accounts are, how

3    much is in them, how they're titled.

4            THE COURT:  All right.  Mr. Swanson, do you want to

5    address that?

6            MR. SWANSON:  Yes, Your Honor.  So I believe with

7    respect to the Ellisdale accounts, the cash and collateral

8    accounts that are held in the MVB Bank, that that did wipe

9    those out or almost completely wipe those out.

10           The same is true for the, the accounts that are in

11   the Courthouse and Lansdowne.  It was probably somewhat --

12   somewhere around 90, 90 percent of the money in those accounts.

13           There is another account that is company money for

14   Ellisdale that was invested in an investment account, stocks

15   and bonds.  That -- you know, we're trying our best to mitigate

16   any potential damage.  We are in the process of liquidating

17   that account to try to, you know, make those funds available.

18           We're taking -- we can't really put that back into

19   the, into the bank, so we're taking steps to put that into a

20   trust with a third-party law firm to hold it and permit money

21   only to be distributed with, you know, both managers'

22   permission, written permission.

23           The, the bigger issue, though, for Ellisdale is that

24   it needs all of that revenue as collateral for its very

25   high-dollar bond requirements, which, you know, are currently

1   around 45-50 million, and then there's going to be another one

2   very shortly for another 50 million, and all of that will be

3   materially prejudiced and could likely fall through as, you

4   know, without, without all of the money that's supposed to be

5   there at year end.

6            THE COURT:  Well, again, I'm working in the dark on

7   this case, and there are things about it that I am very

8   uncomfortable about.  What is it that broke down between

9   Mr. Ward and Mr. Ash?  What's the problem?

10           MR. SWANSON:  Well, well, there seems to be two

11  problems.  One, one is that it was a misunderstanding about the

12  money that was placed into this investment account.  It was

13  done so by Mr. Ash in good faith just to earn more money on

14  that money in the company.  It was under the name of the

15  company that was a subaccount under his own investment account.

16  I think that was done for convenience.

17           There's been -- you know, there was some confusion

18  about that, and I think that has created a large part of this

19  dispute.  There's, you know --

20           THE COURT:  Mr. Swanson, let me stop you.  Let me --

21  I want more detail about that.

22           MR. SWANSON:  Okay.

23           THE COURT:  So you're saying, you're saying that the

24  plaintiff, Mr. Ash, took -- approximately how much did he take

25  out of, what, one of the Ellisdale accounts?  Is that correct?

10

1          MR. SWANSON:  Yeah.  It was -- yeah.  There was an

2    Ellisdale CD that matured, and he moved the principal of the

3    CD, $2 million, into this account.  It was done so

4    transparently, and, you know, it was accomplished by the CFO of

5    the company, and, you know, told -- told to Mr. Ward, and I

6    think there was just some confusion perhaps over, you know,

7    whether that was done in good faith or bad faith.  It's been,

8    it's been communicated that it was done in good faith, and it

9    earned several hundred thousand dollars for the company while

10   those funds were invested.

11          We're, we're taking immediate action to have that

12   liquidated and try to resolve that issue for Mr. Ward by having

13   those funds liquidated and placed into trusts, you know, such

14   that he can feel more secure that he is in control of those.

15          I think this is kind of a self-help thing that he

16   did, you know, feeling like he needed to gain some leverage,

17   and, you know, we're -- we would love to work this out with

18   him.  It's just not been possible because, you know, we've been

19   advised that he has been consulting with counsel, and we have

20   not yet been contacted by any counsel.

21          THE COURT:  All right, but -- all right.  When was

22   the -- the money that was taken out of Ellisdale, that is, this

23   CD that has matured -- right?

24          MR. SWANSON:  That's correct.

25          THE COURT:  $2 million CD taken out, when was that

1    done?

2           MR. SWANSON:  I think it was in the early part of the

3    2020 calendar year.

4           THE COURT:  All right.  And was Mr. Ward -- all

5    right.  But this CD was in the name of Ellisdale?  Was it

6    formally part of the Ellisdale accounts?  Is that correct?

7           MR. SWANSON:  Well, the, the CD was in -- was part of

8    an Ellisdale CD account, and now it is -- and so hopefully,

9    maybe even later today or tomorrow was, you know, invested in

10   an investment account.  It was placed in the name of Ellisdale,

11   but it was, it was, it was sort of a subaccount under Mr. Ash's

12   existing, you know, investment accounts, and, you know, again,

13   that was done in good faith and transparently.

14          THE COURT:  Well, when you say "transparently" --

15          MR. SWANSON:  Not --

16          THE COURT:  I'm sorry, when you say "transparently,"

17   was Mr. Ward advised before it was done or after it was a fait

18   accompli?

19          MR. SWANSON:  Well, I can't speak to the timing, but

20   I think it's been long known and that -- and wasn't in any way

21   kept secret.  It was, you know, just part of the normal, you

22   know, business and, and normal advising, and, I mean, he's been

23   provided documents about it, and, you know, this, this all --

24   everything seemed to be okay until, until just this past

25   Friday, and he -- Mr. Ward sort of indicated, yeah, everything

1   is fine, and then he marched off to the bank and, you know, set

2   up accounts in his own name and withdrew, you know, most of the

3   money, remaining money out of the, out of these companies', you

4   know, cash accounts and the, and the accounts that -- there's

5   an account for Ellisdale of 1.4 million that is a bond

6   collateral account that, that secures the bond -- the bonds

7   that they have on their large construction contracts.

8           THE COURT:  What leads you to believe that he

9   wouldn't make monies available to cover among the checks that

10  you've claimed that would be dishonored if the funds were not

11  there?

12          MR. SWANSON:  Well, you know, he might -- he may be

13  willing to do that if we can, you know, have appropriate

14  negotiations with him, but the problem is that that really

15  doesn't solve the problem.  The bigger problem is going to be

16  that this, you know, they have to maintain almost all of this,

17  this money, you know, to, to have, you know, appropriate -- to

18  be able to secure the bonding, and, you know, we, we're ready

19  to try to -- when he gets counsel, we can -- we're going to

20  work with him and try to get this all wrapped up.

21          I think the problem is that the bank is going to

22  unfreeze this money probably tomorrow, and at that point, it's

23  going to be too late, and so what we're looking for with the

24  TRO is just something that we can provide to the bank so that

25  they can continue to hold this, you know, you know, for a few

13

1    more days, maybe until after the holidays, where the companies

2    can get, you know, where we can speak with counsel and

3    negotiate.

4            You know, we have agreements ready to go when he, you

5    know, has counsel, and we can present them, where we can kind

6    of get everybody to go back to the status quo and then, and

7    then, and then look forward to resolving the business dispute.

8            We're really just looking to keep those funds in the,

9    in the accounts, you know, temporarily so that, so that these,

10   you know, disastrous financial and business consequences don't

11   occur, you know, tomorrow.

12           THE COURT:  Well, the other --

13           MR. DUNLAP:  Judge, this is --

14           THE COURT:  Wait, hold on.

15           MR. DUNLAP:  Sorry, Your Honor.  Sorry.

16           THE COURT:  Mr. Swanson, you said that there were two

17   problems.  One was this investment account.

18           MR. SWANSON:  Yeah.

19           THE COURT:  What is the other problem that you

20   understand that, that broke up the relationship between Mr. Ash

21   and Mr. Ward?

22           MR. SWANSON:  Well, the other, the other problem, I

23   think, is that there's been a third party who's expressed some

24   interest in purchasing Ellisdale and, and maybe these other

25   companies as well, and I think that the parties, Mr. Ward and

1  Mr. Ash, don't necessarily agree on how the companies should be

2  valued.

3          So -- but I think if you were to ask Ms. Imperatore,

4  and I believe I have, I think that she would say that's sort of

5  a -- that's a secondary issue, and the bigger issue is, is the

6  perception that the funds that were transferred into this

7  investment account in good faith for, for the benefit of the

8  company, that that was somehow, you know, done in bad faith or

9  done to exclude, you know, Mr. Ward from that money, which,

10  which isn't true, and, of course, we're, you know, we're

11  working, you know, right now to move those funds -- have them

12  liquidated and move them into a trust that --

13          THE COURT:  You know, it's funny because if part of

14  the problem here or the main problem seems to be that the

15  company, Ellisdale, has to keep a certain amount of money in

16  its accounts to keep its bond -- its bonding situation under

17  control, then the removal of $2 million from your account done

18  by your client earlier on in the year would seem to be,

19  contradict that concern, and I can understand without even

20  having anybody here representing Mr. Ward why he would look

21  upon that with great concern.

22          And it sounds like this is almost a tit-for-tat kind

23  of case.  It sounds like he basically took about the same

24  amount of money out of the investment funds.

25          But this seems rather --

1           MR. SWANSON:  Well --

2           THE COURT:  This seems rather silly.  I don't

3    understand why mature businesspeople would be in this type of a

4    situation.

5           MR. DUNLAP:  And, Your Honor --

6           THE COURT:  Yeah.

7           MR. DUNLAP:  Your Honor, this, this is Tom Dunlap.

8    This is Tom Dunlap, Your Honor.  Just, just to put a little --

9    so I was talking with Mr. Ash, one of the two partners,

10   Mr. Ward's other partner, earlier this year about the sale of

11   this company, and from what I understand from Mr. Ash, the, the

12   transfer that he did was based on his cash planning.  The money

13   was sitting in an account with MVB Bank that was earning less

14   than a quarter percent interest, and he essentially moved these

15   over to -- in Ellisdale's federal tax ID number into a fidelity

16   account outside of the bank where he could earn a higher rate

17   of return.  I think they were fixed term CDs or something like

18   that, and it gave him maybe 5 percent interest, which is a lot

19   more than the quarter percent interest.

20          And he disclosed that.  They have quarterly meetings,

21   from what I understand, and Ms. Imperatore can verify that, and

22   I know their last quarterly meeting was last Friday, when all

23   of this happened at the end of the meeting, and Mr. Ward gave

24   no indication to Mr. Ash.  He said, "Hey, thanks for the

25   meeting," and then walked out and went straight to the bank.

1    He had made an appointment to open a personal account, which is

2    what he did, and moved the funds into his name.

3            So the issue really is not that we want to take the

4    funds from Mr. Ward or Mr. Ash.  It's that they -- we just want

5    to preserve the status quo, keep them in the company, and

6    Mr. Ash and the companies are perfectly happy to have a

7    third-party trustee, any attorney that Mr. Ward would agree

8    to manage the funds, but just to cover the checks that are

9    going to bounce and just to have the funds in there as of

10   December 31.

11           I talked to Mr. Ash about this a little bit this

12   morning.  The financial snapshot that they take apparently for

13   the insurer, for the bonding company, that money has to be

14   sitting in that account as of the 31st, and Mr. Ash -- the

15   other thing to understand background-wise, and I think

16   Ms. Imperatore can speak more to this, but Mr. Ash has been

17   running the company for the last 14 years, and in the last ten

18   or so years, Mr. Ward has been essentially a silent partner.

19   He has not been active in the company from what I understand.

20           And again, Jane, please correct that.

21           So, so Mr. Ash is the one who's been planning and

22   working with the CFO to figure out, okay, we have X amount of

23   dollars.  That's what we need to satisfy our bonding

24   requirements.

25           And the whole time, the whole 16 years, Mr. Ward had

1   the ability to take money out and do whatever he's wanted as a

2   silent partner, but he's not never been, at least not recently,

3   the last ten years or so, been directly involved in the

4   management of construction projects.

5         The company -- he's moved to -- he's lived in Utah

6   for a number of years now, and all the projects are D.C. metro

7   area: D.C., Arlington, I think Lansdowne, Fairfax.

8         So -- but that's kind of the situation how we ended

9   up here, a silent partner and then an active business partner,

10   and they -- you know, despite the quarterly meetings, my

11   understanding, our challenge and the reason we had to go the

12   TRO route is Mr. Ward has said to various people, "I've got a

13   lawyer," but he won't tell us who the lawyer is or who we can

14   talk to.

15         If we could call and talk to a lawyer, we probably

16   could have just entered into this agreement and said: Mr. Ash

17   won't touch the money, you won't touch the money, and we'll put

18   it back in the account, and here's a lawyer that everybody

19   agrees on, and we even have an agreement drafted that says both

20   parties agree that this lawyer authorizes all distributions,

21   etc., and all the, all the money from everywhere is going back

22   in there, but we can't even speak to him, and the problem is he

23   knows that, so we, we had to file the TRO to give the bank

24   ability not to let him take the money out of -- he was trying

25   to send the money outside of the bank, and they've held it for

1   internal fraud investigation right now, but without something

2   more, it's going to go out of the bank, and then it will be

3   completely gone.

4          So that -- that's our challenge, Your Honor.

5          THE COURT:  Ms. Imperatore, do you want to tell me

6   your view on all of this?

7          MS. IMPERATORE:  You know, I think, I think Tom's

8   summary was, was certainly fairly accurate in terms of the

9   relationship between the parties, and I think, you know, Derek

10  also pinpointed the issues that have occurred.

11         Starting -- I think that that other transfer was in

12  the summer, as I understand it, you know, starting from the

13  summer, and then my sense that tensions have continued to rise

14  through the fall as this offer, you know, to sell the company

15  has come in, and, you know, the, the partners appear to have

16  diverged on their views on many, on many of these issues but,

17  importantly, you know, the management of the company at this

18  time and any sale terms.

19         So I -- and I think -- but I do think this issue,

20  this transfer by Mr. Ash is Concern No. 1 to Mr. Ward followed

21  closely by the sale terms.

22         THE COURT:  All right.

23         MS. IMPERATORE:  And as I understand -- I'm sorry, I

24  did want to say one thing.  I do think that the transfer to the

25  separate account was in a different EIN than the companies',

19

1    and I think that was part of the concerns raised by Mr. Ward --

2              MR. SWANSON:  Okay.

3              MS. IMPERATORE:  -- with respect to that transfer.

4              THE COURT:  All right.  Now --

5              MS. IMPERATORE:  But again, I haven't seen any of

6    those documents.  That's just been what's, what's relayed to

7    me.

8              THE COURT:  Do you know who Mr. Ward's attorney is?

9              MS. IMPERATORE:  So he told me this -- today that he

10   had called Compton & Duling and that they would be getting in

11   touch, you know, getting in touch with Mr. Ash's counsel.  I

12   don't know when, and when I spoke to Derek probably, you know,

13   half-hour before this call, I understood he had not yet heard

14   from them.

15             THE COURT:  All right.

16             MR. SWANSON:  That's correct.

17             THE COURT:  This would have been a much more valuable

18   hearing if Mr. Ward were on the phone.  Are you-all really

19   afraid to call him and see if he'll dial in?

20             MS. IMPERATORE:  I'm not, I'm not afraid to call him.

21   I'm not afraid at all.  I'd be happy to call if you'd like me

22   to try.

23             MR. SWANSON:  And, Your Honor, Mr. Ash is available

24   as well.  I could have both Mr. Ash and Mr. Ward -- I don't

25   know if we can get Mr. Ward, but I know we can get Mr. Ash on

20

1    as well.

2            THE COURT:  Well --

3            MR. SWANSON:  Certainly you could hear from each of

4    them.

5            THE COURT:  Mr. Ward is the one I'm more concerned

6    about because you're asking me to issue -- I mean, I don't

7    know, for example, whether -- what kind of, if any, disability

8    this would put him in if we were to freeze the, the assets.  It

9    doesn't sound as though he has bills that are coming due

10   imminently.  I mean, it's this matter he's trying to protect

11   himself somehow.  It's hard to tell.

12           So why don't we do this:  Ms. Imperatore, do you

13   think you could reach Mr. Ward and tell him what's going on and

14   that the judge would like to hear from his view, his side of

15   things?

16           MS. IMPERATORE:  Yes, Your Honor.

17           THE COURT:  All right.

18           MS. IMPERATORE:  I can call him as soon as we're

19   done.

20           THE COURT:  Why don't we do this:  We're going to

21   go -- we'll break for 15 minutes.  At 3:45, I will re-set up

22   this -- use the, use the same numbers that you-all have, all

23   right?  That gives my court reporter a couple of minutes to

24   rest her fingers.

25           And we'll try to see if we can work this thing out

1     this evening, all right?

2              MS. IMPERATORE:  Understood.

3              MR. SWANSON:  Thank you, Your Honor.

4              MS. IMPERATORE:  Thank you, Your Honor.

5              THE COURT:  All right, 3:45.

6              MR. SWANSON:  Good.  Thank you, Your Honor.

7              THE COURT:  Thank you.  All right, we're going off

8     right now.

9              MS. IMPERATORE:  Thank you.  Bye-bye.

10             MR. SWANSON:  Thank you.

11              (Recess from 3:21 p.m., until 3:45 p.m.)

12             THE COURT:  I hope we're all back on.  This is again

13    the matter of Kevin D. Ash as Manager of Ellisdale

14    Construction, LLC, et al., versus Richard E. Ward, II.

15             Mr. Ward, are you on the phone?

16             MR. WARD:  I am.

17             THE COURT:  Very good.  And do you have any of your

18    counsel with you on the phone?

19             MR. WARD:  I'm hoping Jason is on the phone as we

20    speak.

21             MR. HICKMAN:  Yes.  Judge Brinkema, Jason Hickman.

22    I'm on the phone.  I'm not sure what's going on, but I'm on the

23    phone.

24             THE COURT:  Very good.  Mr. Hickman, what firm are

25    you with, please?

22

1          MR. HICKMAN:  Compton & Duling, in Prince William

2    County.

3          THE COURT:  All right, great.

4          Well, what I have before me is a miscellaneous matter

5    that's been filed by Mr. Ash in his capacity as manager of the

6    three LLCs:  Ellisdale Construction, Courthouse Commons, and

7    A&W Lansdowne, and in the temporary restraining order, he's

8    asking me to issue an order that would prevent the bank where

9    you-all have your accounts from allowing the monies that you

10   have withdrawn from accounts of these three entities to go --

11   to leave those entities' accounts and to go to your account,

12   and I have had about a 15-minute, 20-minute conversation with

13   Mr. Ash's counsel, Mr. Swanson and Mr. Dunlap, and

14   Ms. Imperatore has also been on the line discussing this, and

15   it struck me that I wanted to hear your side of the case,

16   because what's been represented to the Court is that this

17   essentially is the kind of dire emergency that requires a

18   temporary restraining order because if the funds are removed

19   from those accounts, these entities, number one, will be

20   unable -- the checks that they have issued will bounce because

21   there'll be insufficient funds to cover them, and secondly,

22   that the monies removed would deplete the balances in the

23   accounts to such an extent that it would create problems for

24   the -- your bonding situation.

25          I think -- Mr. Swanson, is that a fair description of

1    what we've talked about?

2             MR. SWANSON:  Yes, Your Honor.  Derek Swanson.  This

3    is a -- that is a fair description.

4             THE COURT:  All right.  And just so you-all know, we

5    are on the record.  My court reporter, Ms. Thomson, is able to

6    take this down, so this is an official on-the-record

7    conversation, or discussion.

8             Mr. Ward, I'd like to hear your side of the, of the

9    story and to find out whether you agree that if these funds are

10   not in those accounts, it's going to become a major problem for

11   these entities.

12            MR. WARD:  Sure.  I have to go back to a time period

13   where I believe, maybe it's not the beginning of the problem,

14   but where it started was back in March.  There was $4 million

15   in MVB that was sitting in there for a bonding capacity.

16            I'm just curious, is -- do we -- do I know everybody

17   that's on the phone?

18            THE COURT:  You may not.  Why don't we have -- the

19   court people you don't need to know.  My court reporter,

20   Ms. Thomson, is there.  I've got court staff on the phone.

21            I assume we have Mr. Swanson and Mr. Dunlap again for

22   Mr. Ash.  Is that correct?

23            MR. SWANSON:  Yes, Your Honor, Derek Swanson.  That

24   is correct.  And we also have invited to join Mr. Ash.

25            THE COURT:  All right.  So Mr. Ash is there.

24

1          We have --

2          MR. ASH:  Yes, I'm here.

3          THE COURT:  All right.  We have Ms. Imperatore.  And
4   it's going to be important that you-all say your name before
5   you speak so that my court reporter is able to attribute the
6   correct statements to the correct speaker.

7          And so, ma'am, we do have you on the phone, correct,
8   for the entities?

9          MS. IMPERATORE:  Yes, Your Honor.  Jane Imperatore is
10  here.

11         THE COURT:  All right.  All right, I believe that's
12  it.  Is there anybody who's not court staff who's on this call?

13                  (No response.)

14         THE COURT:  No.  That's it, Mr. Ward.

15         MR. WARD:  Okay.  Thank you.  March -- mid-March,
16  COVID hit.  Ellisdale Construction did not have a lot of work.
17  There was discussions about potentially shutting down.
18  Ellisdale, it didn't go much further than that.

19         And I said to Kevin, I said, "We have a lot of cash.
20  The market is way down.  We should potentially invest that,
21  make Ellisdale some money."

22         And he said, "No, I'm going to wait for another dip
23  in the market."

24         And I said, "Oh, okay," you know.

25         And then a month or so later, and I don't have dates

1    at this point, Kevin said, "I'm going to take some of the money

2    and invest it for Ellisdale."

3            And I said, "Okay.  Cool.  I'm glad we're on board

4    with that plan."

5            COVID hits, and we're all quarantining, and I'm in

6    Utah, and Kevin is in Virginia, and, you know, PPP loans and

7    all sorts of other stuff are going on, the full chaos of COVID

8    hits, and then somewhere along the line, it becomes aware -- I

9    become aware that the money actually is not invested for

10   Ellisdale, that the money is actually in an account attached to

11   Kevin Ash's Social Security number.

12           I asked Kevin a few times gently about potentially

13   seeing statements, and he said, "Yep," and then he never sent

14   them.  So I'm increasingly getting nervous about the

15   relationship and the fact that he now has money that would be

16   qualified as a distribution, which would be on -- against our

17   corporate rules to take uneven distribution, and I'm getting

18   sort of pushed in the corner in a lot of other aspects of the

19   company and being -- other employees are being told, you know,

20   certain things.

21           And so I'm increasingly getting nervous, but I'm

22   optimistic, and we hire a business coach to sit down to talk

23   through some things about potentially new hires, and I know

24   that the end of the year is the time where we need to have as

25   much money in the bank as possible, and in the past, that has

1  been one of my jobs is to make sure that we have as much money

2  in the bank as possible.

3        It appears that we asked -- our CFO asked Kevin for a

4  statement from the Ellisdale account at CIVC, and Kevin

5  forwards a transaction statement to me and to the CFO, and it's

6  got no account information, it's got no anything.  It's just a

7  very cryptic transaction statement that shows nothing, how much

8  money is in the account or anything.

9        At some point, it's becoming clear that Kevin is not

10  planning on putting the money back into the account, but he

11  maintains in many e-mails and texts that it's in an EDC

12  account, it's in an EDC account, it's in an EDC subaccount, and

13  so I'm hoping that for the benefit of the company, he puts the

14  money back and that, you know, we can sit down with our

15  business coach and work things out and move forward, but in the

16  meantime, Kevin has given himself a raise without saying

17  anything to me.  He has taken a bonus for a vacant position at

18  the company without saying anything to me.  He has raised his

19  auto allowance without saying anything to me and not really

20  doing things that are very partner-like.

21        And then last week, we have a meeting set up on

22  Friday, and I had the gut feeling that if I didn't take an

23  equal distribution that Kevin took, that my fear was that Kevin

24  was going to take it all, and, and I know that because there

25  are certain things that have gone on that I can prove that have

1   Kevin starting another company, actually trying to work for

2   somebody that's trying to buy -- you know, in the meantime,

3   Kevin wanted to sell our company, but the offer showed Kevin

4   only selling my shares, and when I got involved and said, "If

5   I'm -- my shares would be sold, I'll manage those," and I don't

6   think he liked that.

7          And so I felt scared, scared for, scared for myself,

8   scared for the company and what direction it was heading, and I

9   decided that, that I needed to take a withdrawal.  I have

10  not -- obviously, if that money is frozen, and I would still

11  like to -- and the amount of money that I took, I left money in

12  there that was enough to pay the checks that are written, to

13  pay the employees for over a month, and I stand ready to honor

14  any further commitments that we have as partnerships to loans

15  or anything, but, but the offer I made this morning to the

16  bank -- break a CD, pay off the collateral -- would solve the

17  immediate problems of the companies so that we as business

18  partners could sit down and negotiate potentially our split-up.

19         And our split-up requires, it's involved in three or

20  four or five other entities.  So my goal in this process is to

21  really protect the innocent, which means pay our subs and pay

22  our employees; to be fair financially both to myself and to

23  Kevin; and to exit this relationship -- business relationship

24  as gracefully as possible.

25         I knew that that wasn't viable if all of the -- if

1    Kevin took again more money out than he has already taken.

2            THE COURT:  All right.  I'm glad we heard your side

3    of the story because I felt that there was most likely, you

4    know, a different side.

5            It's a sad case because this appears to be a,

6    basically a corporate breakup, much like a divorce between a

7    long-married couple.

8            MR. WARD:  Yes, ma'am.

9            THE COURT:  I'm sorry you-all have reached that

10   point.  The bottom line is I'm not granting a temporary

11   restraining order.  I do not find based upon what I've now

12   heard that the equities ally so strongly in the plaintiff's

13   direction.

14           What has happened today, however, is I finally have

15   you-all in one space talking to each other.  Mr. Swanson and

16   Mr. Dunlap have represented to me that they are completely

17   comfortable, I believe, in working something out with that CD,

18   and they've suggested and they apparently have worked on

19   something of a draft document, which I don't think you've had a

20   chance to see, Mr. Ward or Mr. Hickman, creating perhaps a

21   third-party custodian of the funds to make sure that -- what

22   you have indicated, Mr. Ward, and that is, that the money would

23   be made available to cover all of the obligations of these

24   entities to third parties and to make sure that the entities'

25   fiscal status is not damaged while you-all work out the

1  resolution of divorce and the equitable distribution of the

2  property.

3       Mr. Hickman, I know you're brand new to this

4  apparently, but from what conversations you've had in the past

5  with Mr. Ward, do you think that some kind of a third-party

6  custodian or, you know, some neutral holding the funds or

7  having, quote, control of these funds is something that you-all

8  could live with?

9       MR. HICKMAN:  Yeah.  I would need to talk to, to

10  Mr. Ward to confirm exactly -- again, I'm late to the game

11  here.  I only just a few minutes ago got an e-mail from

12  Mr. Swanson that sent me the filing, so at least I have that

13  now, and I've only started speaking to Rich about this this

14  morning, so I'm very late to the game.

15       I've represented Mr. Ward in a number of matters,

16  real estate matters over the years, so I'm familiar with him

17  and familiar with the fact that we would certainly like to

18  resolve this.

19       THE COURT:  Well, then I see no reason why as

20  responsible adults, you-all can't work this out.

21       Mr. Swanson?

22       MR. SWANSON:  Derek Swanson.  Thank you, Your Honor.

23  We understand your, your ruling.  Can, can we discuss for a

24  moment whether we can -- while we work that out, whether,

25  whether Mr. Ward or his counsel would be willing to, you know,

1    you know, advise -- you know, instruct the bank to return the

2    money back into the accounts while we work out the third-party

3    conservatorship so that there isn't an adverse consequence of

4    those, those accounts being diminished?

5              MR. WARD:  Your Honor, this is Rich Ward again.  I'm

6    going to go back to the fact that Kevin took money on May 4,

7    okay, and that right now, he's trying to give the money back,

8    right, because of the exposure.

9              Right now, my recommendation is Kevin is sitting on

10   about two-and-a-half million dollars; I'm sitting on about

11   two-and-a-half million dollars.

12             MR. ASH:  It's not --

13             MR. WARD:  This is still Rich Ward.  And that the

14   company has 30 days of time, right?  And so for me, moving

15   money back around is really -- I don't want to, I don't want to

16   move anything.  I want to sit down and negotiate this breakup

17   from the position that we're in right now and not spend all

18   this money in legal fees, because the money is not in Kevin's

19   hands or my hands whatsoever.

20             I feel like that this is the best position for us to

21   negotiate a breakup, and I feel that we can do it quickly.

22             MR. ASH:  Your Honor --

23             THE COURT:  Wait one second.

24             Mr. Ward, are you telling me that you have left

25   enough money in those accounts that all outstanding checks can

1    be honored and that there is enough balance that whatever you

2    need to keep the bonding companies on board is there at least

3    for a 30-day time period?  Is that what you're telling me?

4             MR. WARD:  I am going to say that yes to your first

5    part of that question.

6             THE COURT:  All right.

7             MR. WARD:  I'm going to say on your second part of

8    your question about the bonding, I have a text from Kevin Ash

9    that says that the ARIA (phonetic) and the value in our real

10   estate holdings was enough for the bonding.

11            Now, I know that not to be true and was trying to

12   prepare for some other situation, but if the -- for the, for

13   the company and, and my responsibility to the company, I am

14   willing, right, to talk about what that bonding needed, but I

15   have a text that says, "I'm talking to Josh," and this text was

16   with the CFO and me where Kevin said, "We don't need any cash."

17            So at his direction --

18            MR. ASH:  We don't need additional cash.  I'm sorry,

19   we don't need additional cash.  We need the cash we have in the

20   company.

21            MR. WARD:  Well --

22            MR. ASH:  I'm sorry, Your Honor, this is Kevin.

23   Those are not accurate statements.

24            MR. WARD:  So back to your first question, Your

25   Honor, there is enough money for 30 days to pay the checks and

32

1   to pay employees left in the company if we break the CD.

2               MR. ASH:  That's, that's --

3               THE COURT:  Wait a minute.  One at a time.

4               MR. ASH:  That's not accurate.

5               THE COURT:  Mr. Ash, one at a time.

6               MR. ASH:  Okay.  I'd like an opportunity to speak

7   when you're free.  Thank you.

8               THE COURT:  Mr. Ward?

9               MR. WARD:  My information comes directly from the

10  CFO.

11              THE COURT:  And how recent was that information,

12  Mr. Ward?

13              MR. WARD:  Thursday.

14              THE COURT:  So today -- all right.  Today is a

15  Wednesday, so that's six days ago, the CFO told you that there

16  was -- would be enough money if the CD were cashed or that

17  there is now enough money in the account to cover all your

18  outstanding checks?

19              MR. WARD:  If the CD was cashed.

20              THE COURT:  All right.  In other words, you have to

21  return about $2 million, or whatever the CD amount is.

22              MR. WARD:  There's a $2 million CD.  There's $983,000

23  collateralized against it.  There's currently about $800,000 of

24  checks outstanding.  There's about $85,000 every two weeks in

25  payroll, and there's $415,000 available for payroll.

1      To me, that covers all the checks and the payroll for

2  one month.  That should be enough time for me and Ash to

3  negotiate our breakup.

4      THE COURT:  All right.  So, Mr. Ash, what's the

5  problem with breaking the CD and getting that money into the

6  account?

7      MR. ASH:  Your Honor, so first and foremost, we have

8  requirements to our surety to have liquidity in the company.

9  These are the cash reserves.

10      What Mr. Ward is speaking about is money that I

11  invested on behalf of the company.  I invested $2 million.

12  2.215 million has -- is being returned to a specified account

13  that -- I don't want any of this money.  I want it all to go

14  back to the company.

15      I -- so the bonding company requires liquidity.  If

16  we need new bonds, which we have several projects in -- coming

17  forward next year that the -- the ARIA (phonetic) value helps

18  our bonding, you know, for future projects, but the current

19  bonds that we have outstanding, we have a liquidity requirement

20  to meet our obligations.

21      The company with the monies that were invested that

22  are returned prior to the end of the year and all the monies in

23  the accounts that Rich took on Friday mean our total

24  end-of-the-year financial balance.  What -- that is the CDs

25  that Rich is speaking of and the $2 million that was invested

1  that I, you know, was able to gain another $200,000 on, that

2  goes into the overall project -- or the overall company

3  financial picture.

4          We have a $40 million project active right now.  We

5  have an $8.2 million project active right now that is bonded.

6  We have a $102 million project that's not bonded that counts

7  against backlog.  So our liquidity for all cash is very

8  important.

9          What Rich is speaking of, the accounts that he took

10  monies out of, he took $800,000 out of our operating account

11  that we have already written $700,000 in checks against.  Those

12  checks have been bouncing day in and day out for the last two

13  days.  The bank is making me aware of those.

14          The other two accounts that he liquidated have -- one

15  of them has a mortgage requirement that's due at the end of the

16  month, and the other one has ongoing invoices that are due.  I

17  would be willing -- if all monies were returned to their proper

18  spot and let a third-party fiduciary help Rich and I

19  disseminate what monies need to be allocated, I would be

20  willing to do that, but he is not speaking in the detail of the

21  specific accounts that are available for payment to

22  subcontractors and vendors.

23          MR. WARD:  Your Honor?

24          MR. ASH:  Thank you, Your Honor.

25          MR. WARD:  Your Honor?  I'd like to ask -- I'd like

1  you to ask Mr. Ash when he took the $2 million in May, did he

2  put it into an Ellisdale account, or did he put it into his

3  personal trust account?

4         MR. ASH:  I put it in an investment account labeled

5  "Ellisdale," and every month in our balance sheet detail, the

6  second line item says "Cash, TIBCMMA."  Every month, that

7  $2 million is accounted for.

8         And as Rich started this conversation, he knew -- and

9  he had first asked me early on to invest it.  I was not

10  prepared to invest it at the beginning of the pandemic, but as

11  the market stabilized, I took his direction and agreed with

12  that direction and invested it on the behalf of the company.

13         THE COURT:  Is the Social -- do you have it

14  registered to your Social Security number or to the EIN for

15  Ellisdale?

16         MR. ASH:  It is not in a separate EIN account number,

17  Your Honor.  It was an investment company that I used.  I'm not

18  in the investment world.  I'm a construction manager, and I

19  manage the day-to-day operations of our construction and real

20  estate company.

21         I was merely trying to increase the gains of

22  $2 million that was sitting in a bank making a quarter percent

23  versus what I was able to accomplish and make about 15 percent

24  for the company.

25         THE COURT:  Yeah, but the point is there'll be tax

1   consequences on the money that was earned.  To what account is

2   that tax consequence being attributed?

3          MR. ASH:  The tax consequence is going to be to

4   Ellisdale.  So all of that money is liquidated, and we are

5   trying to put that into an account, and that's what Mr. Swanson

6   was mentioning, that all that money, we would like that money

7   to be set aside, and we want Rich to put all the other

8   operating money back to its appropriate accounts so that we can

9   have a separate fiduciary help Rich and I manage through this

10  process.

11         MR. WARD:  Your Honor, if you would allow me, I can

12  send you an e-mail from Kevin's CIVC referencing the

13  conversation that says, "Kevin, you're aware that we are going

14  to put this money and that the tax consequences will be

15  attached to your Social Security number," so what he just said

16  is a lie on the record.

17         MR. ASH:  Well, it's not a lie.  Okay.  It's not a

18  lie, Rich.

19         MR. WARD:  I don't --

20         THE COURT:  Wait, gentlemen, we can't do it this way

21  because we can't see who you are, and we can't get the voices

22  attributed correctly.

23         Look, obviously, you don't agree on many facts, but

24  what you both do seem to agree upon, even though the numbers

25  may not be yet agreed to, is that there's going to be a

1   significant financial disaster for these entities if their

2   checks bounce and the arrears is not immediately rectified.

3          All I have before me today is the plaintiff's motion

4   for a temporary restraining order, and I'm not going to grant a

5   temporary restraining order when the facts are this much in

6   dispute and where it does appear as though the actual victim

7   isn't even a party to this proceeding.  The actual victim are

8   these LLCs.  They're not a plaintiff or defendant, they're just

9   out there, but it's their reputation, ultimately it will affect

10  both of you financially because if you're trying to sell

11  ultimately these businesses and they're going under, that

12  probably will not look all that attractive, although I have no

13  idea what the market is like these days for LLCs or for real

14  estate development entities.

15         I strongly recommend now that there are counsel for

16  both sides that you-all get together after this phone

17  conversation and work this out.  I will say to you, Mr. Ward,

18  it does appear, and I've only read them quickly, that you

19  probably have violated some of the elements of these agreements

20  that you-all had because it sounds as though there had to be an

21  agreement of all the managers to some of these transactions.

22         And it also indicates, and it's, it's the same

23  paragraph in all of the, the contracts that you-all have, but

24  if you look at paragraph 13 of all of them, it all says the

25  same thing, which I thought was rather interesting.  I'm going

1   to find it right now.

2           Paragraph 13 is "Bank Accounts," and it says that

3   withdrawals from any bank account shall be made upon such

4   signature or signatures as the managers may designate, and

5   shall be made only for the purposes of the company, not for

6   purposes of the individuals but the company.

7           And so both of you, it seems to me -- perhaps if

8   Mr. Ash did, in fact, correctly invest this money -- and when I

9   say "correctly," I mean, did it in an account that clearly was

10  an Ellisdale account and not for anything that might be

11  perceived as his own personal account, that may have been okay,

12  but in your case, Mr. Ward, if, in fact, this is simply a way

13  to leverage your ability to negotiate a resolution of your

14  ultimate business disputes, I'm not sure you're in compliance

15  with paragraph 13.

16          But that's not enough for the Court to engage in the

17  extraordinary relief of a temporary restraining order, so

18  that's the only issue that's before me right now, and I'm

19  denying the motion.  I am strongly recommending, because

20  neither side should want to incur the attorneys' fees that go

21  in with serious litigation, and if you're trying really to get

22  these companies up and running for potential sale, then having

23  them viable is important.

24          And so now that you've got counsel, you can maybe

25  cool down what are obviously some emotions here.

1    Businesspeople should never be emotional when they're trying to

2    make business decisions; it should be done very rationally; and

3    maybe the CFO has to be on board because I have no way of

4    knowing what the numbers are or aren't at this point.

5            In any case, that's my ruling for today.  I hope you

6    can work it out.  If not, then things will happen as they

7    happen, but that's -- yes.

8            MR. SWANSON:  Your Honor, Derek Swanson.  I just

9    wanted to clarify for the record that, you know, with respect

10   to your, your point that the real parties in interest, the

11   companies are not parties, I wanted to clarify that, you know,

12   we styled the case with, with Kevin Ash as the plaintiff, in

13   his capacity as a manager on behalf of those three companies,

14   you know, so I do think that the -- that, you know, the parties

15   in interest are represented by a fiduciary in the case.

16           We do understand your ruling, and I can assure you

17   that we will be on the phone immediately with Mr. Hickman, and

18   perhaps before the close of business we can, we can make a --

19   work out an agreement to, if Mr. Hickman is available, to see

20   if we can't reach an agreement in principle to handle these

21   funds in an appropriate way so as not to cause damage to these

22   companies.

23           THE COURT:  Well, I just think that would be

24   everybody's interest, and I hope you can do it, and so I wish

25   you-all luck, but I've ruled on the motion, and we'll get an

40

1    order out to that effect.

2            Thank you very much.  You-all stay safe, and have a

3    Happy New Year.  Bye-bye.

4            A VOICE:  Happy Holidays.

5            MS. IMPERATORE:  Thank you, Your Honor.

6            A VOICE:  Thank you, Your Honor.

7                         (Which were all the proceedings

8                          had at this time.)

9

10           CERTIFICATE OF THE REPORTER

11       I certify that the foregoing is a correct transcript of

12   the record of proceedings in the above-entitled matter.

13

14

15                        _____
                                      /s/
16                          Anneliese J. Thomson

17

18

19

20

21

22

23

24

25